**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND<br>ETHICS IN WASHINGTON,<br>455 Massachusetts Avenue, N.W.<br>Sixth Floor<br>Washington, D.C. 20001<br><br>NATIONAL SECURITY ARCHIVE<br>Gelman Library<br>George Washington University<br>2130 H Street, N.W.<br>Suite 701<br>Washington, D.C. 20037<br><br>                Plaintiffs,<br><br>   v.<br><br>THE HON. DONALD J. TRUMP,<br>President of the United States of America<br>1600 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20500<br><br>EXECUTIVE OFFICE OF THE PRESIDENT,<br>725 17th Street, N.W.<br>Washington, D.C. 20503<br><br>                Defendants. | Civil Action No._____ |

## COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

1.     This is a civil action for declaratory, injunctive, and mandamus relief brought

under the Presidential Records Act, 44 U.S.C. §§ 2201–2209 ("PRA"); the Declaratory

Judgment Act, 28 U.S.C. §§ 2201 and 2202; and Article II, Section 3 of the Constitution, which

imposes on the President a duty to "take care that the laws be faithfully executed," challenging

actions of the President, his staff, and the Executive Office of the President ("EOP")

(collectively, the "Defendants") that seek to evade transparency and government accountability.

First, this suit challenges as contrary to law the Defendants' communications practices that knowingly prevent the proper preservation of records the Defendants generate or receive when carrying out the President's constitutional, statutory, or other official duties.  Second, Plaintiffs challenge the Defendants' usurpation of agency duties and responsibilities by consolidating power in the White House.  As decisions generated by the White House, Executive Orders are cloaked in secrecy, preventing federal agencies from complying with their statutory duties under the Federal Records Act ("FRA"), the Administrative Procedure Act ("APA"), and the Freedom of Information Act ("FOIA").

2.     Plaintiffs bring this action at a time when allegations of potential misconduct and questionable decision-making have been leveled against President Donald J. Trump and other, high-level White House officials.  Among other things, President Trump's purported pressuring of then-FBI Director James Comey to terminate the FBI's investigation of former National Security Advisor Michael Flynn, and his firing of Mr. Comey after the FBI director refused to terminate the investigation are just some of President Trump's actions that have been questioned as illegal and have raised an issue regarding his conduct as President.  These questions can be resolved only through access to contemporaneous records that explain what the President did and why.

3.     Critical checks and balances are built into our system of government, including those implemented through congressional and judicial oversight.  The ability of those checks and balances to work depends on the availability of a record of President Trump's actions.  Thus, the Defendants' compliance with their record-keeping responsibilities under the PRA and FRA could not be more important.

4.      Yet, the evidence to date suggests that President Trump and others within the White House are either ignoring or outright flouting these responsibilities.  From early on in this Administration, White House staff have used and, on information and belief, continue to use certain email messaging applications that destroy the contents of messages as soon as they are read, without regard to whether the messages are presidential records.  Presidential statements made on Twitter sent from the President's personal Twitter account, which are subject to federal record-keeping obligations, have been destroyed.  The President also has implied that he is secretly tape-recording some or all conversations with Administration officials, and it is unclear if these tapes are being preserved.  And there is at least one news report that, when the ongoing congressional and FBI investigations were disclosed, White House aides purged their phones of potentially compromising information.  These practices violate the Presidential Records Act.

5.      At the same time, the Defendants have centralized much of the governmental decision-making within the White House.  This ensures decisions normally made or implemented by Executive Branch agencies evade disclosure under laws like the FOIA, preservation under laws like the FRA, and public review and comment under the APA.  Because of the Administration's centralization, however, the Defendants, not agencies, are charged with maintaining records generated from these decisions.  As a result of this usurpation of record-keeping responsibility, records that the public otherwise would have the right, under the law, to access because they would be agency records subject to disclosure under the FOIA are improperly cloaked as presidential records subject to the President's exclusive control and beyond the reach of the public.  Similarly, decisions that would otherwise be subject to review under the APA are improperly shielded from review as presidential decisions.  *See* Kate Brannen, Steve Bannon Is Making Sure There Is No White House Paper Trail, Says Intel Source,

Foreign Policy (Jan. 30, 2017), http://foreignpolicy.com/2017/01/30/steve-bannon-is-making-sure-theres-no-white-house-paper-trail-trump-President/.

6.      These actions by the Defendants, which have prevented federal agencies from complying with their statutory responsibilities, violate the constitutional requirement that the President take care that the law be faithfully executed.  As a further consequence, this regime increases the likelihood that valuable historical records of this presidency are already lost, and will continue to be lost, to Plaintiffs and the public, absent injunctive and declaratory relief.

## JURISDICTION AND VENUE

7.      This Court has personal and subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States); 44 U.S.C. §§ 2201–2209 (the PRA); 44 U.S.C. §§ 3101–3107 (the FRA); 28 U.S.C. § 1361 (mandamus); and 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act).

8.      Venue in this district is proper pursuant to 28 U.S.C. § 1391(e).

## PARTIES

9.      Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") is a nonprofit, non-partisan corporation, organized under section 501(c)(3) of the Internal Revenue Code.  CREW is committed to protecting the right of citizens to be informed about the activities of government officials and to ensuring the integrity of government officials.  To advance its mission, CREW uses a combination of research, litigation, advocacy, and public education to disseminate information to the public about public officials and their actions.  CREW researches and reviews data made available to the public under the PRA, and uses the FOIA to obtain information about the government critical to its mission and purpose.  CREW has a significant

interest in accessing historical presidential records in a timely fashion, including the records of the current Administration when they become available for public review.

10.     CREW has filed nearly 100 FOIA requests since the start of the Trump Administration, including with those EOP components subject to the FOIA, on a wide variety of subjects ranging from President Trump's travel ban imposed on majority-Muslim countries to the ethics conflicts posed by many Executive Branch appointees.  In addition, CREW has used the APA to challenge agency policies it believes are contrary to law.

11.     Founded in 1985 by journalists and scholars to check rising government secrecy, the National Security Archive combines a unique range of functions: investigative journalism, a research institute on international affairs, and a library and archive of declassified U.S. documents that is often considered the world's largest nongovernmental collection of such materials.  The Archive is one of the leading non-profit users of the FOIA and is also a public interest law firm defending and expanding public access to government information.  In these roles, the Archive has established an extraordinary track record of highly credible, award-winning investigative journalism and scholarship.

12.     For Plaintiffs, access to and the ability to view presidential records are essential to fulfill their core missions.  Using certain communications technology that prevents the preservation of a record almost from when it is created deprives, and will continue to deprive, the Plaintiffs of eventual access to the documentary history of this presidency.  *See, e.g.*, *Armstrong v. Bush*, 924 F.2d 282, 287-88 (D.C. Cir. 1991) (citing *Am. Friends Service Comm. v. Webster*, 720 F.2d 29, 57 (D.C. Cir. 1983)).  Not only the Plaintiffs, but the American public, will lose vital information and insight about presidential policies and decision making, which are required to interpret and prevent illegal or unwise government action.

13.     Defendant Donald J. Trump is the President of the United States and is sued in his official capacity only.  President Trump is subject to the requirements of the PRA, including the obligation to segregate and preserve his presidential records for eventual transfer to the National Archives and Records Administration ("NARA") when his term of office concludes.  *See* 44 U.S.C. § 2203.  He also is subject to the constitutional requirement to take care that the law be faithfully executed.  This constitutional duty includes a mandate that non-discretionary aspects of the laws be followed.  *Marbury v. Madison*, 5 U.S. 137, 179 (1803).

