**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON and NATIONAL
SECURITY ARCHIVE,

                       Plaintiffs,

     v.

THE HON. DONALD J. TRUMP, President of
the United States of America and
EXECUTIVE OFFICE OF THE PRESIDENT,


                  Defendants.

Case No. 1:17-CV-01228 (CRC)

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION.................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 4

ARGUMENT ......................................................................................................................... 9

    **I.**     **Standard of review.** ................................................................................... 9

    **II.**    **As presented in the complaint, Defendants' violations of the PRA and the Take Care Clause are claims upon which relief may be granted.** ................... 10

        A.    Plaintiffs' complaint states judicially reviewable claims under the PRA. . 11

        B.    Plaintiffs' complaint states a judicially reviewable claim under the Take Care Clause.................................................................................................. 13

    **III.**   **CREW and the Archive have standing in this case because they are unable to currently access federal agency records relating to executive orders and there is a very real risk that presidential records have been and will continue to be destroyed.** ................................................................................................. 20

        A.    Plaintiffs' allegations and supporting declarations demonstrate that they have suffered and continue to suffer injuries caused by Defendants' noncompliance with the PRA.................................................................... 21

        B.    Plaintiffs allegations and supporting declarations demonstrate current and ongoing injury related to their claims under the Take Care Clause of the Constitution. ............................................................................................. 24

    **IV.**   **Plaintiffs' claims are not barred by *Armstrong I* or any other precedent.**....... 26

    **V.**    **The Court has the power to issue the relief sought by Plaintiffs.** .................... 35

        A.    Plaintiffs state a valid claim for mandamus relief because Defendants have failed to comply with their ministerial duties under the PRA.................... 35

        B.    Plaintiffs have raised valid claims for declaratory relief............................ 41

CONCLUSION ..................................................................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Aulaqi v. Panetta,*
   35 F. Supp. 3d 56 (D.D.C. 2014) ........................................................................6, 17

*Ali v. Trump,*
   No. 17-00135 (W.D. Wash., Mar. 28, 2017), ECF No. 82 ....................................18

*Am. Historical Ass'n v. Peterson,*
   876 F. Supp. 1300 (D.D.C. 1995) ........................................................................30

*Ams. for Safe Access v. Drug Enforcement Admin.,*
   706 F.3d 438 (D.C. Cir. 2013) ............................................................................21

*Arab Am. Civil Rights League v. Trump,*
   No. 17-10310 (E.D. Mich. July 6, 2017), ECF No. 115 ........................................18

*\*Armstrong v. Bush,*
   924 F.2d 282 (D.C. Cir. 1991) ..................................................................... *passim*

*\*Armstrong v. Exec. Office of the President,*
   1 F.3d 1274 (D.C. Cir. 1993) ........................................................................ *passim*

*Arpaio v. Obama,*
   797 F.3d 11 (D.C. Cir. 2015) .........................................................................20, 26

*Banneker Ventures, LLC v. Graham,*
   798 F.3d 1119 (D.C. Cir. 2015) ..........................................................................10

*\*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ...........................................................................................10

*Boritz v. United States,*
   685 F. Supp. 2d 113 (D.D.C. 2010) ....................................................................10

*Boumediene v. Bush,*
   553 U.S. 723 (2008) ...........................................................................................40

*Center for Biological Diversity v. Envtl. Prot. Agency,*
   861 F.3d 174 (D.C. Cir. 2017) ............................................................................20

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ......................................................................................40, 41

*Chamber of Commerce v. Reich,
    74 F.3d 1322 (D.C. Cir. 1996) ...................................................................... passim

Chrysler Corp. v. Brown,
    441 U.S. 281 (1979) ..................................................................................17

*Citizens for Responsibility and Ethics in Washington v. Cheney,
    593 F. Supp. 2d 194 (D.D.C. 2009) ............................................... passim

Citizens to Preserve Overton Park v. Volpe,
    401 U.S. 402 (1971) ..................................................................................17

Clapper v. Amnesty Int'l USA,
    133 S. Ct. 1138 (2013) .............................................................................24

*Clinton v. City of New York,
    524 U.S. 417 (1998) ..................................................................................14

Clinton v. Jones,
    520 U.S. 681 (1997) ..................................................................................40

Cohens v. Virginia,
    19 U.S. 264 (1821) ....................................................................................15

*Comm. on the Judiciary, U.S. House of Reps. v. Miers,
    558 F. Supp. 2d 53 (D.D.C. 2008) ....................................................3, 41, 42

Council of & for the Blind of Delaware Cty. Valley, Inc. v. Regan,
    709 F.2d 1521 (D.C. Cir. 1983) ................................................................35

Erickson v. Pardus,
    552 U.S. 89 (2007) ....................................................................................10

*Fed. Election Comm'n v. Akins,
    524 U.S. 11 (1998) ....................................................................................25

Franklin v. Massachusetts,
    505 U.S. 788 (1992) ..............................................................................40, 41

Freedom Watch v. Obama,
    807 F. Supp. 2d 28 (2011) .........................................................................41

*Hurd v. Dist. of Columbia,
    864 F.3d 671 (D.C. Cir. 2017) .................................................................6, 10

Judicial Watch, Inc. v. NARA,
    845 F. Supp. 2d 288 (D.D.C. 2012) .............................................................32

*Marbury v. Madison,*
    5 U.S. 137 (1803) ....................................................................................4, 38, 39

*Medellin v. Texas,*
    552 U.S. 491 (2008) .............................................................................................14

*In re Medicare Reimbursement Litig.,*
    414 F.3d 7 (D.C. Cir. 2005) .................................................................................35

*Mississippi v. Johnson,*
    71 U.S. 475 (1867) ...............................................................................................40

*Nat'l Harbor GP, LLC v. Gov't of D.C.,*
    121 F. Supp. 3d 11 (D.D.C. 2015) .....................................................................9, 10

*Nat'l Treasury Emps. Union v. Nixon,*
    492 F.2d 587 (D.C. Cir. 1974) .................................................................. *passim*

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) ..........................................................................40

*Nixon v. Adm'r,*
    433 U.S. 425 (1977) .............................................................................................34

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) .............................................................................................40

*Nixon v. United States,*
    506 U.S. 224 (1993) .............................................................................................19

*NLRB v. Robbins Tire & Rubber Co.,*
    437 U.S. 214 (1978) .............................................................................................17

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974) ...............................................................................................9

*Susan B. Anthony List v. Driehaus,*
    134 S. Ct. 2334 (2014) .........................................................................................21

*Train v. City of New York,*
    420 U.S. 35 (1975) ...........................................................................................13, 14

*United States v. Nixon,*
    418 U.S. 683 (1974) .............................................................................................40

*Washington v. Trump,*
    No. 17-00141 (W.D. Wash. Apr. 5, 2017), ECF No. 177 ....................................18

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) (Frankfurter, J. concurring) ...................................................................3

**Statutes**

5 U.S.C. § 552 (2012) ........................................................................................................17

6 U.S.C. § 111 (2012) ........................................................................................................16

6 U.S.C. § 112 (2012) ........................................................................................................16

6 U.S.C. § 202 (2012) ........................................................................................................16

28 U.S.C. § 1331 (2012) .....................................................................................................42

28 U.S.C. § 1361 (2012) .....................................................................................................35

28 U.S.C. § 2201 (2012) ................................................................................................35, 41

*44 U.S.C. § 2201 (2012) ...............................................................................................27, 36

*44 U.S.C. § 2202 (2012) ..................................................................................................26

*44 U.S.C. § 2203 (2012) ..............................................................................................26, 36

*44 U.S.C. § 2204 (2012) ..................................................................................................17

*44 U.S.C. § 2209 (2012) ...............................................................................................2, 11

44 U.S.C. § 3101 (2012) .....................................................................................................17

**Other Authorities**

124 Cong. Rec. 34,894 (daily ed. Oct. 10, 1978) ...........................................................34

124 Cong. Rec. 36,843 (daily ed. Oct. 13, 1978) ...........................................................34

124 Cong. Rec. 36,845 (daily ed. Oct. 13, 1978) ...........................................................28

*Exec. Order No. 13,769, 82 Fed. Reg. 8977 (Feb. 1, 2017) ..........................................8

*Fed. R. Civ. Pro. 8...........................................................................................................10

*Fed. R. Civ. Pro. 12..........................................................................................................10

*Fed. R. Evid. 201 .............................................................................................................17

H.R. Rep. No. 95-1487, 95th Cong., 2d Sess. (1978)..................................................27, 31

S. Rep. No. 113-218 (2014) ...............................................................................................12

Staff of H. Comm. on Government Operations, 85th Cong., 1st Sess., Executive
    Orders and Proclamations: A Study of a Use of Presidential Powers 1 (Comm.
    Print 1957). ..................................................................................................................15

*The Presidential Records Act of 1978: Hearing on S. 3494 Before the Comm. on
    Gov't Affairs*, 95th Cong. (1978) ..............................................................................28

*U.S. Const. Art. II, §3 ......................................................................................3, 13, 20

White House Briefing Room, Presidential Actions, Executive Orders,
    https://www.whitehouse.gov/briefing-room/presidential-actions/executive-
    orders (last visited Nov. 3, 2017)................................................................................15

**\*** *The authorities on which we principally rely are marked with asterisks.*

## INTRODUCTION

In 1974, a disgraced president resigned, taking "his" presidential papers with him as he left the White House. Recognizing that a country of the people, by the people, and for the people cannot survive if the people do not have access to its historical record, Congress mandated public ownership of a president's papers through the Presidential Records Act. President Donald Trump seeks to upend that law, claiming the absolute, unchecked power to ignore the PRA at will. In the words of his lawyers, "Courts cannot review the President's compliance with the Presidential Records Act." Def. Memo. at 1.[1] So framed, this lawsuit presents the fundamental question of whether the president may subvert congressional checks and balances embodied in a series of statutes including the PRA to further enhance his own power while the people and the judiciary stand by and watch. The answer must be no.

The PRA requires that the president document the activities, deliberations, decisions, and policies of his administration; maintain those records created during the performance of his duties; and preserve those records for posterity. To this end, the PRA requires the president to categorize records as either presidential or personal. While the president enjoys significant discretion in the day-to-day management of his records, the PRA mandates that categorization be made. And, once made, presidential records may only be destroyed after the president affirmatively determines they no longer have administrative, historical, or evidentiary value, and only then with the written views of the Archivist of the United States. The president's significant discretion over the records is thus controlled and also temporary, because the records are owned and eventually accessible by the people of the United States. Plaintiffs brought this case to ensure that the people's history is preserved.