14.     Defendant Executive Office of the President includes the agency known as the EOP and its individual components.  The agency components of the EOP subject to the FOIA and the FRA include the Council on Environmental Quality, the Office of Management and Budget, the Office of National Drug Control Policy, the Office of Science and Technology Policy, and the Office of the United States Trade Representative.  All other EOP components are subject to the PRA, and beyond the reach of the FOIA.

## STATUTORY AND CONSTITUTIONAL FRAMEWORK

### *The PRA*

15.     In response to presidential misconduct revealed by the Watergate scandal, Congress enacted the PRA in 1978 to establish public ownership of presidential and vice presidential records, to impose record-keeping requirements on the President and Vice President, and to authorize the NARA to preserve and make publicly available presidential records.  *See* Carl Bretscher, The President and Judicial Review Under the Records Act, 60 Geo. Wash. L. Rev., 1477, 1483 (1992) (PRA passed "to prevent a repeat of Watergate's legal drama surrounding ownership of presidential records").

16.     Toward that end, the PRA specifies that "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records[.]"  44 U.S.C. § 2202.

17.     The PRA directs the President to "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of his constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are maintained as Presidential records[.]"  44 U.S.C. § 2203(a).

18.     The PRA defines "Presidential records" broadly to include documentary materials "created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President" in conducting activities related to the President's constitutional, statutory, or ceremonial duties.  44 U.S.C. § 2201(2).  The PRA excludes from the definition of presidential records "personal records," defined as those "of a purely private or nonpublic character" unrelated to the President's constitutional, statutory, or ceremonial duties.  44 U.S.C. § 2201(3).

19.     The PRA defines "documentary materials" to include, *inter alia*, "electronic or mechanical recordations."  44 U.S.C. § 2201(1).  As the PRA's legislative history explains, Congress intended the scope of the term "Presidential records" to be "very broad since a great number of what might ordinarily be construed as one's private activities are, because of the nature of the presidency, considered to be of public nature, *i.e.*, they effect the discharge of his official or ceremonial duties."  H.R. Rep. No. 95-1487, at 11-12 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5732, 5742-43.  Further, "an examination of the nature of political activities in which a President becomes involved shows that few are truly private and unrelated to the performance of his duties."  H.R. Rep. No. 95-1487, at 12.

20.     Congress broadly defined "documentary materials" to ensure that the President

and NARA preserve records that have, or may later be found to have, great historical value.

NARA guidance explains:

> Every day the President and his staff generate thousands of records
> both textual and audiovisual providing insight into the issues
> confronting our nation.  Presidential Libraries preserve not only
> these official records, but also the personal papers of Presidential
> family members, associates, and friends.  Together, these archival
> materials provide a comprehensive view of our Presidents and our
> history.

NARA, Research Presidential Materials, National Archives,

https://www.archives.gov/presidential-libraries/research (last visited June 8, 2017).

21.     The PRA also dictates when and how presidential records may be destroyed

during a President's term of office.  The President may destroy his or her non-personal records

*only after* the President affirmatively determines that the records "no longer have

administrative, historical, or evidentiary value[.]"  44 U.S.C. § 2203(c).  Once a President

determines that he or she may destroy his or her non-personal records, the President must obtain

the written views of the Archivist of the United States (the "Archivist") that the Archivist does

not intend to take action to the contrary.  44 U.S.C. § 2203(c)(1)-(2).

22.     Further, after the Archivist states, in writing, that he or she does not intend to take

action with respect to the destruction of specified presidential records, the President must then

notify the appropriate congressional committee sixty days before the proposed disposal date of

the President's intention to dispose of the records.  44 U.S.C.§ 2203(d).  This multi-step process

reflects the care Congress took to ensure presidential records could be destroyed only after

considered deliberation by multiple entities.

23.     The PRA confers on the Archivist "responsibility for the custody, control, and preservation of, and access to, the presidential records" upon conclusion of a President's term of office.  44 U.S.C. § 2203(g)(1).  In addition, the PRA imposes on the Archivist "an affirmative duty to make such records available to the public as rapidly and completely as possible consistent with provisions of this chapter."  *Id.*

24.     Innovations in communications technology led Congress to expand the scope of the PRA to embrace new means of communication.  In 2014, Congress amended the PRA to, among other things, address the issue of presidents and vice presidents using "non-official electronic message accounts."  *See* Presidential and Federal Records Act Amendments of 2014, Pub. L. No. 113-187, § 2, 128 Stat. 2003, 2006-07 (codified at 44 U.S.C. § 2209).

25.     The 2014 amendment prohibits the President, his staff, and the EOP from using non-official electronic message accounts unless they: (1) copy one of the President's official electronic messaging accounts, or that of his staff or EOP; or (2) forward a complete copy of the presidential record to an official electronic messaging account of the President, his staff, or EOP.  44 U.S.C. § 2209(a)(1)-(2).  The President must comply with this requirement within twenty days after the presidential record is created or transmitted.  *Id.*  Those who intentionally violate this provision are subject to disciplinary action.  44 U.S.C. § 2209(b).

26.     Further, Congress defined "electronic messages" under the PRA to mean "electronic mail *and other electronic messaging systems* that are used for purposes of *communicating between individuals*."  44 U.S.C. § 2209(c)(2) (emphasis added).

27.     Congress explained that the purpose of this amendment was to "ensure that all Presidential records, even those sent from a personal electronic messaging account, are properly preserved and maintained."  S. Rep. No. 113-218, at 4 (2014) (Comm. Rep.).  Congress

recognized the need to "modernize federal recordkeeping statutes and additional changes to improve the federal government's ability to capture and archive electronic records." *Id.* at 1-2.

28.     NARA likewise continues to evolve its policies to keep up with the pace of communications technology innovation and use in the federal government.  NARA Bulletin 2015-02 sets forth new guidance for the heads of federal agencies on managing electronic messages.  *See* NARA, Bulletin 2015-02, National Archives (July 29, 2015), *available at* https://www.archives.gov/records-mgmt/bulletins/2015/2015-02.html.  Specifically, NARA guidance recognizes that "[e]lectronic messages created or received in the course of agency business are Federal records[.]"  *Id.*  Not only are such electronic messages federal records, but those like email messages, which "are more likely to contain substantive information," are "likely to require retention for several years, or even permanently."  *Id.*

29.     Beyond emails, the 2015 NARA Bulletin lists a myriad of electronic messaging applications (apps) and platforms, including chat/instant messaging, text messaging, voicemail messaging, social media, and other mobile device applications to which it applies.  *Id.*  The guidance makes clear that such communications, including those sent from a Twitter account, must be managed as "records."  *Id.*; *see also* NARA, *White Paper on Best Practices for the Capture of Social Media Records* (May 2013), https://www.archives.gov/files/records-mgmt/resources/socialmediacapture.pdf.

30.     Although presidential records are not subject to the Freedom of Information Act while a President is in office, the records become subject to FOIA requests under the PRA beginning five years after a President leaves office, with some material (classified material or material which reflects the deliberative process) subject to the FOIA beginning twelve years after a President leaves office.  44 U.S.C. § 2204(a)–(c).