---

[1] Cites to "Def. Memo." are to the Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss, Dkt. No. 17-1228, ECF No. 11. Cites to "Compl." are to the complaint.

Recognizing the importance of the president's compliance in the process of preserving these important records, the D.C. Circuit has construed the PRA to allow judicial review where a president is simply ignoring his statutory responsibilities.  Thus, while courts will not second-guess a president's day-to-day decisions about individual documents, courts may review "guidelines outlining what is, and what is not, a 'presidential record' under the terms of the PRA." *Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1290 (D.C. Cir. 1993) ("*Armstrong II*").

The Defendants' actions in this case contravene the explicit requirements of the PRA in at least two ways that are subject to judicial review.  First, Defendants have ignored their responsibility to categorize records created on message-deleting applications, effectively excluding them from the definition of presidential records.  This is despite the fact that Congress made clear that presidential records include records created using "electronic messaging systems that are used for purposes of communicating between individuals."  44 U.S.C. § 2209(c)(2) (2012).  Defendants have thus contravened the PRA by knowingly allowing employees to use message-deleting apps that make categorization and preservation impossible.

Second, Defendants have impermissibly used the executive order process to circumvent congressional delegations of rulemaking authority to executive agencies and the accountability and transparency checks of the Administrative Procedure Act, the Federal Records Act, and the Freedom of Information Act.  Implementing changes to agency rules by executive order rather than by agency regulation, and keeping that process wholly within the White House, prevents judicial review under the APA as well as the creation of a publicly accessible paper trail of federal records under the FRA and the FOIA.  Instead of being immediately publicly accessible, these documents—assuming they are preserved—will only be available to the public in, at the

earliest, eight years.  The outsized role the president has arrogated to himself thus interferes with executive agencies' statutory responsibilities and evades the transparency and accountability measures Congress adopted through these laws.

Despite the importance of preserving presidential records, Defendants insist that the PRA bars the president only from "issue[ing] guidelines that improperly treat materials that should be subject to the FOIA or the FRA as presidential records" and that the president may otherwise "mismanage[] and fail[] to preserve . . . presidential records" with impunity.  Def. Memo. at 15. This claim of presidential immunity under the PRA provides the foundation for Defendants' argument that, without a cause of action under the PRA, declaratory judgment is unavailable.  To the contrary, the PRA permits, and indeed requires, the review requested here.  Further, because Defendants have failed to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, no independent cause of action need be identified to obtain a declaratory judgment.  *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1326 (D.C. Cir. 1996); *Comm. on the Judiciary, U.S. House of Reps. v. Miers*, 558 F. Supp. 2d 53, 81 (D.D.C. 2008).

Defendants also contend that "separation of powers concerns" prevent this Court from granting mandamus relief.  Def. Memo. at 22.  If accepted, this argument would prevent courts from ever mandating that a president remedy constitutional or statutory violations.  Thankfully, the separation of powers is linked to checks and balances on each branch's power.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 593 (1952) (Frankfurter, J. concurring). One of these checks and balances is the tempering of presidential authority by statute. "Presidential powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress."  *Id.* at 635 (Jackson, J. concurring).  By suggesting that the president can act without checks on his power, Defendants knock the constitutional safeguards out of

balance, amplifying their power and preventing the judiciary from exercising its own.  This proposed subordination of the judiciary to the executive has been rejected since the founding. *See Marbury v. Madison*, 5 U.S. 137 (1803).  The president has failed to comply with the ministerial obligations imposed on him by Congress to categorize and maintain presidential records.  This Court has the power to mandate that he do so.

Finally, contrary to Defendants' contention, Def. Memo. at 8, Citizens for Responsibility and Ethics in Washington ("CREW") and the National Security Archive (the "Archive") have standing because they have been denied access to records under FOIA and are highly likely to suffer a future injury from Defendants' continuing failure to preserve presidential records that are essential to their missions.  The very real risk that records will be unavailable to them constitutes a sufficient injury-in-fact to give them standing.

For all these reasons, the Court should deny Defendants' Motion to Dismiss and allow this case to proceed on the merits.

## STATEMENT OF FACTS

This lawsuit was brought against a backdrop of reports that White House staff were ignoring, if not flouting, their responsibilities under federal records laws.  Just days after President Trump's inauguration, the *Wall Street Journal* reported that some of the president's staff were using Signal, an encrypted peer-to-peer messaging application, to communicate with each other about presidential business.  Compl. ¶ 50.  Similar reports followed in *The Atlantic* and *Vanity Fair*.  Compl. ¶ 50.  Signal is produced by Open Whisper Systems, a private software organization unaffiliated with the U.S. Government.  Compl. ¶¶ 51, 53.  Importantly, it has a disappearing message function that allows the user to set a time to delete the message from all devices.  Compl. ¶ 52.

4

In February, *The Washington Post* reported that some White House staffers were also using another messaging application, Confide, that erases messages as soon as they are read. Compl. ¶ 56.  Confide was developed by Confide, Inc., a privately held third-party technology company also unaffiliated with the U.S. Government.  Compl. ¶ 57.  Confide touts its product as a "confidential messenger"; upon receiving messages through Confide its users "wand" over the words and, according to the company's website, "watch them disappear without a trace when [they're] done."  Compl. ¶ 58.  At that point, the message is destroyed and is no longer capable of being preserved.  Compl. ¶ 58.  Indeed, Confide touts the fact that by using its product, messages are "gone for good—no forwarding, no printing and no archiving."  Compl. ¶ 58.  The destruction of messages through applications like Confide and Signal occurs with no independent assessment of whether the message is a presidential record.  Compl. ¶ 58.

In March, following these revelations, Jason Chaffetz, then chairman of the Oversight and Government Reform Committee of the U.S. House of Representatives ("House Oversight Committee"), and Ranking Member Elijah E. Cummings sent a letter to White House Counsel Donald F. McGahn II regarding the obligations of the president and the Executive Office of the President ("EOP") under the PRA.  Compl. ¶ 63.  The letter observed that use of "new forms of electronic communication, including encrypted messaging applications like Signal, Confide, and WhatsApp . . . could result in the creation of presidential or federal records that would be unlikely or impossible to preserve."  Compl. ¶ 63.  The House Oversight Committee requested, among other things, information on White House policies relating to the use of non-official electronic messaging accounts, official text message or other messaging or communications applications, and policies and procedures for securing and preserving presidential records. Compl. ¶ 63.

By letter dated April 11, 2017, Marc T. Short, assistant to the President and director of Legislative Affairs, responded to the House Oversight Letter.  Mr. Short stated only: "It is the policy of the White House to comply with the preservation requirements of the PRA regardless of where presidential records reside, how they are created, or the manner in which they are transmitted."  Ex. A to the Declaration of George Clarke, dated Nov. 3, 2017 ("Clarke Decl.").[2] Notably, Mr. Short's letter did not deny the reports that message-deleting apps were being used or otherwise address how it is technologically possible for the above statement to be accurate.  It also did not end the congressional and press inquiries into this conduct.

A recent report in *Politico* about White House Senior Advisor Jared Kushner's use of private email for official business prompted House Oversight Committee Chairman Trey Gowdy and Ranking Member Cummings to reach out to Mr. McGahn once more.  By letter dated September 25, 2017, they sought documents and information pertaining to five categories of records.  Clarke Decl., Ex. B.  This included the identities of those non-career White House officials who had used "text messages, phone-based message applications, or encryption software," the cellular number and account used, and requested that the White House "provide evidence of measures to ensure compliance with federal law."  *Id.* at 2.  The House Oversight Committee also asked the White House to identify changes in policies or directives relating to non-official email accounts and messaging applications since January 1, 2017. *Id.*

Mr. Short, again on behalf of the White House, responded by letter dated October 10, 2017.  Clarke Decl., Ex. D.  Rather than answer the questions posed in the House Oversight letter, however, he noted simply that "[a]ll White House employees must comply with 44 U.S.C.

---

[2] This Court may take judicial notice of public records and government documents available from reliable sources.  *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67–68 (D.D.C. 2014); Fed. R. Evid. 201(b).  "'[M]atters of which the court may take judicial notice' are properly considered at the motion-to dismiss stage."  *Hurd v. Dist. of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017).

§ 2209, which governs the use of non-official electronic message accounts," and further that "[t]he White House and covered employees endeavor to comply with all relevant laws[.]"  *Id.* Notably, Mr. Short also stated that "[t]here has been no change in White House policy in the areas you cite since January 20, 2017."  *Id.*  This letter appears to confirm plaintiffs' allegation that neither the president, nor his staff, nor the EOP have implemented guidelines addressing presidential records created on third-party electronic messaging platforms, including message-deleting apps such as Confide and Signal.  Compl. ¶ 101.  And, once again, Defendants had the opportunity in this case to deny the underlying conduct regarding message-deleting apps or assert that they have put in place countermeasures to ensure PRA compliance.  They did neither.

Beyond the use of message-deleting apps, the president and the White House have demonstrated a disregard for other aspects of PRA compliance.  President Trump, for example, uses his personal Twitter account (or "handle") to put forth his views on a range of policies and official actions, and even appears to conduct foreign policy through his tweets.  Compl. ¶¶ 66–67.  The Archivist of the United States has advised the White House that such tweets from the president must be preserved under the PRA.  Compl. ¶ 68.  Nevertheless, numerous statements made by President Trump on Twitter have been deleted, in some instances in an apparent attempt to avoid criticism.[3]  Compl. ¶ 69.

Other recent reports indicate that Mr. Kushner used a private email address to conduct government business, discrediting the White House's previous representation to Representatives Chaffetz and Cummings that, "There are no senior officials covered by the PRA with multiple accounts."  Clarke Decl., Ex. A, D.  In response to these revelations, Rep. Cummings wrote to

---

[3] Defendants' counsel has represented to Plaintiffs by letter that all the president's Tweets are being preserved under the PRA, but Defendants have not submitted a declaration or otherwise represented that fact to the Court.

Mr. Kushner on September 25, 2017, requesting that he preserve all official records in his custody and provide information including email addresses used to conduct official White House business; all emails sent or received on non-governmental accounts used to conduct official business; and information on the private family domain.  Clarke Decl., Ex. C.

During the last year, reports have also indicated that the Trump Administration is intent on restricting public access to government information.  For example, the EOP issued gag orders prohibiting or limiting certain federal agencies from speaking to the public and the press. Compl. ¶ 44.  President Trump also reportedly required congressional staffers to sign non-disclosure agreements in order to work on a draft executive order preventing certain travelers from entering the United States.  Compl. ¶ 45.  In addition, the administration refused to make White House visitor logs public on a regular and ongoing basis.  Compl. ¶ 46.