*The FRA*

31.     The FRA is the corollary record-keeping statute for federal agencies.  Congress

enacted, and amended, the FRA to assure "[a]ccurate and complete documentation of the

policies and transactions of the Federal Government," and "[j]udicious preservation and

disposal of records."  44 U.S.C. § 2902(1), (5).

32.     Under the FRA, each head of a federal agency must

> make and preserve records containing adequate and proper
> documentation of the organization, functions, policies, decisions,
> procedures and essential transactions of the agency and designed to
> furnish the information necessary to protect the legal and financial
> rights of the Government and of persons directly affected by the
> agency's activities.

44 U.S.C. § 3101.  The head of each federal agency also must "establish safeguards against the

removal or loss of records [the federal agency head] determines to be necessary and required by

regulations of the Archivist."  44 U.S.C. § 3105.

33.     The public or other interested parties may request the disclosure of agency records

subject to the FRA through the FOIA.  *See* 5 U.S.C. § 552(f).  The FOIA's purpose is gutted

where records that should be accessible through this mechanism were never preserved.

*The APA*

34.     Beyond these record laws, the APA governs internal rulemaking procedures of

federal agencies.  *See* 5 U.S.C. §§ 551-559.  A federal agency creates a rule subject to the APA

when it seeks to "implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4).

35.     The APA requires agencies engaging in rulemaking to provide public notice of a

proposed rulemaking in the Federal Register, 5 U.S.C. § 553(b); to provide interested persons

with a meaningful opportunity to comment on the proposed rule, 5 U.S.C. § 553(c); and to

engage in reasoned decision making, considering all public comments.  5 U.S.C. § 553(c);

11

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 54 (1983).

36.     Agency rules are subject to judicial review and must be consistent with the statutory text authorizing the agency to promulgate regulations.  5 U.S.C. § 706(2); *see also Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

*The FOIA*

37.     The FOIA, enacted in 1966, established a statutory right of public access upon request to information held by Executive Branch agencies.  Congress enacted the FOIA to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  The FOIA carries a "strong presumption in favor of disclosure," *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991), and its "limited exceptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act."  *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976).

38.     Under the FOIA, virtually every record of a federal agency must be made publicly available, unless it is specifically exempted pursuant to one or more of the FOIA's nine exemptions.  5 U.S.C. § 552(b).  Those exemptions describe categories of information that may be withheld, generally, but not always, as a matter of discretion.  Those government entities that fall outside the APA's definition of "agency," including the Office of the President, are not subject to the FOIA.  *See, e.g.*, *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980).

*The Constitution*

39.     Article II, Section 3 of the U.S. Constitution (the "Take Care Clause") provides, "[The President] shall take care that the laws be faithfully executed[.]"  U.S. Const., art. II, § 3. As interpreted by the Supreme Court, the Take Care Clause imposes a "duty" or "obligation" on the President to ensure that Executive Branch officials comply with Congress' laws.  *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 613 (1838).

40.     In the context of the Presidential Records Act, at least one court has held that a President violates both the PRA and the Take Care Clause by actions purporting to give an outgoing President power that infringes on the incumbent President's constitutional responsibilities.  *Am. Historical Ass'n v. Peterson*, 876 F. Supp. 1300, 1322 (D.D.C. 1995). While the context of that case differs from the actions challenged here, that decision nevertheless confirms that a President's duties and obligations flow from both the PRA and the Take Care Clause.

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS FOR RELIEF

*The President, the Law, and Technology Collide in Executive Actions*

41.     On January 20, 2017, Donald J. Trump was inaugurated as the 45th President of the United States.

42.     On Inauguration Day, the President tweeted,

> Today, we are not merely transferring power from one Administration to another, or from one party to another – but we are transferring . . . power from Washington, D.C. and giving it back to you, the American people. #InaugurationDay

Donald Trump (@realDonaldTrump), Twitter (Jan. 20, 2017, 12:51 PM), https://twitter.com/realDonaldTrump/status/822501939267141634.

13

43.     In fact, since 1978, the American people have had access to presidential records created or received after 1981, once a President leaves office.  *See* 44 U.S.C. § 2203(g)(1). Because of the PRA, that power remains in the hands of the American people — the owners of a President's records — rather than in the hands of the President or the President's staff.

44.     Despite the President's day-one tweet promising to return power to the people, he has deprived the public of the opportunity to exercise any power by cloaking presidential actions in a veil of secrecy.  At the outset of the Trump Administration, the EOP issued gag orders prohibiting or limiting federal agencies such as the Environmental Protection Agency, the Department of Health and Human Services, the Department of the Interior, including the National Parks Service, and the Department of Agriculture from speaking to the public and the press.  *See, e.g.*, Mathew Ingram, <u>Trump Administration Puts Gag Order on Several Government Agencies</u>, Fortune (Jan. 24, 2017), http://fortune.com/2017/01/24/trump-gag-order/; Juliet Eilperin & Brady Dennis, <u>Trump Administration Instructs Federal Agencies to Cease Communicating With the Public</u>, Chicago Tribune (Jan. 24, 2017), http://www.chicagotribune.com/news/nationworld/politics/ct-trump-federal-agencies-communications-20170124-story.html.

45.     When the President turned to congressional staffers to help him draft his first Muslim travel ban executive order, he made them sign non-disclosure agreements.  *See, e.g.*, Rachel Bade et al., <u>Hill Staffers Secretly Worked on Trump's Immigration Order</u>, Politico (Jan. 30, 2017), http://www.politico.com/story/2017/01/trump-immigration-congress-order-234392. This was a carryover from his long-established business practices.  Julie Pace and Chad Day, <u>Donald Trump Requires Nondisclosure Agreements</u>, Assoc. Press (June 21, 2016),

https://www.usnews.com/news/politics/articles/2016-06-21/for-many-trump-employees-keeping-quiet-is-legally-required.

46.     More recently, the White House announced it would not continue the policy of the Obama Administration of making White House visitor logs public on a regular and ongoing basis.  *See, e.g.*, Julie Hirschfeld Davis, <u>White House to Keep Its Visitor Logs Secret</u>, N.Y. Times (Apr. 14, 2017), https://www.nytimes.com/2017/04/14/us/politics/visitor-log-white-house-trump.html?_r=0.

47.     And in early May, President Trump implied that as President he has continued his private sector practice of taping conversations.  *See, e.g.*, Philip Rucker, <u>Trump Suggests There May Be 'Tapes' of His Private Conversations With Former FBI Director</u>, Wash. Post (May 12, 2017), https://www.washingtonpost.com/news/post-politics/wp/2017/05/12/trump-suggests-there-may-be-tapes-of-his-private-conversations-with-former-fbi-director/?utm_term=.8e8af800d902; Marc Fischer, <u>Trump Has a Long History of Secretly Recording Calls, According to Former Associates</u>, Wash. Post (May 12, 2017), https://www.washingtonpost.com/politics/trump-has-a-long-history-of-secretly-recording-calls-according-to-former-associates/2017/05/12/b302b038-372d-11e7-b412-62beef8121f7_story.html?utm_term=.094b52f0a79d.  While the White House has yet to confirm that such taping is, in fact, taking place, reportedly there remains in the Oval Office "the ability to record conversations," a carryover from numerous past presidents.  Philip Bump, <u>Why It's Likely that Trump Does Have Recordings of His Oval Office Conversations</u>, Wash. Post (May 12, 2017), https://www.washingtonpost.com/news/politics/wp/2017/05/12/why-its-likely-that-trump-does-have-recordings-of-his-oval-office-conversations/?utm_term =.174 28424d7dd.  And at a June 8, 2017 press conference, White House Principal Deputy Press Secretary Sarah

Huckabee Sanders did not deny the existence of a West Wing taping system, saying instead she has "no idea" if it exists.  Abby Phillip, White House Spokeswoman Has 'No Idea' If There Are Tapes, Wash. Post (June 8, 2017), https://www.washingtonpost.com/politics/2017/live-updates/trump-white-house/james-comey-testimony-what-we-learn/white-house-spokeswoman-has-no-idea-if-there-are-tapes/?hpid=hp%20_rhp-top-table-main_liveblog-910a-desktop%3Aprime-time%2Fpromo&utm_term=.18c170d892af.