The president has also sought to improperly prevent the creation of federal agency records related to the implementation of certain policies, circumventing the delegation of rulemaking authority to those agencies and the APA, FRA, and FOIA.  For example, on January 27, 2017, President Trump signed Executive Order No. 13,769, "Protecting the Nation from Foreign Terrorist Entry into the United States" ("Travel Ban EO").  Compl. ¶ 78.  The Travel Ban EO applied "immediately," requiring, among other things, that the Secretary of Homeland Security "immediately conduct a review to determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA [Immigration and Nationality Act]" and "suspend[ing] entry into the United States . . . of [aliens from countries referred to in section 217(a)(12) of the INA] for 90 days from the date of this order[.]"  Travel Ban EO § 3(a), (c).  The travel suspension was meant to "temporarily reduce investigative burdens on relevant agencies[.]"  Travel Ban EO § 3(c).  Then Department of Homeland Security ("DHS") Secretary

John Kelly publicly stated during a press conference that individuals within DHS were involved in drafting the Travel Ban EO.  Compl. ¶ 79.

In early February, CREW filed FOIA requests with DHS, Immigrations and Customs Enforcement ("ICE"), the Transportation Security Administration ("TSA"), Office of the Director of National Intelligence ("ODNI"), the Department of Transportation ("DOT"), the State Department ("DOS"), and Citizenship and Immigration Services ("USCIS") for documents relating to the Travel Ban EO.  Ex. A to the Declaration of Noah Bookbinder, dated Nov. 3, 2017 ("Bookbinder Decl.").[4]  TSA and USCIS have both indicated that they were unable to locate any responsive records.  Bookbinder Decl., Ex. F–G.  DHS and ICE shuffled CREW's FOIA requests among different offices.  Bookbinder Decl., Ex. D–E, H–I.  CREW has not received a response from DOS or ODNI other than acknowledgements that the requests were received.  Bookbinder Decl. ¶ 13, Ex. J.  CREW received no response from DOT.  Bookbinder Decl. ¶ 13  All of these agencies were presumably involved in either drafting or implementing the Travel Ban EO, yet, to date , none has produced a single record.

## ARGUMENT

### I.     Standard of review.

When resolving a Rule 12(b)(1) motion, a court must accept all factual allegations in a complaint as true and must draw all reasonable inferences in the plaintiff's favor.  *Citizens for Responsibility and Ethics in Washington v. Cheney*, 593 F. Supp. 2d 194, 210 (D.D.C. 2009); s*ee also Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984).  Likewise, in ruling on a motion to dismiss under Rule 12(b)(6), a

---

[4] Plaintiffs seek to supplement the record with the Bookbinder and Blanton declarations only for purposes of the Court's analysis of Plaintiffs' standing in this case.  A court may consider material outside of the pleadings when deciding a motion to dismiss under Rule 12(b)(1).  *Nat'l Harbor GP, LLC v. Gov't of D.C.*, 121 F. Supp. 3d 11, 17 (D.D.C. 2015).

court must construe the complaint liberally, accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor. *Hurd v. Dist. of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017).

When deciding a Rule 12(b)(1) motion, a court may consider material outside of the pleadings. *Nat'l Harbor GP, LLC v. Gov't of D.C.*, 121 F. Supp. 3d 11, 17 (D.D.C. 2015); *Boritz v. United States*, 685 F. Supp. 2d 113, 117 (D.D.C. 2010) (court "may consider a complaint 'supplemented by undisputed facts evidenced in the record'"). However, "[i]n determining whether a complaint fails to state a claim, the court may consider only the facts alleged in the complaint, any documents either attached or incorporated in the complaint and matters of which the court may take judicial notice." *Hurd*, 864 F.3d at 678.

## II.     As presented in the complaint, Defendants' violations of the PRA and the Take Care Clause are claims upon which relief may be granted.

Under Rule 8(a)(2), a complaint is required to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." A Rule 12(b)(6) motion may be granted only if the Court finds that the complaint failed to provide fair notice of the claim and the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiffs are not required to set forth "detailed factual allegations," but rather "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 555, 570; *accord. Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).

A claim is "plausible on its face" if the facts pleaded allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Hurd*, 864 F.3d at 678. "A claim crosses from conceivable to plausible when it contains factual allegations that, if proved, would 'allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Banneker Ventures*, 798 F.3d at 1129.

### A.      Plaintiffs' complaint states judicially reviewable claims under the PRA.

While Defendant's motion does not contest the sufficiency of Plaintiffs' factual allegations (or deny them), it challenges the legal conclusions that flow from those facts based on a twisted construction of Plaintiffs' claims.  Properly understood, the claims are judicially reviewable.

First, Plaintiffs' PRA claims (Claims One and Three) challenge the Defendants' knowing use of message-deleting apps that prevent the preservation of presidential records because, in the first instance, they "prevent any reasoned consideration of whether a particular electronic message is a presidential record that must be preserved."  Compl. ¶ 92.  The complaint explains the nature of this practice and how it prevents Defendants' from complying with their obligations under the PRA.  Compl. ¶¶ 50–62.  Message-deleting apps like Signal and Confide automatically and instantaneously delete messages after a recipient reads them, with no independent action on the part of the recipient and regardless of their content.  Compl. ¶¶ 93–94.  Confide, for example, destroys messages as they are being read.  Compl. ¶ 58.  By their very nature, these apps prevent a White House message recipient from making an initial classification decision that any particular message is either presidential or personal.

Further, electronic messages like those sent through Confide and Signal without question fall within the scope of the PRA.  In 2014, Congress amended the statute to, among other things, address the issue of presidents and vice presidents using "non-official electronic message accounts."  Presidential and Federal Records Act Amendments of 2014, Pub. L. No. 113-187, § 2, 128 Stat. 2003, 2006–07 (codified at 44 U.S.C. § 2209).  Congress further defined "electronic messages" under the PRA to mean "electronic mail and other electronic messaging systems that are used for purposes of communicating between individuals."  44 U.S.C. § 2209(c)(2).  Through

this amendment Congress intended to "ensure that all Presidential records, even those sent from a personal electronic messaging account, are properly preserved and maintained."  S. Rep. No. 113-218, at 4 (2014).

Plaintiffs' complaint explains that use of these message-deleting apps contravenes the requirements of the PRA because they usurp the critical record-keeping functions the PRA imposes on the president, his staff, and the EOP.  Faced with an instantly deleting message, Defendants' are unable to determine whether the message is a presidential record.  And if it was a presidential record, because it is deleted automatically and almost instantaneously it is impossible for Defendants to segregate that presidential record from private records or preserve and maintain that record.  Compl. ¶ 93.

Second, Plaintiffs challenge Defendants' failure to issue guidelines concerning the use of these message-deleting apps (Claims Two and Three).  As set forth in the complaint, despite multiple reports of the use by White House staff and officials of messaging applications that violate the PRA, Defendants have neither implemented nor enforced "any 'guidelines,'" choosing instead to let "third-party electronic messaging platforms [make] the 'designation' decision for the Defendants by deleting all communications regardless of content."  Compl. ¶ 101.  Since Plaintiffs filed the complaint, the White House has acknowledged it has not adopted any new policies to address the use of text messages, encryption software, and phone-based messaging applications.  Clarke Decl., Ex. D.  Whether understood as a failure to issue guidelines or as following guidelines that improperly allow the use of messaging apps like Confide and Signal, these practices violate the PRA.

Specific allegations in Plaintiffs' complaint that touch on the creation, destruction, or classification decisions related to individual records do not make Plaintiffs' claims unjusticiable.

Plaintiffs' claims focus on the broader questions of whether Defendants are properly classifying presidential records, whether they have issued guidance that conflicts with the PRA, and whether they are using technologies that impede or preclude compliance with the their statutory obligations.  Defendants' attempts to characterize Plaintiffs' claims as focused on day-to-day managerial decisions are without merit.  *See* Def. Memo. at 13 (mischaracterizing Claim One as an allegation that "Defendants are improperly disposing of presidential records"), 18 (mischaracterizing the PRA claims as based on an allegation that "Defendants are deleting [presidential records] 'wholesale'").

Finally, Defendants challenge the viability of Plaintiffs' PRA claims because the complaint includes factual allegations about the destruction of presidential records, such as the deletion of the president's tweets and the reported purging by White House aides of "potentially compromising information" on their phones, Compl. ¶¶ 4, 66–69, that are not subject to judicial review.  Def. Memo. at 3 n.1, 13. But even if the destruction of particular presidential records by the president and White House staff is not directly actionable under the PRA, these facts support a larger narrative of a White House that is flouting its record-keeping responsibilities.

> **B.**     **Plaintiffs' complaint states a judicially reviewable claim under the Take Care Clause.**

Article II, Section 3 of the U.S. Constitution provides that the president "shall take Care that the Laws be faithfully executed" (the "Take Care Clause").  The Take Care Clause requires that the president comply with and execute the laws as enacted by Congress.  It also prevents him from ordering executive branch officials to violate the law.  *See, e.g.*, *Train v. City of New York*, 420 U.S. 35, 47 (1975) (president could not direct EPA Administrator to withhold validly appropriated funds).

Accordingly, the president may not act contrary to a validly enacted statute.  The president also may not disregard or suspend laws enacted by Congress.  *Train*, 420 U.S. 35 (1975); *Nat'l Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974).  Neither can he make the law or amend a validly enacted law.  *Medellin v. Texas*, 552 U.S. 491, 532 (2008) (Take Care Clause "allows the President to execute the laws, not make them").  As the Supreme Court held in *Clinton v. City of New York*, the Line Item Veto Act was unconstitutional because it effectively allowed the president to amend legislation that had been validly enacted by Congress.  524 U.S. 417, 448 (1998).  This was so even though both political branches were *aligned* for, as the Court explained, "[i]f there is to be a new procedure in which the President will play a different role in determining the final text of what may 'become a law,' such change must come not by legislation, but through the amendment procedures set forth in Article V of the Constitution."  *Id.* at 449.  Even more so here, where they are not.