*Technology's Role in the Defendants' Failure to Determine Whether to Preserve Presidential Records*

48.     The President has stated "if you have something really important, write it out and have it delivered by courier, the old-fashioned way.  Because I'll tell you what:  No computer is safe."  Jill Colvin, Trump Says He Doesn't Trust Computers as He Rings in 2017, Assoc. Press (Jan. 1, 2017), http://www.apnewsarchive.com/2017/President-elect-Donald-Trump-says-that-no-computer-is-safe-when-it-comes-to-keeping-information-private/id-3cc7e56c71bc49978823ce54f318f6cd.  Despite this statement, the President, his staff, and the EOP heavily use electronic messaging tools and platforms to conduct presidential and federal business.

49.     At the outset of this Administration, NARA posted "Guidance on Presidential Records" on its website.  NARA paid special attention to preserving electronic records under the PRA:

> The vast and growing use of electronic systems to create and manage Presidential records requires special attention. Because so many of the most important policy records may exist only in electronic form, it is imperative that these records be identified, maintained, and protected from loss or change. Most of these systems will have to be transferred to NARA at the end of the Administration so that the records can be preserved and accessed. Accordingly, it is essential that records management requirements are designed directly into such systems from the very beginning,

> ***particularly when using proprietary systems***, which can include
> capabilities to archive in place in coordination with NARA.

NARA, Guidance on Presidential Records 9, National Archives,

https://www.archives.gov/files/presidential-records-guidance.pdf (last visited June 13, 2017)

(emphasis added).

50. Notwithstanding this guidance, on January 24, 2017, the Wall Street Journal

reported that at least some of the President's staff were using Signal, an encrypted peer-to-peer

messaging application, to communicate with each other about presidential or federal business.

*See* Mara Gay, Messaging App Has Bipartisan Support Amid Hacking Concerns, Wall St. J.

(Jan. 24, 2017), https://www.wsj.com/articles/messaging-app-has-bipartisan-support-amid-

hacking-concerns-1485215028.  *See also* Kaveh Waddell, The Risks of Sending Secret Messages

in the White House, The Atlantic (Feb. 15, 2017),

https://www.theatlantic.com/technology/archive/2017/02/white-house-secret-messages/516792/;

Maya Kosoff, White House Staffers Are using a Secret App to Speak Freely, Vanity Fair (Feb.

27, 2017), http://www.vanityfair.com/news/2017/02/white-house-staffers-are-using-a-secret-

chat-app-to-speak-freely.  Communications sent with Signal are encrypted at both the sender and

user ends, meaning no one else can read them.  *See* Open Whisper Systems,

https://whispersystems.org/ (last visited June 8, 2017).

51. Open Whisper Systems Private Messaging, or Signal, is a free, open-source

communications application that allows the user to "send high-quality group, text, picture, and

video messages" using an "existing phone number and address book."  Open Whisper Systems,

https://whispersystems.org/#page-top (last visited June 8, 2017).  Signal has "[a]rchive

functionality mak[ing] it easy to keep track of the conversations that matter."  *Id.*

52.     Signal also has a disappearing message function that allows the user to set a timer to delete the message from all devices.  Open Whisper Systems, https://whispersystems.org/blog/disappearing-messages/ (last visited June 16, 2017).

53.     Open Whisper Systems is a private software organization funded by donations and grants, unaffiliated with the U.S. Government.

54.     On information and belief, neither the President, nor his staff, nor the EOP have contracted with, or otherwise engaged, Open Whisper Systems as a contractor to segregate, control, preserve, or maintain documentary materials related to the President's conduct of constitutional, statutory, official, or ceremonial business.

55.     On information and belief, the President, his staff, and the EOP are failing to comply with the PRA when they use Signal to conduct presidential or federal business, because they do not affirmatively decide whether a record sent via Signal is a presidential record requiring preservation before they delete the communications.

56.     On February 13, 2017, the Washington Post reported that at least some of the President's staffers "have resorted to a secret chat app—Confide —that erases messages as soon as they're  read."  Ashley Parker & Philip Rucker, Upheaval is Now Standard Operating Procedure Inside the White House, Wash. Post (Feb. 13, 2017), https://www.washingtonpost.com/politics/upheaval-is-now-standard-operating-procedure-inside-the-white-house/2017/02/13/d65dee58-f213-11e6-a9b0-ecee7ce475fc_story.html?utm_term=.e6b84d988da8.

57.     Confide, Inc., the developer of the Confide messaging app, is a privately-held, third-party technology company unaffiliated with the U.S. Government.  On information and belief, neither the President, nor his staff, nor the EOP have contracted with, or otherwise

engaged, Confide, Inc., as a contractor to segregate, control, preserve, or maintain documentary materials related to the President's conduct of constitutional, statutory, official, or ceremonial business.

58.     Confide touts its product as a "confidential messenger."  Confide Inc., https://getconfide.com/ (last visited June 8, 2017).  Toward that end, users of Confide receive messages from colleagues, "'wand' over the words with [their] finger or mouse to read them, and watch them disappear without a trace when [they're] done."  Confide, Frequently Asked Questions, https://getconfide.com/faq  (last accessed June 8, 2017).  The messages remain intact only until the reader "wands" over the screen, at which point the messages are destroyed and are no longer capable of being preserved.  Confide touts the fact that by using Confide messages are "gone for good – no forwarding, no printing and no archiving."  *Id.*  This destruction occurs with no independent assessment by the message sender or recipient of whether the message constitutes a presidential record.

59.     Beyond these preservation issues, the use of Confide by EOP staff also has raised critical questions about whether Confide contains the "military-grade encryption" that it markets. Security researchers say features of Confide leave users vulnerable to interception.  Kate Conger, Researchers Critique Security in Messaging App Confide, TechCrunch (Mar. 8, 2017), https://techcrunch.com/2017/03/08/researchers-critique-security-in-messaging-app-confide/.

60.     On information and belief, the President, his staff, and the EOP have outsourced and absolved themselves of all decision-making as to whether to preserve a presidential record when they use Confide to conduct presidential or federal business.  The Confide app itself, rather than any of the Defendants, summarily and without consideration, deletes all messages.

61.     On information and belief, neither the President, nor his staff, nor the EOP have generated or implemented policies or guidelines for preserving or maintaining presidential or federal business communications produced or received by the President and his staff in and through third party messaging services, including but not limited to Confide, Signal, or similar applications, despite their knowledge that these services are being used to conduct official business.

62.     On information and belief, at least a portion of the electronic messages using Confide, Signal, or similar applications that the Defendants produce or receive are produced or received while conducting the President's constitutional, statutory, official, and ceremonial duties within the scope of the PRA.