And, make no doubt, such unconstitutional conduct by the president is subject to judicial review.  *See, e.g.*, *Medellin*, 552 U.S. at 1372 (determining validity of presidential memorandum); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1326 (D.C. Cir. 1996) ("[A]n independent claim of a President's violation of the Constitution would certainly be reviewable.").  This is unsurprising since, in general, "'judicial review is available to one who has been injured by an act of a government official which is in excess of his express or implied powers.'"  *Id.* at 1327 (quoting *Harmon v. Brucker*, 355 U.S. 579, 581–82 (1958).  Indeed, as explained by the D.C. Circuit, "the judicial branch of the Federal Government has the constitutional duty of requiring the executive branch to remain within the limits stated by the legislative branch."  *Nat'l Treasury Employees Union*, 492 F.2d at 604.  Failure to do so "not only might indicate a disrespect for congressional legislative authority under Article I, Section 1 of the Constitution,

but itself might be constitutionally improper." *Id.* at 605; *accord. Cohens v. Virginia*, 19 U.S. 264, 404 (1821) (court "must take jurisdiction if it should").  This is because "judicial resolution of the issue better enables the President to perform his constitutional duty to take care that the laws be faithfully executed." *Nat'l Treasury Employees Union*, 492 F.2d at 605.

Since taking office on January 20, 2017, President Trump has issued fifty two executive orders.  *See* White House Briefing Room, Presidential Actions, Executive Orders, https://www.whitehouse.gov/briefing-room/presidential-actions/executive-orders.  Executive orders are directives or actions that the president uses to direct the executive branch and "are generally directed to, and govern actions by, Government officials and agencies."  Staff of H. Comm. on Government Operations, 85th Cong., 1st Sess., Executive Orders and Proclamations: A Study of a Use of Presidential Powers 1 (Comm. Print 1957).  However, just as with any other presidential action, executive orders must be consistent with the laws enacted by Congress including the APA, FRA, and FOIA, which form part of a comprehensive statutory scheme that governs agency rulemaking and protects the rights of private persons by creating accountability and transparency between federal agencies and the public.

Here, the complaint is sufficient to allow the Court to draw the reasonable inference that Defendants' actions have violated the Take Care Clause of the Constitution because their actions with respect to some of these executive orders preclude federal agencies from complying with the APA, the FRA, and FOIA and abrogate those agencies' congressionally-delegated powers. Specifically, the complaint alleges sufficient facts to reasonably infer that the procedures used by the Defendants to issue several executive orders frustrate the congressional scheme delegating power to and requiring judicial review of and document retention by administrative agencies, and were undertaken for that purpose.  Compl. ¶¶ 73–84.  Instead of issuing an executive order that

puts forward a directive or policy, with the agency to engage in congressionally-delegated rulemaking to develop and implement that policy, the Trump executive orders supplant the agency rulemaking process.  Defendants thereby usurp the authority Congress delegated to specific federal agencies, absorbing it into the EOP.  Tellingly, these executive orders were reportedly prepared "outside of the normal construct" to avoid creating a publicly accessible paper trail.  Compl. ¶ 78.  The White House is apparently controlling the executive order drafting process to avoid creating agency records that would be publicly accessible under FOIA.  Compl. ¶ 73.  In this way, Defendants have subverted federal laws and violated a central premise of agency recordkeeping laws and the PRA: that federal records not be folded into the PRA to avoid public disclosure.  *Armstrong II*, 1 F.3d at 1292.

For example, the Travel Ban EO effectively issues new regulations that affect the rights of individuals and implements new agency policies, but is not subject to the APA, the FRA, or the FOIA.  Compl. ¶ 78.  The Travel Ban EO implemented several changes governing admission to the United States, which supplant DHS regulations.  Travel Ban EO, §§ 3(c), 5(a)–(c).  DHS was created by Congress in 2002 to, among other things, "prevent terrorist attacks within the United States[.]"  6 U.S.C. § 111(b)(1)(A) (2012).  To that end, Congress delegated power to the Secretary of Homeland Security to "[p]revent[] the entry of terrorists and the instruments of terrorism into the United States[,]" and to "[s]ecur[e] the borders . . . and air, land, and sea transportation systems of the United States[.]"  6 U.S.C. § 202(1)–(2) (2012).  Regulations issued by DHS to further these objectives are subject to the public notice and comment requirements of the APA.  6 U.S.C. § 112(e) (2012).  This is because, in enacting the APA, "Congress made a judgment that notions of fairness and informed administrative decision-making require that agency decisions be made only after affording interested persons notice and an opportunity to

comment." *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979).  The changes made to these

regulations by the Travel Ban EO, however, were not subject to notice and comment under APA.

Likewise, if DHS or other federal agencies had been involved in drafting and

implementing the regulation changes in the Travel Ban EO, records created by those agencies

would properly be "agency records" under the FRA and subject to immediate public access

under FOIA (barring a legitimate exception).  44 U.S.C. § 3101 (2012); 5 U.S.C. § 552(a)(3)

(2012).  Instead, documents created by Defendants in the process of drafting the Travel Ban EO

are presidential records and are not accessible by the public through the FOIA until many years

from now.  44 U.S.C. § 2204(a)–(c) (2012).  Congressional intent to "ensure an informed

citizenry, vital to the functioning of a democratic society, needed to check against corruption and

to hold the governors accountable to the governed" is thus being thwarted.  *NLRB v. Robbins

Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).

This is not an abstract concern.  Defendants have used the way in which the Travel Ban

EO regulation changes were promulgated as a defense to discovery in litigation challenging that

executive order.  Although those same records would form the basis of a court's review of

agency action, s*ee, e.g.*, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)

(review must be based "on the full administrative record that was before the Secretary at the time

he made his decision"), in litigation challenging the Travel Ban EO, Defendants have objected

that discovery into "the Executive's discretionary national security and immigration authority" is

"inappropriate[,]" because such discovery would "invite impermissible intrusion on Executive

Branch deliberations, which are constitutionally 'privileged' against such inquiry[.]"[5]  *See e.g.*,

_____

[5] A court may take judicial notice of facts contained in public records of other proceedings and
of a formal position of the U.S. Government.  *Al-Aulaqi*, 35 F. Supp. 3d at 67; Fed. R. Evid.
201(b).

*Ali v. Trump*, Dkt. No. 17-00135 (W.D. Wash., Mar. 28, 2017), ECF. No. 82 at 3–4; *accord.*

*Arab Am. Civil Rights League v. Trump*, Dkt. No. 17-10310 (E.D. Mich. July 6, 2017), ECF No.

115 at 6–7; *Washington v. Trump*, Dkt. No. 17-00141 (W.D. Wash. Apr. 5, 2017), ECF No. 177

at 5–6.  These objections would not apply in an APA challenge to DHS regulations.

The Defendants' arguments urging dismissal of Plaintiff's Take Care claim

fundamentally misstate its nature.  Plaintiffs do not challenge the substantive validity of any

particular executive order, even the Travel Ban EO.  Instead, Plaintiffs are challenging a broader

pattern and course of conduct that appears focused on hiding information from the public and

usurping federal agencies' congressionally-delegated functions.  The president may not ignore

congressional delegations of agency power.  Nor may he ignore the FOIA, the FRA, or the APA.

He may also not undermine the purposes of any of those statutes.  Thus, Defendants' arguments

that the Plaintiffs have not identified a specific executive order and that the FOIA, FRA, and

APA do not prohibit the conduct alleged entirely miss the mark.  Plaintiffs' argument is not that

the FOIA, FRA, or APA prohibit the president's conduct, but rather that his actions intentionally

frustrate those laws by precluding agencies from complying with them.  Accordingly, Plaintiffs

agree that this claim is not properly brought under the FOIA, the FRA, or the APA.  This suit

cannot be a challenge to agency action under those statutes because Defendants have made it

impossible for the agencies to act consistently with those laws.

Neither do Plaintiffs merely allege that the president failed to comply with a federal

statute.  Def. Memo. at 28 (citing *Dalton v. Spencer*, 511 U.S. 462 (1994)). As the D.C. Circuit

explained in *Chamber of Commerce*, "*Dalton*'s holding merely stands for the proposition that

when a statute entrusts a discrete specific decision to the President and contains no limitations on

the President's exercise of that authority, judicial review of an abuse of discretion claim is not

available." 74 F.3d at 1331. "*Dalton* is inapposite where the claim instead is that the presidential action—not one, it should be added, even contemplated by Congress— independently violates . . . a statute that delegates no authority to the President" to commit the allegedly unlawful act. 74 F.3d at 1332. Here, Plaintiffs do not allege that the president has committed an abuse of discretion. Rather, Plaintiffs claim is that the president's actions violate statutes that have delegated no discretionary authority to him. Neither the FOIA, FRA, nor PRA delegate authority to the president to disregard those laws or exempt agencies from complying with their provisions.

Defendants also argue that this Court lacks jurisdiction over Plaintiffs' claim because "'there is a textually demonstrable constitutional commitment of the issue to a coordinate political department" or  because of "a lack of judicially discoverable and manageable standards for resolving it.'"  Def. Memo. at 29 (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993) (internal quotation marks and citation omitted)).  Not surprisingly, Defendants do not explain the constitutional commitment they reference, as there is no portion of the Constitution that gives the executive branch exclusive authority to determine the accountability and transparency requirements that can be imposed on itself or administrative agencies.  And *Nixon* is inapposite. That case involved the question of whether the Senate's compliance with the Impeachment Trial Clause, Article 1, section 3, cl. 6, was subject to judicial review.  *Nixon*, 506 U.S. at 226. Finding it sufficiently vague, the Supreme Court held that it lacked a standard to review.  *Id.* at 230.  But the Court blessed judicial review over, as here, "either legislative or executive action that transgresses identifiable textual limits." *Id.* at 238.

More apt is the D.C. Circuit's decision in *Chamber of Commerce v. Reich*, where the plaintiffs sought declaratory and injunctive relief against the Secretary of Labor's enforcement of

President Clinton's Executive Order 12,954.  74 F.3d 1322 (D.C. Cir. 1996).  The plaintiffs in

that case argued that the executive order at issue was unlawful because it was contrary to a

validly enacted statute and the Constitution.  In finding the case subject to judicial review and,

ultimately, invalidating the executive order, the court explained that it had "never held that a lack

of a statutory cause of action is *per se* a bar to judicial review."  74 F.3d at 1326.  To the

contrary, the court stated that there is a "general presumption of reviewability" of the legality of

executive action.  *Id.* at 1327.  Here, the APA, the FRA, and the FOIA, together with the

authority delegated by Congress to administrative agencies, constitute identifiable limits on the

power of the president.  By violating those laws he has failed to "take Care that the Laws be

faithfully executed."  U.S. Const. art. II, § 3.