63.     On March 8, 2017, Jason Chaffetz, Chairman of the Oversight and Government Reform Committee of the U.S. House of Representatives ("House Oversight Committee"), and Ranking Member Elijah E. Cummings sent a letter to White House Counsel Donald F. McGahn II regarding the obligations of the President and EOP under the PRA ("Chaffetz PRA Letter to President").  Specifically, Mr. Chaffetz and Mr. Cummings observed:

> Recent news reports suggest federal employees may increasingly be turning to new forms of electronic communication, including encrypted messaging applications like Signal, Confide, and WhatsApp, that could result in the creation of presidential or federal records that would be unlikely or impossible to preserve. The security of such applications is unclear.  Generally, strong encryption is the best defense against cyber breaches by outside actors, and can preserve the integrity of decision-making communications. The need for data security, however, does not justify circumventing requirements established by federal recordkeeping and transparency laws.

20

Letter from Jason Chaffetz & Elijah Cummings, Comm. on Oversight and Gov't Reform, to

Donald McGahn, Counsel to the President (Mar. 8, 2017) (on file with the Comm.) at 2

(footnotes omitted).

64.     Mr. Chaffetz and Mr. Cummings requested that the President, *inter alia*:

> Identify all policies referring or relating to the use of non-official electronic messaging accounts, including email, text message, messaging applications, and social media platforms, to conduct official business, including but not limited to archiving and recordkeeping procedures.
>
> Identify all policies referring or relating to the use of official text message or other messaging or communications applications, and social media platforms to conduct official business, including but not limited to archiving and recordkeeping procedures.
>
> Identify policies and procedures currently in place to ensure all communications related to the creation or transmission of presidential records on official electronic messaging accounts other than email, including social networking platforms, internal agency instant messaging systems and other communications applications, are properly secured and preserved as presidential records.

*Id.* at 3 (footnotes omitted).

65.     Document destruction within the EOP has extended beyond the use of messaging

apps like Confide and Signal.  On March 24, 2017, Andrea Mitchell, a news anchor for MSNBC,

reported that the President's staff was purging their phones because they expected to be

subpoenaed in connection with various investigations involving the President.  Frank DiPrima,

Any WH Staffer or Campaign Assoc Purging Phone Faces 20 Years in Prison for Obstruction of

Justice, Daily Kos (Mar. 24, 2017), http://www.dailykos.com/story/2017/3/24/1647106/-Any-

WH-Staffer-of-Campaign-Assoc-Purging-Phone-Faces-20-Years-in-Prison-for-Obstruction-of-

Justice.

66.     When they use electronic messaging platforms, Defendants have also blurred the lines between "official" electronic messaging platforms accounts and personal or private electronic messaging platforms and accounts to conduct government business.  Since his inauguration, President Trump has continued to use his personal Twitter account (or "handle"), "@RealDonaldTrump," to tweet his views, commentary, and official actions to the American public.  By contrast, the President uses the official presidential Twitter handle, @POTUS, more sporadically, including to retweet from @RealDonaldTrump the President's statements made on Twitter.

67.     When the President expresses his views on U.S. international relations, national security, and our nation's defense against terrorism, he often uses his personal Twitter handle.  For example, on April 9, 2017, he used his personal Twitter account to comment on a terrorist attack in Egypt, expressing "confidence that President Al Sisi [sic] will handle situation properly," and further "So sad to hear of the terrorist attack in Egypt. U.S. strongly condemns . . ."  Donald Trump (@realDonaldTrump), Twitter (Apr. 9, 2017, 11:20 AM), https://twitter.com/realDonaldTrump/status/851092500056072198.  President Trump said he will continue to use his personal Twitter handle to "speak directly 'to the people'" on national and international issues.  Shontavia Johnson, Donald Trump's Tweets Are Now Presidential Records, U.S. News & World Rep. (Feb. 1, 2017), https://www.usnews.com/news/national-news/articles/2017-02-01/donald-trumps-tweets-are-now-presidential-records.

68.     As with secret tape recordings, President Trump's use of a personal Twitter account raises issues about proper document preservation.  In a letter dated March 30, 2017, to Senators Claire McCaskill and Tom Carper, David Ferriero, Archivist of the United States, stated that NARA has advised the White House that the President's statements made on Twitter both

Case 1:17-cv-01228   Document 1   Filed 06/22/17   Page 23 of 38

from his personal and official Twitter handles must be preserved as the PRA requires.  *See* Letter

from David Ferriero, NARA, to Senators McCaskill and Carper (Mar. 30, 2017), *available at*

https://www.archives.gov/files/press/press-releases/aotus-to-sens-mccaskill-carper.pdf (last

visited June 8, 2017).

69.     According to the Archivist, the White House claims to be capturing all

presidential statements made on Twitter.  *Id.*  Nevertheless, numerous statements made by

President Trump on Twitter have been deleted.  In some instances, the deletions appear to be an

attempt to avoid criticism over apparent conflicts of interest, such as a tweet concerning the

President's meeting with generals at his Mar-a-Lago residence.  *See* Ben Kentish, <u>Donald Trump</u>

<u>Deletes Tweet About Meeting Generals at his Mar-a-Lago Florida Resort</u>, The Independent (Feb.

22, 2017), http://www.independent.co.uk/news/world/americas/us-politics/donald-trump-delete-

tweet-generals-meeting-mar-a-lago-florida-keith-kellogg-h-r-mcmaster-a7590886.html.

70.     On information and belief, from the outset of the Trump Administration, the

President, his staff, and EOP have failed to adopt adequate policies and guidelines to identify and

segregate presidential records in the first instance.  This failure keeps presidential records from

being managed and preserved pursuant to the PRA.

71.     On information and belief, from the outset of the Trump Administration, the

Defendants have failed to adopt adequate policies and guidelines to maintain and preserve

presidential records.

*The Process Used by the President to Generate Many of His Executive*
*Orders Cloaks Them in Secrecy and Puts Them*
*Beyond the Reach of the FOIA and the Administrative Rulemaking Process*

72.     Since his inauguration on January 20, 2017, the President has issued at least 43

executive orders, purporting to rely on powers granted to him by Article II of the U.S.

Constitution.  Only the President may issue and sign executive orders.  The President's ability to issue executive orders is, by its very nature, a presidential act, not a personal one.

73.     On information and belief, for at least some of these executive orders the White House has maintained control over the process and the documents it generated to avoid leaving a publicly accessible paper trail.  That process, headed by White House advisor Steve Bannon, reportedly was run like "a cabal, almost like a shadow NSC [National Security Council]," and "outside of the normal construct."  Brannen, Foreign Policy (Jan. 30, 2017).  As a result, individuals like Secretary of Homeland Security John Kelly reportedly were being briefed on the executive order implementing a travel ban on individuals from specified majority-Muslim counties just as the President was in the middle of signing the order.  *Id.  See also* Evan Perez, Pamela Brown, and Kevin Liptak, <u>Inside the Confusion of the Trump Executive Order and Travel Ban</u>, CNN (Jan. 30, 2017), http://www.cnn.com/2017/01/28/politics/donald-trump-travel-ban/index.html.