**III.     CREW and the Archive have standing in this case because they are unable to
           currently access federal agency records relating to executive orders and there is a
           very real risk that presidential records have been and will continue to be destroyed.**

To show it has met constitutional standing requirements, a plaintiff must demonstrate: (1)

that it has suffered an injury in fact, which is the invasion of a legally protected interest that is (a)

concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that

there is a causal connection between the injury and the conduct at issue, such that the injury is

fairly traceable to the challenged act; and (3) that it is likely, as opposed to speculative, that the

injury will be redressed by a favorable decision.  *Center for Biological Diversity v.*

*Environmental Protection Agency*, 861 F.3d 174, 182 (D.C. Cir. 2017).  When seeking

prospective relief, a plaintiff must also allege an ongoing or future injury, *Arpaio v. Obama*, 797

F.3d 11, 19 (D.C. Cir. 2015), where an allegation of future injury means "a likelihood of future

violations of [its] rights . . . not simply future effects from past violations."  *Cheney*, 593 F.

Supp. 2d at 225 (quoting *Fair Employment Council of Greater Washington, Inc. v. BMC*

*Marketing Corp.*, 28 F.3d 1268, 1273 (D.C. Cir. 1994)).  A plaintiff may rely on an alleged

future injury "if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'"  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414, n. 5 (2013)).  In cases with multiple plaintiffs, standing need be shown for only one plaintiff.  *Americans for Safe Access v. Drug Enforcement Administration*, 706 F.3d 438, 443 (D.C. Cir. 2013).

Defendants challenge the standing of CREW and the Archive solely on the basis they have failed to plead certainly impending injury.  Def. Memo. at 8–11.  Defendants do not deny that CREW and the Archive have met every other element required to show standing.  As demonstrated below and by the declarations submitted with this brief, CREW and the Archive do indeed have standing to bring each of the claims in their complaint because they have suffered and will continue to suffer injury from Defendants' actions.

A.   **Plaintiffs' allegations and supporting declarations demonstrate that they have suffered and continue to suffer injuries caused by Defendants' noncompliance with the PRA.**

Defendants' use of message-deleting apps that preclude preservation of presidential records have injured and will continue to injure CREW and the Archive.  These apps delete records before the recipients can decide whether such records are presidential records and before the president can take the steps required by the PRA to preserve them.  *See* Compl. ¶¶ 86–98.  Plaintiffs also are injured by Defendants' past and ongoing failure to issue guidelines concerning the use of message-deleting apps because, as Plaintiffs have alleged, that failure is leading to the wholesale loss of presidential records in violation of the PRA.  *See* Compl. ¶¶ 99–102.

The complaint alleges that Defendants' failure to comply with the PRA will cause CREW and the Archive a significant injury because "access to and the ability to view presidential records are essential to fulfill their core missions."  Compl. ¶ 12.  Defendants' destruction of presidential records "deprives, and will continue to deprive, the Plaintiffs of eventual access to

the documentary history of this presidency."  Compl. ¶ 12.  Those allegations are supported by

the declarations of Noah Bookbinder and Thomas S. Blanton, which show that both CREW and

the Archive have made and plan to make further FOIA requests for materials related to the

Trump Administration, including presidential records.  Those requests are consistent with both

Plaintiffs' prior and current practices.  CREW has a longstanding interest in the adequacy of

recordkeeping by the executive branch, has brought multiple lawsuits to ensure proper

recordkeeping, and has published a report on the failures of the George W. Bush administration

to properly preserve records.  Bookbinder Decl. ¶¶ 4–6, 16, 18–25, 28–31.  CREW also routinely

files FOIA requests to obtain information about the government, including over 130 requests to

the Trump Administration so far, many of which are still pending.  Bookbinder Decl. ¶¶ 7–8.

CREW also uses the FOIA to gain information about whether government officials are

complying with ethics obligations.  Bookbinder Decl. ¶¶ 14–16.  To the extent the documents

sought during the Trump Administration are presidential records not subject to the FOIA, CREW

plans to obtain such records when they later become available pursuant to the PRA.  Bookbinder

Decl. ¶¶ 17, 25–27.

　　　Archive staff routinely publish books and other publications of, relating to, or based on,

presidential records acquired through the FOIA.  Declaration of Thomas S. Blanton , dated Nov.

3, 2017, ¶¶ 4–5 ("Blanton Decl.").  In previous projects, they have used documents acquired

from every existing presidential library.  Blanton Decl. ¶ 5.  Archive staff plan to file requests

with the Trump Presidential Library as soon as they are legally permitted, with anticipated topics

of such requests including U.S. relations with Russia and China, U.S. military action in Africa,

and the nuclear escalation between North Korea and the United States.  Blanton Decl. ¶ 11.  Any

future publications with respect to such topics will require access to a set of, as complete as

possible, presidential and federal agency records.  Blanton Decl. ¶ 6.  The Archive also has a

longstanding interest in presidential recordkeeping and has brought several lawsuits against

presidential administrations to prevent the destruction of government records.  Blanton Decl. ¶¶

7–9.  These include the seminal PRA cases *Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991)

("*Armstrong I*") and *Armstrong II*.

A court in this district already has found a plaintiff to have standing in a case very similar

to this one.  In *CREW v. Cheney*, the plaintiffs alleged that Vice President Cheney, the Executive

Office of the Vice President, and the EOP had improperly excluded records from the PRA, and

accordingly, the plaintiffs sought declaratory judgment or a writ of mandamus.  593 F. Supp. 2d

at 199.  The court determined that one of the plaintiffs, Stanley Kutler, had established standing

because, as set forth in a declaration, he had authored numerous publications about American

presidents, using in part the records of former presidents and vice presidents; he planned to

research Vice President Cheney's advocacy of the "unitary theory" of government, for which he

would need to review the vice president's emails with staff, as well as other papers; and because,

without access to the vice president's records, it would be impossible for him to do his research

and give a full scholarly account of his subjects.  *Id*. at 226–27 (citing Pls.' Reply to Defs.'

Opp'n to Pls.' Mot. for PI, Ex. 1 P 1).  The court found Mr. Kutler's declaration and associated

allegations "sufficient to establish that Professor Kutler has sought PRA records in the past and

unambiguously intends to do so again in the future." *Id*. at 227.  The court further found that

destruction of the records would cause him injury when he sought them in the future.  *Id*. at 227.

Here, both the Archive and CREW have submitted declarations showing that they

previously sought and used presidential records and intend to do so in the future.  Bookbinder

Decl. ¶¶ 18, 21–27; Blanton Decl. ¶¶ 4–5, 11.  Also, the destruction of those records would

injure the Archive and CREW, who would then be unable to access such records for their

research and publishing.  Bookbinder Decl. ¶¶ 19, 23, 27–31; Blanton Decl. ¶ 6.  Rather than

being "a highly attenuated chain of possibilities," *Clapper*,  568 U.S. at 410, the destruction of

presidential documents will definitely cause clear injury to CREW and the Archive, who will be

unable to review records that Defendants fail to preserve.  If the records at issue are not

preserved, "then no speculation is needed to determine what will happen when Professor Kutler

seeks to use them in his future research—they will be unavailable."  *Cheney*, 593 F. Supp. 2d at

227.  Plaintiffs are not required to wait until "records are actually destroyed in order for [their]

claimed injuries to become concrete and imminent."  *Id.*

Defendants nevertheless argue that CREW and the Archive must allege "a specific intent

to submit a particular FOIA request" and must identify "specific Presidential records (or

categories of records)" that will be the subject of such requests.  Def. Memo. at 10–11.

Plaintiffs' declarations do identify categories of records they anticipate seeking once such

records are made available to the public.  This satisfies their burden on standing.  *See Cheney*,

593 F. Supp. 2d at 228.  Given that such records will not be available to the public until five

years after President Trump leaves office at the earliest, Defendants' suggestion that CREW and

the Archive must be able to allege with specificity the particular records they will seek today is

patently ridiculous and  contrary to decisions from this district.  If CREW and the Archive,

plaintiffs with heightened interests in the preservation of presidential records, are deemed not to

have standing to challenge Defendants' noncompliance with the PRA, it is unclear who would.

> **B.**     **Plaintiffs allegations and supporting declarations demonstrate current and ongoing injury related to their claims under the Take Care Clause of the Constitution.**

Defendants' use of "executive orders to transform what would otherwise be federal

records into presidential records" has deprived Plaintiffs of access to federal records under the

FOIA.  Compl. ¶¶ 109–120.  Defendants' continuing misuse of the executive order process to shield federal records from public access will likewise continue to prevent CREW and the Archive from obtaining federal records relating to executive orders through the FOIA.  An inability to obtain information that the FOIA requires be made public constitutes injury in fact for standing purposes.  *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998).

For example, CREW has been denied access to federal records relating to the Travel Ban EO.  Bookbinder Decl. ¶¶ 9–10.  CREW submitted FOIA requests to CIS, ICE, FAA, DHS, DOT, and TSA, for records relating to the Travel Ban EO.  Bookbinder Decl. ¶ 9.  These agencies should have been involved in the drafting and implementation of the rule changes set out in the Travel Ban EO.  Bookbinder Decl. ¶ 9.  In fact, the then Secretary of Homeland Security publicly announced that his agency was involved.  Compl. ¶ 79.  As a result, documents created and maintained by these agencies should properly be considered federal records.  However, the recipient agencies have either denied CREW's FOIA requests on the basis that no such records exist, subject to a Kafkaesque shuffling from FOIA office to FOIA office, or simply failed to respond.  Bookbinder Decl. ¶¶ 10–13.  In particular, USCIS and TSA responded that they were unable to locate any records related to the Travel Ban EO.  Bookbinder Decl. ¶12, Ex. F–G.  This is because the Defendants have improperly used the PRA to shield agency records from the purview of FOIA.  Thus, through the Defendants' actions, CREW has been deprived of access to federal records relating to the Travel Ban EO.

Moreover, Defendants have given no indication that they intend to stop using the executive order process for this purpose.  As a result, CREW and the Archive have been denied, and will continue to be denied, access to other records that otherwise would be publicly accessible through the FOIA.  CREW's mission is to "protect[] the right of citizens to be

informed about the activities of government officials and to ensur[e] the integrity of government officials."  Compl. ¶ 9.  CREW relies upon access to agency records in order to fulfill its mission.  Compl. ¶ 12.  Similarly, the Archive engages in investigative journalism and other functions that require access to agency records.  Compl. ¶¶ 11–12.  Defendants' use of the PRA to prevent Plaintiffs from accessing agency records therefore constitutes an actual injury in fact that is still ongoing, thus meeting the standing requirements.  *See Arpaio*, 797 F.3d at 19.