74.     Nevertheless, leaks by the President, his staff, and/or the EOP have offered a glimpse into the President's process to formulate the orders.  On information and belief, government personnel outside of the President, his staff, and the EOP have had significant roles in preparing, reviewing, and commenting on draft executive orders, including personnel in Executive Branch agencies.  For example, on January 25, 2017, an unsigned, red-lined draft executive order titled "Executive Order — Detention and Interrogation of Enemy Combatants" ("Draft Black Site EO"), which raised the possibility of reviving CIA "black site" prisons, was released to the public through the U.S. media.  *See, e.g.*, Greg Miller, <u>White House Draft Order Calls for Review on Use of CIA 'Black Site' Prisons Overseas</u>, Wash. Post (Jan. 25, 2017), https://www.washingtonpost.com/world/national-security/white-house-draft-order-calls-for-

review-on-use-of-cia-black-sites-overseas/2017%0b/01/25/e4318970-e310-11e6-a547-

5fb9411d332c_story.html?utm_term=.626751994d49; Mark Mazzetti & Charlie Savage, <u>Leaked

Draft of Executive Order Could Revive C.I.A. Prisons</u>, N.Y. Times (Jan. 25, 2017),

https://www.nytimes.com/2017/01/25/us/politics/executive-order-leaked-draft-national-security-

trump-administration.html.

75.     White House Press Secretary Sean Spicer stated in a press briefing on January 25,

2017, that the Draft Black Site EO "is not a White House document," *see, e.g.*, CBS/AP, <u>Sean

Spicer: Draft Order on Interrogation Methods 'Is Not a White House Document'</u>, CBS News

(Jan. 25, 2017), http://www.cbsnews.com/news/trump-executive-action-torture-black-site-

prisons/, which would make it an agency record outside the scope of the PRA and publicly

accessible through the FOIA.  The draft EO, however, was attached to an electronic message the

White House circulated to NSC staff members on January 24, 2017, at 8:41 a.m., Mazzetti &

Savage, N.Y. Times (Jan. 25, 2017), all indicia of a record created and controlled by the White

House.

76.     In addition to the Draft Black Site EO, six draft immigration-related executive

orders also were leaked to Vox on January 25, 2017.  *See* Matthew Yglesias & Dara Lind, <u>Read

Leaked Drafts of 4 White House Executive Orders on Muslim Ban, End to DREAMer Program,

and More</u>, Vox (Jan. 25, 2017), https://www.vox.com/policy-and-

politics/2017/1/25/14390106/leaked-drafts-trump-immigrants-executive-order.

77.     One of the leaked draft executive orders, titled "Protecting the Nation from

Terrorist Attacks by Foreign Nationals," proposed to "temporarily ban entries from seven

majority-Muslim countries and bar all refugees from coming to the US for several months."

("Draft Travel Ban EO").  *Id.*

78.     On January 27, 2017, President Trump signed the executive order "Protecting the

Nation from Foreign Terrorist Entry into the United States" ("Travel Ban EO").  Exec. Order No.

13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017),

https://www.federalregister.gov/documents/2017/02/01/2017-02281/protecting-the-nation-from-

foreign-terrorist-entry-into-the-united-states.  This, along with other executive orders, was

prepared "outside of the normal construct" according to an unnamed intelligence official within

the Trump Administration.  Brannen, Foreign Policy, (Jan. 30, 2017).

79.     On January 31, 2017, during a press conference about the Travel Ban EO,

Secretary Kelly stated that his agency was involved in drafting the executive order.  Specifically,

Secretary Kelly said, "We did know the executive order was coming.  We had people involved in

the general drafting of it." *See, e.g.*, Alan Neuhauser, Homeland Security Defends Trump's

Muslim Immigration Order, U.S. News & World Rep. (Jan. 31, 2017),

https://www.usnews.com/news/national-news/articles/2017-01-31/homeland-security-defends-

trumps-muslim-immigration-order.  Secretary Kelly further stated that he had reviewed "two

'initial drafts' of the order 'that were coming back and forth' between [DHS] and the White

House." *Id.*  He reiterated "I saw the draft." *Id.*  Secretary Kelly's statements conflict with other

reporting that the White House kept DHS and other affected agencies out of the process of

preparing and finalizing the executive order.  Mazzetti & Savage, N.Y. Times (Jan. 25, 2017).

80.     On January 31, 2017, the *Washington Post* received two draft executive orders.

Abigail Hauslohner and Janell Ross, Trump Administration Circulates More Draft Immigration

Restrictions, Focusing on Protecting US. Jobs, Wash. Post (Jan. 31, 2017),

https://www.washingtonpost.com/world/national-security/trump-administration-circulates-more-

draft-immigration-restrictions-focusing-on-protecting-us-jobs/2017/01/31/38529236-e741-11e6-

80c2-30e57e57e05d_story.html?utm_term=.825e6cd13500.  The first draft, dated January 23,

2017, was accompanied by a memorandum on White House letterhead from Andrew Bremberg,

assistant to the President, and was titled "Executive Order on Protecting Taxpayer Resources by

Ensuring Our Immigration Laws Promote Accountability and Responsibility." ("Draft

Immigration – Public Charge EO").  *Id.*  The second draft, with the same date and accompanying

memo also authored by Mr. Bremberg, was titled "Executive Order on Protecting American Jobs

and Workers by Strengthening the Integrity of Foreign Worker Visa Programs." ("Draft

Immigration – Visa EO").  *Id.*

81.     On February 20, 2017, less than one month after the President signed the Border

Security EO, DHS publicly released two implementation memos dated February 20, 2017:

"Implementing the President's Border Security and Immigration Enforcement Improvements

Policies" ("DHS Border Security Implementation Memo"),

https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-

Border-Security-Immigration-Enforcement-Improvement-Policies.pdf (last visited June 13,

2017), and "Enforcement of the Immigration Laws to Serve the National Interest" ("DHS

Immigration Enforcement Implementation Memo"),

https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-

Immigration-Laws-to-Serve-the-National-Interest.pdf (last visited June 13, 2017).  Both memos

constitute guidance for "all Department personnel."  DHS Border Security Implementation

Memo at 1, DHS Immigration Enforcement Implementation Memo at 1.

82.     DHS Secretary Kelly also stated that the Border Security EO itself "implements

new policies designed to stem illegal immigration and facilitate the detection, apprehension,

detention, and removal of aliens who have no lawful basis to enter or remain in the United

States.  It [the Border Security EO] constitutes guidance to all Department personnel, and

supersedes all existing conflicting policy . . . [subject to exceptions specified in the memo]."

DHS Border Security Implementation Memo at 1.

83.    Notwithstanding Secretary Kelly's admission that the Border Security EO was

agency-wide guidance and a change of policy, by establishing agency guidance and policy

through an executive order, the Defendants purportedly cloaked it and other executive orders on

immigration in secrecy and removed them from challenge under the APA.  This is so

notwithstanding that DHS likely has seen and contributed to many of the draft executive orders

on immigration leaked to the public, as evidenced by DHS Secretary Kelly's statements about

his role, and the role of his agency, in drafting and reviewing the Travel Ban Executive Order.

84.    Further, notwithstanding Secretary Kelly's characterization of the Border Security

EO as agency-wide guidance, which would make it subject to disclosure under the FOIA as an

agency record, by issuing that guidance in the guise of an executive order it and other executive

orders on immigration issued by President Trump and documents concerning their creation are

purportedly exempt from the FOIA and the APA.

85.    The failure of the President, his staff, and the EOP to maintain and preserve

records as the PRA requires, and their hamstringing of federal agencies from preserving and

maintaining records under the FRA, and issuing guidance under the APA, has produced an

actual, tangible, and irreversible harm.