In their brief, Defendants misconstrue Plaintiffs' Take Care claim as a simple complaint that specific FOIA requests have turned up empty.  This is not the case.  As explained in *supra* Section II.B, Plaintiffs have alleged that the president has violated the Take Care Clause by subverting the transparency and accountability requirements Congress established in the FOIA and the APA that were intended to check the massive delegation of power from Congress to executive agencies.  Accordingly, Defendants' suggestion that the proper recourse is for Plaintiffs to file FOIA requests, which would turn up empty *precisely because of Defendants' alleged unlawful conduct*, is meritless.

## IV.    Plaintiffs' claims are not barred by *Armstrong I* or any other precedent.

Congress enacted the PRA in 1978, following a protracted legal battle between the United States and President Nixon over his ability to control the records of his presidency after leaving office.  The PRA, which first took effect on January 20, 1981, directs the president to "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records[.]"  44 U.S.C. § 2203(a) (2012).  The PRA specifies that "[t]he United States shall reserve and retain complete ownership, possession and control of Presidential records[.]"  44 U.S.C. § 2202 (2012).  As the House Report on the PRA explains, the

statute was intended to ensure both "the preservation of the historical record of the future

Presidencies" and "public access to the materials" that was "consistent under standards fixed in

law."  H.R. Rep, No. 95-1487, 95th Cong., 2d Sess. § 2 (1978).

The statute defines "presidential records" very broadly, recognizing that "a great number

of what might ordinarily be construed as one's private activities are, because of the nature of the

presidency, considered to be of public nature, *i.e.*, they effect the discharge of his official or

ceremonial duties."  H.R. Rep. No. 95-1487, 95th Cong., 2d Sess. §§ 11–12.  Congress

considered "few" of the president's activities to be "truly private and unrelated to the

performance of his duties,"  *Id.* § 12, and the statutory definition of "presidential records"

reflects this breadth:

> documentary materials . . . created or received by the President, his immediate
> staff, or a unit or individual in the Executive Office of the President whose
> function is to advise and assist the President, in the course of conducting activities
> which relate to or have an effect upon carrying out of the constitutional, statutory,
> or other official or ceremonial duties of the President.

44 U.S.C. § 2201(2) (2012).  The FRA governs records of components of the EOP that do not

advise or assist the president.

The legislative history of the PRA explains that its intent was to guard against the very

conduct this lawsuit challenges and to protect the interests of individuals and entities such as

plaintiffs here.  The PRA was intended to "promote the creation of the fullest possible

documentary record" of a president and insure its preservation for "scholars, journalists,

researchers and citizens of our own and future generations."  124 Cong. Rec. 34,894 (daily ed.

Oct. 10, 1978) (statement of Rep. John A. Brademas).  Indeed, part of the concern Congress had

in the wake of Watergate was the possibility that "[e]vidence vital to ongoing criminal

investigations could have been permanently lost."  124 Cong. Rec. 36,845 (daily ed. Oct. 13, 1978) (statement of Sen. Charles H. Percy).

Contrary to the separation of powers arguments raised by the government in this case, the PRA enjoyed the support of the president at the time.  *See The Presidential Records Act of 1978: Hearing on S. 3494 Before the Comm. on Gov't Affairs* 95th Cong. 5 (1978) (testimony of Jay W. Solomon, Administrator, General Services Administration on Behalf of President Jimmy Carter) (reading letter from President Carter stating "It is my belief that the official papers and other historical materials produced during the Administration of a President represent an important part of our nation's history.  Such materials should be permanently preserved and should be made available for historical review.").  The PRA also reflected the input of many components of the Executive, including the White House, the Department of State, the Department of Defense, the Department of Justice, the Librarian of Congress, and the Archivist. *See* 124 Cong. Rec. 36,845 (daily ed. Oct. 13, 1978) (statement of Sen. Charles H. Percy).

Based on an unduly narrow construction of the PRA and the case law interpreting that statute, Defendants advance the sweeping argument that courts can hear virtually no PRA claims, including those of Plaintiffs, leaving the president and EOP free to ignore, if not flout, the law. Defendants' arguments find no support in the D.C. Circuit's decisions in *Armstrong I*, *Armstrong II*, or opinions from other courts in this district, by advocating for an executive that is beyond the reach of Congress and the courts.  Their arguments draw no force from precedent, which, far from closing off review, has recognized the ability of courts to review an expanding universe of PRA challenges that logically extends to Plaintiffs' challenges here.

In *Armstrong I*, the D.C. Circuit addressed the interplay between the PRA and the FRA and the degree to which courts could review a president's decisions and actions under each

28

statute.  The court concluded that with respect to the PRA, Congress intended to preclude judicial review "of the president's *general compliance with the PRA*"—albeit by implication, not expressly—because such review "would substantially upset Congress' carefully crafted balance" between a president's "control of records creation, management, and disposal" while in office and "public ownership and access to the records" once a president leaves office.  924 F.2d at 291 (emphasis added).  Left unanswered, however, was the breadth of the preclusion for issues involving a president's "general compliance with the PRA."

Two years later, the D.C. Circuit narrowed and further explained the scope of this preclusion in *Armstrong II*, when it held that "courts are accorded the power to review guidelines outlining what is, and what is not, a 'presidential record' under the terms of the PRA."  1 F.3d at 1290.  In reaching this conclusion, the court expressly declined to construe its earlier decision in *Armstrong I* as "stand[ing] for the unequivocal proposition that all decisions made pursuant to the PRA are immune from judicial review," *id.* at 1293, and eschewed an interpretation of the PRA that would deprive courts of the ability to review "the initial classification of materials as presidential records."  *Id.* at 1294.

Although the D.C. Circuit has not revisited this issue since *Armstrong II*, several courts in this district have addressed the meaning and scope of the *Armstrong* decisions as applied to judicial review of PRA claims.  In *CREW v. Cheney*, Judge Kollar-Kotelly characterized CREW's claim that the vice president had adopted policies and guidelines that excluded most of his records from the reach of the PRA as "squarely within the types of claims . . . that are subject to judicial review" under *Armstrong II*.  593 F. Supp. 2d at 217.  Notably, she rejected as "untenable" the government's position—asserted here as well—that she should confine *Armstrong II* to its facts, reasoning that to do so would "eviscerat[e] its precedential value."  *Id.*

at 215.  Judge Kollar-Kotelly also stressed that "[t]he distinction between *Armstrong I* and

*Armstrong II*, according to the D.C. Circuit, was the type of conduct the plaintiffs were seeking

to challenge, not the vehicle by which plaintiffs were challenging it."  *Id.*

Similarly, in *American Historical Ass'n v. Peterson*, the court rejected the government's

claim that *Armstrong I* and *Armstrong II* made unreviewable "discretionary Presidential

decisions alleged to be in excess of statutory authority[.]"  876 F. Supp. 1300, 1313 (D.D.C.

1995) (internal quotation marks omitted).  As the court observed, "*Armstrong I* and *Armstrong II*

do not mark the beginning and end of the complicated inquiry regarding judicial review under

the PRA[.]"  *Id.* at 1314.  Although *American Historical Ass'n* raised the issue of whether the

court could review under the PRA a president's disposal decision after he left office—an issue

not presented here—its more expansive interpretation of judicial review generally under the PRA

compels a similar interpretation in this case.  *See Cheney*, 593 F. Supp. 2d at 216 *contra*. Def.

Memo. at 19–20.

Far from affording *Armstrong I* the narrowest construction, each of these courts *expanded*

the scope of judicial review under the PRA to maintain the careful balance Congress struck

between a president's right to control decisions about the creation, management, and disposal of

his or her records while in office, and the public's right to a complete historical record of a

president's actions and decisions upon leaving office.  The practices at issue here fall within the

arc of these decisions.  Specifically, Defendants' uncontested use of communications practices

that knowingly prevent the president and his staff from making a threshold classification

decision about whether a particular communication is a presidential record that must be

preserved and their failure to issue guidelines concerning these practices directly impede the

rights the PRA affords the public, and fall within the category of "classification decisions" subject to judicial review.

As set forth in the complaint, Signal and Confide automatically and instantaneously delete electronic messages after a recipient reads them, with no independent action on the part of the recipient and regardless of their content.  Compl. ¶¶ 93–94.  In other words, they rob the recipients of the ability to classify the messages as presidential or personal and to treat them accordingly.  Judicial review of this unlawful practice is, therefore, a logical extension of the courts' decisions in *Armstrong II* and its progeny, which distinguished as unreviewable, creation, management, and disposition decisions as opposed to "the initial classification of materials as presidential records," *Armstrong II*, 1 F.3d at 1294, which is subject to judicial review.

Here, too, that Plaintiffs "are not pursuing FOIA or FRA claims," and do not challenge guidelines that directly implicate those statutes, Def. Memo. at 15, does not shield Defendants' actions from judicial review where those actions effectively represent an end-run around the PRA's core provisions.  As the legislative history makes clear, "[d]efining the types of documentary materials falling within the ambit of either 'presidential' or 'personal' records is of primary importance to the act."  H.R. No. 95-1487, 95th Cong., 2d Sess. § 11 (1978).  Plaintiffs' claims seek to give full effect to this purpose.

The PRA's definitional provisions reinforce this conclusion.  The D.C. Circuit in *Armstrong II* explained:

> A 'creation' decision refers to the determination to make a record documenting presidential activities . . . 'Management decisions' describes the day-to-day process by which presidential records are maintained . . . Finally, 'disposal decisions' describes the process outlined in 44 U.S.C. § 2203(c)–(e) for disposing of presidential records.  Judicial review of the President's action under these provisions is . . . unavailable.

1 F.3d at 1294 (citations omitted); *accord. Cheney*, 593 F. Supp.2d at 214.  As applied here, the use of Confide and Signal constitutes neither a "creation" nor a "management" decision.  Rather these apps function completely independently from the decision of a sender to create an email communication, and they prevent altogether any day-to-day management of the communication as their very use (and indeed their very purpose) ensures no record will remain to be managed.  Finally, use of these apps does not represent a "disposal decision," as they ensure destruction in all cases with no thought involved whatsoever.

None of the other cases Defendants cite alter this conclusion.  Although the court opined in *Judicial Watch, Inc. v. NARA* that the holding in *Armstrong II* was narrower than its language suggests, 845 F. Supp. 2d 288, 297 (D.D.C. 2012), this observation was pure dicta as the case was decided on redressability grounds with the court concluding the requested relief was not available under the PRA.  *Id.* at 298–99.  *CREW v. Cheney*, by contrast, sets forth an extended analysis of the D.C. Circuit precedent, and explains how immunizing decisions that negate the PRA's purpose from judicial review "'borders on the absurd[.]'"  593 F. Supp. 2d at 216 (quoting *Am. Historical Ass'n*, 876 F. Supp. at 1315).  Here, too, it "borders on the absurd" to conclude Congress passed a statute to protect our national history, but left presidents with unfettered discretion to ignore the statute at will, and immunized their actions from all judicial review.