## PLAINTIFFS' CLAIMS FOR RELIEF

## CLAIM ONE

### (For a Declaratory Judgment that the Knowing Use by Defendants of Messaging Apps that Prevent the Preservation of Presidential Records Violates the Presidential Records Act)

86.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs above.

87.     No matter its method of delivery, a message communicated from one user to another exists for an amount of time, however fleeting.  Even a Confide-generated message appears for the second or seconds it takes for the reader to "wand" over the message, after which it supposedly disappears "forever."  When "confidential" messaging apps like Confide and Signal, developed for private use, are used by the President, his staff, and/or the EOP to conduct presidential business, the records that these messaging apps create are subject to the requirements of the PRA.[1]

88.     As a form of "electronic messaging," the use of third-party messaging apps like Confide and Signal falls squarely within the 2014 amendments to the PRA, which Congress enacted to cover precisely the types of electronic messaging that, on information and belief, the President, his staff, and/or the EOP use to conduct the President's constitutional, statutory, official, or other duties.

89.     Accordingly, the President under the PRA must take all necessary steps to assure that his activities, deliberations, decisions, and policies, and those of his staff, that reflect the President's performance of his constitutional, statutory, or other official or ceremonial duties, are adequately documented.  *See* 44 U.S.C. § 2203(a).

---

[1] Records created by the President, his staff, and/or the EOP when using "confidential" messaging apps like Confide and Signal to conduct business other than presidential business or for personal purposes are not subject to the requirements of the PRA and are not the subject of this suit.

90.     The PRA also requires that the President, his staff, and the EOP preserve and maintain as presidential records those records they produce or receive when conducting activities relating to, or affecting, how the President carries out his constitutional, statutory, and ceremonial duties.  *See* 44 U.S.C. § 2203(a).

91.     Documenting presidential activities, without also imposing the incumbent duty to preserve or maintain those same presidential records, would eviscerate the plain language and congressional intent behind the PRA and its amendments.  For example, the PRA's restrictions on access to information in a presidential record, 44 U.S.C. § 2204, only make sense if there is a preceding duty to preserve and maintain presidential records.

92.     The software and programming that created the Confide and Signal apps prevent any reasoned consideration of whether a particular electronic message is a presidential record that must be preserved.  Indeed, the apps' developers created these apps for private use to ensure utmost privacy by destroying messages as soon as they are read.

93.     Specifically, the source code and software supporting Signal and Confide delete electronic messages after a recipient receives and reads the messages.  The Signal functionality allows for the user to set timers to delete messages, whether instantaneously or at some future time.  The Confide application summarily deletes messages once read.  The source code and software completely usurp all the critical record-keeping functions the PRA imposes on the President, his staff, and the EOP including: (1) determining whether an electronic message contains a presidential record; (2) segregating that presidential record from private records; (3) controlling that presidential record; and (4) preserving and maintaining that presidential record.

94.     The source code and software supporting Confide and Signal treat all electronic messages produced or received by the President, his staff, and/or the EOP similarly, no matter

their content.  The source code and software supporting Confide and Signal do not determine whether an electronic message contains a presidential record, do not segregate presidential records from private records, do not adequately control the presidential record, and do not preserve and maintain the presidential record as the PRA expressly requires.  44 U.S.C. § 2203(a)-(c).

95.     The wholesale deletion of electronic messages sent or received with these applications directly contravenes the PRA, which limits the ability of a President to dispose of or destroy presidential records during his term of office.  The President may do so only in limited circumstances, and only after the Archivist comments on the proposed destruction.  *See* 44 U.S.C. § 2203(b).  First, a President may dispose of presidential records only if they no longer have administrative, historical, informational, or evidentiary value.  44 U.S.C. § 2203(c). Second, before destroying a presidential record, the President must solicit the views of the Archivist in writing concerning the President's proposed disposal or destruction of presidential records.  44 U.S.C. § 2203(c)(1).  Finally, the Archivist must inform the President that the Archivist does not intend to request Congress's views on the President's proposed disposal or destruction of presidential records.  44 U.S.C. § 2203(c)(2).  Congress retained the right to advise the Archivist on whether maintaining and preserving presidential records targeted for disposal or destruction might be in Congress's special interest, or in the public interest.  44 U.S.C. § 2203(e).

96.     The Defendants' use of these messaging apps, however, results in the wholesale destruction of presidential records without following the statutorily prescribed steps a President must take before deleting presidential records.

97.     The actions of the President, his staff, and the EOP demonstrate that at least as to presidential records created by or received through applications like Confide and Signal, the President has violated his non-discretionary duties under the PRA.

98.     Plaintiffs are therefore entitled to relief in the form of a declaratory judgment that President Trump, his staff, and the EOP have violated their non-discretionary statutory duties under the PRA, 44 U.S.C. §§ 2201−2209, and that the President has violated his constitutional obligation to take care that laws like the PRA be faithfully executed.

## CLAIM TWO

**(For a Declaratory Judgment that the Failure of the President, His Staff,
and the EOP to Issue Guidelines Concerning the Use of Messaging Apps
that Prevent Document Preservation Violates the Presidential Records Act)**

99.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs above.

100.     "Courts are accorded the power to review guidelines outlining what is, and what is not, a 'presidential record' under the terms of the PRA.  The PRA does not bestow on the President the power to assert sweeping authority over whatever materials he chooses to designate as presidential records without any possibility of judicial review."  *Armstrong v. Exec. Office of President*, 1 F.3d 1274, 1290 (D.C. Cir. 1993) ("*Armstrong II*"); *Citizens for Responsibility & Ethics v. Cheney*, 593 F. Supp. 2d 194, 217 (D.D.C. 2009).

101.     Notwithstanding the reported use within the White House of third-party messaging platforms in violation of the PRA, neither the President, nor his staff, nor the EOP appear to have implemented or enforced any "guidelines" addressing presidential records that are also electronic messages, including designating such communications from third-party electronic messaging platforms as containing presidential records.  Instead, the third-party electronic

messaging platforms are making the "designation" decision for the Defendants by deleting all communications regardless of content.

102.    Plaintiffs are therefore entitled to relief in the form of a declaratory judgment that President Trump, his staff, and the EOP have violated their non-discretionary statutory responsibilities under the PRA by failing to implement guidelines that address whether a documentary record is, in fact, a presidential record when it originates in electronic messages that the Defendants receive and maintain in the course of conducting activities relating to or having an effect on the President's constitutional, statutory, or other official or ceremonial duties.

## CLAIM THREE

**(For a Writ of Mandamus and Injunctive Relief Compelling President Trump, His Staff, and the EO to Comply with Their Non-Discretionary Duties Under the PRA)**

103.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

104.    Mandamus relief is appropriate when a plaintiff has a clear right to relief, but no other adequate remedy, and the defendant has a clear duty to act.  *See, e.g.*, *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931); *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996).  "No separate waiver of sovereign immunity is required to seek a writ of mandamus to compel an official to perform a duty required in his official capacity."  *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005).

105.    The PRA imposes on the President, his staff, and the EOP a non-discretionary duty to segregate, preserve, and maintain, presidential records contained in electronic messages that relate to the President's exercise of his constitutional, statutory, other official, or ceremonial duties.  Moreover, while the President's decision on whether to preserve a specific record may not be subject to challenge under the PRA, not "all decisions made pursuant to the PRA are immune from judicial review."  *Armstrong II*, 1 F.3d at 1293.