Defendants' arguments to the contrary reflect a fundamental misunderstanding of Plaintiffs' claims.  As explained, Plaintiffs do not challenge the "improper[] disposi[tion] of presidential records," Def. Memo at 13, nor does their claim start and stop with the "wholesale" destruction of presidential records.  *Id*. at 18.  Rather, Plaintiffs challenge the use of a new technology that prevents a message recipient from classifying a record as presidential in the first

place.  Plaintiffs also do not challenge "'the President's general compliance with the PRA.'"

Def. Memo. at 13 (quoting *Armstrong I*,924 F.2d at 291).  To the contrary, Plaintiffs challenge

the specific use by Defendants of communications practices that "usurp all the critical record-

keeping functions the PRA imposes on the President, his staff and the EOP[.]"  Compl. ¶ 93.  As

such, Plaintiffs' claims represent the flip side of *Armstrong II* and *CREW v. Cheney*, as Plaintiffs

are challenging Defendants' use of messaging apps that prevent Defendants from making a

classification decision in the first instance, and are challenging the Defendants' failure to issue

guidelines concerning the use of message-deleting apps that otherwise prevent such a decision.[6]

Under the logic of this precedent, both sets of issues are properly subject to review under the

PRA.  A contrary conclusion would allow Defendants to evade judicial review simply by

refraining from issuing or rescinding guidelines implementing the PRA; basically, by hiding

from a known problem.

　　　Defendants also contort the meaning of post-*Armstrong I* decisions to argue for the

president's "unfettered control" over all aspects of his records and records management, Def.

Memo. at 15, even if it results in a White House that recklessly and knowingly flouts the PRA's

statutory commands and deprives the public of the historical record to which it is due.  To get

there, Defendants start from the same narrow construction of *Armstrong I* that multiple courts

have rejected, namely that it precludes judicial review of all the president's recordkeeping

practices and decisions.  Def. Memo. at 13 (citing *Armstrong I*, 924 F.2d at 291).  In *Armstrong

II*, however, the D.C. Circuit expressly rejected this construction, explaining that "[t]he

---

[6] Defendants attempt to escape the impact of *CREW v. Cheney* by arguing "plaintiffs do not
challenge any guidelines[.]"  Def. Memo. at 18.  But Plaintiffs do challenge the failure of the
president, his staff, and the EOP to issue guidelines concerning the use of message-deleting apps
like Confide and Signal.  Compl. ¶¶ 101–02.

*Armstrong I* opinion does *not* stand for the unequivocal proposition that *all* decisions made pursuant to the PRA are immune from judicial review." 1 F.3d at 1293 (emphasis added).

Not only is Defendants' construction incompatible with the D.C. Circuit's own interpretation of its rulings, but it contravenes the animating principle behind the statute. The legislative history of the PRA explains that the Act was intended to guard against the very conduct at issue here and to protect the interests of entities like Plaintiffs. Congress enacted the PRA to "promote the creation of the fullest possible documentary record" of a president and ensure its preservation for "scholars, journalists, researchers and citizens of our own and future generations,"[7] 124 Cong. Rec. 34,894 (daily ed. Oct. 10, 1978) (statement of Rep. John A. Brademas), recognizing the "immense historical value" of a president's records. 124 Cong. Rec. 36,843 (daily ed. Oct. 13, 1978) (statement of Sen. Charles H. Percy). One of the Act's co-sponsors, Rep. John A, Brademas, explained:

> [T]he past may not be the surest guide to the future, but neither can we in Government afford to ignore its lessons altogether. And essential to understanding the past is access to the historical record, to the documents and other materials that are produced in the course of governing and shed light on the decisions and decisionmaking processes of earlier years.

124 Cong. Rec. 34,894 (daily ed. Oct. 10, 1978). Accepting Defendants' position here would undermine these goals by allowing the president to use technology that ensures no record is created in the first place, depriving the public, historians, journalists, and watchdog groups like Plaintiffs of a piece of our history.

Finally, Defendants' interpretation of the PRA would mark the beginning of the end for the PRA's utility in the face of ever-changing technology. To be sure, the advent of messaging apps like Confide and Signal that foreclose any opportunity to classify a message under the PRA

---

[7] The Supreme Court recognized the legitimacy of these interests in *Nixon v. Administrator* when it upheld the constitutionality of the predecessor law to the PRA. 433 U.S. 425, 452 (1977).

present new factual challenges that no court has yet addressed.  And Congress, in enacting the

PRA, could not have envisioned a technology akin to "reverse invisible ink" that destroys a

record upon contact with the recipient.  But these novelties do not justify a hands-off approach,

especially when insulating from judicial review all aspects of the president's compliance with the

PRA would leave the president and his staff free to ignore the PRA entirely.  Technology will

continue to occupy our workplaces, but it should not stymie judicial review of presidential

actions that thwart one of the fundamental tenets of the PRA.

**V.      The Court has the power to issue the relief sought by Plaintiffs.**

Plaintiffs seek mandamus relief under 28 U.S.C. § 1361, which gives district courts

"original jurisdiction of any action in the nature of a mandamus," as well as declaratory relief

under 28 U.S.C. § 2201 for Defendants' violations of the PRA and the Take Care Clause.  Both

forms of relief may properly issue from the Court in this case.[8]

> **A.      Plaintiffs state a valid claim for mandamus relief because Defendants have failed to comply with their ministerial duties under the PRA.**

Plaintiffs' request for a "writ of mandamus and injunctive relief ordering the president,

his staff, and the EOP to comply with their mandatory, non-discretionary duties under the PRA,

and the president's obligations under the take-care clause," Compl. ¶ 108, meets the well-

established standards for such relief.[9]  The writ of mandamus sought by Plaintiffs would simply

---

[8] In the portion of their memorandum addressing the relief available to Plaintiffs, Defendants rely again on their assertion that Plaintiffs' PRA claims are not justiciable.  For the reasons explained in Section II.A, *supra*, the claims advanced in this case are consistent with those that the D.C. Circuit ruled were justiciable in *Armstrong II*.  1 F.3d at 1294.

[9] As the government acknowledges, a court may issue mandamus where "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." *Council of & for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1533 (D.C. Cir. 1983); *see also Cheney*, 593 F. Supp. 2d at 219 (same).  "Even when the legal requirements for mandamus jurisdiction have been satisfied, however, a court may grant relief only when it finds 'compelling . . . equitable grounds.'"  *In re Medicare*

require Defendants to perform their ministerial duty to issue classification guidelines that are consistent with the PRA.  As members of the public with particularly well-established interests in the proper classification of presidential records, Plaintiffs have alleged facts that demonstrate a clear right to relief, that there is no other remedy available, and that the Court's exercise of mandamus jurisdiction would be equitable.  Contrary to the government's assertions that mandamus relief risks violating the constitutional separation of powers, Plaintiffs' prayers for relief in fact represent an attempt to uphold that very principle.

### 1.    Defendants have violated their ministerial obligations under the PRA.

The PRA imposes an affirmative obligation on the president to take "all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records pursuant to the requirements of this section and other provisions of law."  44 U.S.C. § 2203(a); *see also* Compl. ¶¶ 89–90.  The PRA further requires that the president categorize records as either presidential or personal, 44 U.S.C. § 2203(b), based on a statutorily-imposed definitions of what are presidential and personal records.  44 U.S.C. § 2201(2)–(3); *see also* *Cheney*, 593 F. Supp. 2d at 220.  The PRA does not afford the president discretion to destroy records as he sees fit.  *See* 44 U.S.C. § 2203(c)–(f) (describing the processes by which records may be destroyed); *Cheney*, 593 F. Supp. 2d at 220 ("The PRA also requires the [president] to take steps to assure that [presidential] records, as they are defined in the PRA, are appropriately maintained and preserved."); *see also* Compl. ¶ 95.  As laid out in the Section II.A, Plaintiffs

---

*Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005) (quoting *13th Reg'l Corp. v. U.S. Dep't of the Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980)).

have pleaded facts demonstrating violations of these duties. *See also* Compl. ¶¶ 87, 93–97, 101, 110–19.

The classification obligations the PRA creates are ministerial. *Cheney*, 593 F. Supp. 2d at 218. Although the court there considered those obligations as they apply to the vice president, the analysis applies equally to the president: "the PRA provides a definition for [the president's] records and requires the [president] to preserve them, . . . the [president] has a ministerial obligation to preserve [presidential] Records as they are defined in the PRA." *Id.* at 220. If it is not a ministerial duty to issue and implement guidelines that define what a presidential record is, then *Cheney*'s holding that there is a ministerial duty to issue classification guidelines is meaningless.

That even classification decisions under the PRA may require some interpretation and application is entirely consistent with *Cheney's* logic, controlling precedent, and no bar here. In *Nat'l Treasury Employees Union v. Nixon*, , the D.C. Circuit engaged in lengthy statutory analysis of the Federal Pay Comparability Act, 5 U.S.C. § 5301 et seq. (1970), considering the statute's text and legislative history before determining that Congress had imposed a ministerial duty on the president to adjust federal pay scales in October 1972. 492 F.2d 587, 600 (D.C. Cir. 1974). The court defended this approach by quoting from *Roberts v. U.S. ex rel. Valentine*, 176 U.S. 221 (1900), in which the Supreme Court explained,

> Every statute to some extent requires construction by the public officer whose duties may be defined therein. Such officer must read the law, and he must therefore, in a certain sense, construe it, in order to form a judgment from its language what duty he is directed by the statute to perform. But that does not necessarily and in all cases make the duty of the officer anything other than a purely ministerial one. If the law directs him to perform an act in regard to which no discretion is committed to him, and which, upon the facts existing, he is bound to perform, then that act is ministerial, although depending upon a statute which requires, in some degree a construction of its language by the officer. Unless this be so, the value of this writ is very greatly impaired.

*Nat'l Treasury Employees Union*, 492 F.2d at 602 (*quoting Roberts*, 176 U.S. at 231).  Thus, to the extent that the government is claiming any ambiguity in the PRA concerning the scope of the Defendants' duties at issue here, the Court must interpret the PRA before determining whether Defendants' duties under it are ministerial.