106.    Further, as the court found in *Am. Historical Ass'n v. Peterson*, a President's compliance with the PRA also may be evaluated against a President's constitutional obligation to take care that the laws, including the PRA, be faithfully executed.  876 F. Supp. 1300, 1320−21 (D.D.C. 1995).

107.    The statute leaves the President no discretion to remove entire classes of communications from the statute's reach simply because of their method of communication.  Yet the Defendants have done just that by using messaging platforms like Confide and Signal that destroy records before any determination can be made as to whether they should be preserved as presidential records under the PRA.  Secretly tape-recording conversations that are not preserved also prevents this determination from being made.

108.    Plaintiffs therefore are entitled to a writ of mandamus and injunctive relief ordering the President, his staff, and the EOP to comply with their mandatory, non-discretionary duties under the PRA, and the President's obligations under the Take Care Clause.

### CLAIM FOUR

**(For a Declaratory Judgment that Defendants' Use of the Executive Order Process to Remove Records and Rulemaking from the FRA and FOIA and the APA Is Contrary to Law and Violates the President's Constitutional Obligation to Take Care to Faithfully Execute the Law)**

109.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

110.    The President, his staff, and/or the EOP have used executive orders to transform what would otherwise be federal records into presidential records and cloak the entire process in secrecy, seeking to evade the transparency and accountability sought by the FOIA, FRA, and APA.

111.    The Supreme Court has determined that agency rulemaking does not violate the non-delegation doctrine so long as "Congress clearly delineates the general policy, the public

agency which is to apply it, and the boundaries of this delegated authority." *Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 219 (1989) (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).  In this way, "[p]rivate rights are protected by access to the courts to test the application of the policy in the light of these legislative declarations." *Id.*

112.  For example, in 6 U.S.C. § 236, Congress vested the secretary of DHS

> exclusively with all authorities to issue regulations with respect to, administer, and enforce the provisions of such Act [the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq.], and of all other immigration and nationality laws, relating to the functions of consular officers of the United States in connection with the granting or refusal of visas, and shall have the authority to refuse visas in accordance with law and to develop programs of homeland security training for consular officers (in addition to consular training provided by the Secretary of State), which authorities shall be exercised through the Secretary of State, except that the Secretary shall not have authority to alter or reverse the decision of consular officer to refuse a visa to an alien . . . .

113.  The executive orders described herein and other similar executive orders, along with the federal agency guidelines they impose, are "new policies" that "constitute guidance to all Department personnel, and supersede[] all existing conflicting policy[.]"  DHS Border Security Implementation Memo at 1.  But because these new policies and guidance were imposed by executive orders, they were not subject to notice and comment under section 553 of the APA, or judicial scrutiny under section 706 of the APA, as they otherwise would have been had a federal agency issued them directly.

114.  Further, by using executive orders to establish policies and guidance, Defendants have attempted to classify any accompanying documentary materials as presidential records, not federal records, and therefore as purportedly outside the reach of the FRA.  *See* 44 U.S.C. §§ 2201(2), 2202, 3301(a)(1).  As a necessary consequence, the documents also are purportedly not subject to disclosure under the FOIA.  *See* 44 U.S.C. § 2204(b).

115.    This misuse of the executive order process contravenes a central purpose of the

PRA: "'defining the types of documentary materials falling within the ambit of either

'presidential' or 'personal' records[.]'" *Am. Historical Ass'n v. Peterson*, 876 F. Supp. 1300,

1315 (D.D.C. 1995) (quoting H.R. No. 95-1487, 95th Cong., 2d Sess. § 11 (1978)).  Under

*Armstrong II*, the process of categorizing presidential records is subject to judicial review.

*Armstrong II*, 1 F.3d at 1290.

116.    On information and belief, the Defendants have appropriated certain levels of

decision-making and rulemaking from the federal agencies charged with implementing policies

through agency regulations and other guidance and placed them in the White House subject to

the exclusive control of the President through executive orders.

117.    By removing from agencies the process of issuing policies and guidance, the

Defendants have, in effect, blocked the federal agencies from complying with federal law and

policy, including the FRA, FOIA, and APA.  The President, his staff, and the EOP have stripped

the rulemaking function from the relevant federal agencies, absorbing it into the EOP instead.  In

this way, Defendants have subverted federal laws and violated a central premise of the

recordkeeping laws: that federal records not be folded into the PRA to avoid public disclosure.

118.    The U.S. Court of Appeals for the D.C. Circuit has stated that the "narrow, clearly

defined limitation on the scope of the PRA is absolutely essential to preventing the PRA from

becoming a potential presidential *carte blanche* to shield materials from the reach of the FOIA."

*Armstrong II*, 1 F.3d at 1292.  Those words apply with particular force here, where the

Defendants, through their current practices in issuing executive orders, remove agency records

from the reach of the FOIA by not allowing agencies to create them at all.  In so doing, the

President has nullified the ability of federal agencies to carry out their congressionally assigned

role to preserve federal records under the FRA, thereby violating his constitutional obligations under the Take Care Clause.

119.    By shielding these records from public view and access, the Defendants have deprived Plaintiffs and the public, particularly persons directly affected by federal agency actions implementing the President's executive orders—including acts of DHS in implementing immigration-related orders—of access to records needed to protect their legal and financial rights. *See Am. Friends Service Comm. v. Webster*, 720 F.2d 29, 43-45 (D.C. Cir. 1983).

120.    Plaintiffs therefore are entitled to a declaratory judgment that the Defendants' interference with the obligations that the FRA, FOIA, and APA impose on federal agencies is contrary to law and violates the President's constitutional obligation to take care that the law be faithfully executed.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court:

1.    Declare that the Defendants' knowing use of messaging apps that prevent the preservation of presidential records violates the Presidential Records Act;

2.    Declare that the Defendants' failure to issue guidelines concerning the use of messaging apps that prevent document preservation violates the Presidential Records Act;

3.    Order all Defendants, in the form of injunctive and mandamus relief, to refrain from using methods of communication that destroy records before any determination can be made as to whether they should be preserved as presidential records under the Presidential Records Act;

4.    Declare that the Defendants' use of the executive order process to remove records from the Federal Records Act and public access under the Freedom of Information Act, and the

rulemaking process of the Administrative Procedure Act, are contrary to law and the President's

constitutional obligation to take care that the law be faithfully executed; and

     5.     Grant such other and further relief as the Court may deem just and proper.

**Dated:  June 22, 2017**

Respectfully Submitted,

BAKER & McKENZIE LLP

*/s/ George M. Clarke III*        
George M. Clarke III, D.C. Bar No. 480073
Mireille R. Oldak,  D.C. Bar No. 1027998
815 Connecticut Avenue, N.W.
Washington, D.C. 20006
Phone: (202) 835-6184
Fax: (202) 416-7184
Email: george.clarke@bakermckenzie.com
Email: mireille.oldak@bakermckenzie.com

Angela C. Vigil
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
Phone (305) 789-8904
Fax: (305) 789- 8953
Email: angela.vigil@bakermckenzie.com

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON

Anne L. Weismann, D.C. Bar No. 298190
Conor M. Shaw, D.C. Bar No. 1032074
455 Massachusetts Ave., N.W., Sixth Floor
Washington, D.C. 20001
Phone: (202) 408-5565
Email: aweismann@citizensforethics.org
Email: cshaw@citizensforethics.org