### 2.       Defendants' PRA duties are owed to the public, including Plaintiffs.

The government correctly asserts that Defendants' duties under the PRA are owed to the public, *see* Def. Memo. at 26, but makes the remarkable claim that "[t]he mandamus statute does not permit a plaintiff to vindicate duties owed to the general public."  *Id.*  This assertion has no basis in case law, legislative history, or logic, and ignores the fact that CREW and the Archive, are as much members of "the public" as any other (just perhaps more interested ones).

Neither are particular members of the public foreclosed from seeking mandamus relief for a ministerial duty owed to "the public" at large.  The government's citation, Def. Memo. at 26, to *Armstrong I*, for this premise, merely captures the court's acknowledgement of Congress' intent that there be public ownership and access to presidential records; that opinion does not discuss or even mention the standards for mandamus relief.  *See* 924 F.2d at 290; Def. Memo. at 26.  The citation to *Marbury v. Madison* simply proves that there may have been a ministerial duty owed to the Plaintiff in that case—not that a statutory requirement cannot be interpreted to impose a ministerial duty on public officials vis-à-vis "the public."  *See* Def. Memo. at 25.

The legislative history marshalled by the government fares no better.  The testimony of Deputy Attorney General Byron White simply states that mandamus relief should not apply to the discretionary acts of federal officers.  Def. Memo. at 26 (quoting S. Rep. No. 87-1992 (1962) ("We think it essential that the section . . . specifically *limit* its exercise to ministerial duties owed to the plaintiff.  *Should the language be applied to discretionary acts* of Federal officers, *the judicial branch would be invading the executive or legislative function* in violation of the

doctrine of the separation of powers.") (emphasis added)).  White's statement is true, but it speaks to the unavailability of mandamus relief for discretionary acts, not whether particular members of the public may seek mandamus relief for ministerial acts.  This literal reading of his testimony is consistent with the other evidence the government cites.  The Senate's rejection of an amendment to 28 U.S.C. § 1361 that would have made mandamus relief available to enforce "a duty owed to the plaintiff *or to make a decision in any matter involving the exercise of discretion*" merely demonstrates that the Senate rejected mandamus relief for non-discretionary acts.  Def. Memo. at 26 (quoting S. Rep. No. 87-1992 (1962) (emphasis added)).

The Court should therefore reject out-of-hand the government's attempt to foreclose mandamus relief for ministerial duties owed to the public because no particular member of the public has a right to bring a claim to enforce the right.  This Orwellian result would directly undermine Congress' intent to make presidential records public property through the PRA.

**3.      Mandamus relief requiring Defendants to comply with their ministerial duties under the PRA would not raise any separation of power concerns**

By failing to issue guidelines that comply with the ministerial duties required of them by the PRA and then claiming that failure may not be challenged in court, Defendants are claiming extraordinary authority to decide which laws, if any, apply to them.  But if it is "emphatically the province and duty of the judicial department to say what the law is," *Marbury*, 5 U.S. at 177, courts must be able to distinguish between actual interference with the executive functions of a president and hollow invocations of "separation of powers" that are deployed by the president to excuse his conduct.  Since Plaintiffs' claim for mandamus relief simply require the president to issue and maintain guidelines that are consistent with the congressional mandate reflected in the PRA, the imposition of mandamus relief in this case would be fully consistent with the constitutional separation of powers, not a violation of it.

Enforcing Defendants' obligations under the PRA does not require the Court to enjoin the president's discharge of executive or political functions—the legitimate interest that underlies true "separation of powers" concerns.  *See, e.g., Nixon v. Fitzgerald*, 457 U.S. 731, 754 (1982); *Clinton v. Jones*, 520 U.S. 681, 703 (1997).  Instead, the duties imposed on Defendants by the PRA are straightforward, non-discretionary, and do not infringe on the president's core constitutional responsibilities.  Mandating that Defendants comply with these duties would require minimal interference by the Court with the executive function.

Contrary to the Defendants' assertions, such relief is available, even if it is used sparingly.  In *Mississippi v. Johnson*, 71 U.S. 475, 501 (1867), the Supreme Court left open the question of whether injunctive relief against the president in his official capacity was available, but has since upheld such relief on several occasions, including *United States v. Nixon*, 418 U.S. 683 (1974) and *Boumediene v. Bush*, 553 U.S. 723 (2008).  In accordance with those decisions, the D.C. Circuit held in *Nat'l Treasury Employees Union v. Nixon*, that it had jurisdiction "to support the issuance of a writ of mandamus directing the President to effectuate the pay raise sought by plaintiff", even though it ultimately opted to impose declaratory relief instead.  492 F.2d at 616; *cf. Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) ("For purposes of establishing standing, however, we need not decide whether injunctive relief against the President was appropriate, because we conclude that the injury alleged is likely to be redressed by declaratory relief against the Secretary alone.").[10]  Even if the Court were reluctant to issue mandamus relief (especially if it considered declaratory relief likely to prove effective), that is

---

[10] These cases, all of which involved claims for injunctive relief against a president, stand in stark contrast with *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010), in which the government finds its dicta that "'courts do not have jurisdiction to enjoin' the President ."  Def. Memo. at 27.

not a basis for dismissing Plaintiffs' claim at this stage.  *See Franklin*, 505 U.S. at 803; *Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 31 (D.D.C. 2011).

### B.    Plaintiffs have raised valid claims for declaratory relief.

Declaratory judgments are available in federal court "(1) in disputes involving an actual case or controversy; (2) where the issue is actual and adversarial; and (3) when the action is not merely a medium for securing an advisory opinion." *Comm. On Judic. v. Miers*, 558 F. Supp. 2d 53, 80 (D.D.C. 2008) (citing *Coffman v. Breeze Corp.*, 323 U.S. 316 (1945)).  Further, the Declaratory Judgment Act ("DJA") "should be liberally construed to achieve the objectives of the declaratory remedy." *Id*. at 82.  Defendants assert that Claims One, Two, and Four "inappropriately" invoke the Declaratory Judgment Act, because that act does not create a cause of action.  Def. Memo. at 20–21.  But this argument relies on the premise that Plaintiffs do not have causes of action under the PRA and the mandamus statute, which is wrong as set out above at *supra* Sections IV and V.A.  And because Claim Four is rooted in the Constitution, no further cause of action is required.  *See Miers*, 558 F. Supp. 2d at 80 ("[W]here the Constitution is the source of the right allegedly violated, no other source of a right—or independent cause of action—need be identified").[11]

CREW and the Archive have satisfied the conditions set out in the text of the DJA itself. This is a "case of actual controversy within [this Court's] jurisdiction," and Plaintiffs have filed the "appropriate pleading" seeking a declaration relating to their "rights and other legal relations[.]"  28 U.S.C. § 2201(a) (2012).  Further, this Court has jurisdiction to hear the case

---

[11] This is because, even if a particular statute does not permit review of a president's actions, they can still be reviewed for constitutionality. *Franklin*, 505 U.S. at 801.  Indeed, as the government has admitted in other cases, "an independent claim of a President's violation of the Constitution would certainly be reviewable." *See, e.g.*, *Chamber of Commerce*, 74 F.3d at 1326–28 ("[W]e have never held that a lack of a statutory cause of action is per se a bar to judicial review").

pursuant to 28 U.S.C. § 1331.  Defendants' argument to the contrary stems from their premise

that no review is permitted under the PRA which, again, is incorrect.  Accordingly, because

CREW and the Archive have properly alleged violations of the PRA by Defendants, and these

violations are reviewable and justiciable by this Court, the PRA provides a cause of action for

which declaratory judgment is an appropriate remedy.  Further, as the Defendants admit in their

brief, the mandamus statute provides a cause of action sufficient for declaratory relief.  Def.

Memo at 22; *see also Cheney,* 593 F. Supp. 2d at 222 ("Where a plaintiff advances a legally

cognizable claim for mandamus, the plaintiff necessarily also advances a cause of action on

which declaratory relief may lie.").  Thus, while the DJA may[12] not create an independent source

of subject matter jurisdiction, as long as subject matter jurisdiction exists under the Mandamus

Act, the Court can "utilize the tool of declaratory relief."  *Id*. (quoting *Nat'l Treasury Employees*

*Union*, 492 F.2d at 616).

## CONCLUSION

The motion to dismiss should be denied.  Plaintiffs' Claims One, Two, and Three are

justiciable because they relate to the Defendants' disregard of the PRA, rather than day-to-day

management decisions under the statute.  Plaintiffs' Claim Four is subject to judicial review

because it relates to the constitutional validity of the president's actions.  Plaintiffs have standing

to bring these claims because the Defendants' are destroying presidential records that are

essential to Plaintiffs' work and organizational missions and unlawfully thwarting public access

to records relating to executive orders.  A declaratory judgment and writ of mandamus are

appropriate remedies for these claims.  Declaratory judgment is available because Plaintiffs have

---

[12] Although there are cases that appear to conclude that the DJA "does not create a cause of action,"  Def. Memo. 20–21, the better authority indicates that "the wording of the statute does not indicate that any independent cause of action is required to invoke the DJA."  *Miers*, 558 F. Supp. 2d at 80.

both statutory and constitutional causes of action.  In addition, mandamus is appropriate because the Defendants' obligations under the PRA to categorize and preserve presidential records are non-discretionary ministerial duties.

Respectfully submitted,

BAKER & MCKENZIE LLP

/s/ George M. Clarke III
George M. Clarke III, D.C. Bar No. 480073
Mireille R. Oldak,  D.C. Bar No. 1027998
815 Connecticut Avenue, N.W.
Washington, D.C. 20006
Phone: (202) 835-6184
Fax: (202) 416-7184
Email: george.clarke@bakermckenzie.com
Email: mireille.oldak@bakermckenzie.com

/s/ Angela C. Vigil
Angela C. Vigil, *Pro Hac Vice*
1111 Brickell Avenue, Suite 1700
Miami, FL 33131
Phone: (305) 789-8904
Email: angela.vigil@bakermckenzie.com

/s/ Katie Marcusse
Katie Marcusse, *Pro Hac Vice*
100 New Bridge Street
London EC4V 6JA
United Kingdom
Phone: 44 20 7919 1508
Email: katie.marcusse@bakermckenzie.com

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON

/s/ Anne L. Weismann
Anne L. Weismann, D.C. Bar No. 298190
Conor M. Shaw, D.C. Bar No. 1032074
455 Massachusetts Ave., N.W., Sixth Floor
Washington, D.C. 20001
Phone: (202) 408-5565
Email: aweismann@citizensforethics.org
Email: cshaw@citizensforethics.org

*Counsel for Plaintiffs*

**Dated: November 3, 2017**