## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **DONALD J. TRUMP** *et al.*, <br><br> Defendants. | Case No. 17-cv-1228 (CRC) |

## <u>MEMORANDUM OPINION</u>

This case raises difficult questions concerning the ability of private citizens to sue the President for violations of his duty to preserve his official records for historical account. Citing media reports that appeared soon after President Trump took office, plaintiffs Citizens for Responsibility and Ethics in Washington and the National Security Archives allege that White House staffers have conducted official business using instant messaging applications that automatically delete messages after they are read. Plaintiffs seek a declaratory judgment that the use of these apps violates the Presidential Records Act of 1978, which obligates the President to first classify and then take steps to maintain "presidential records." They also request injunctive and mandamus relief requiring the President to comply with the Act. Finally, Plaintiffs seek a declaration that the White House has violated the Take Care Clause of the Constitution by making policy through executive order, rather than agency rulemaking, so as to avoid the public disclosure of records under other statutes like the Administrative Procedure Act and the Freedom of Information Act. The government has moved to dismiss the suit.

The use of automatically-disappearing text messages to conduct White House business would almost certainly run afoul of the Presidential Records Act. But that merits question is not

before the Court.  Rather, the threshold question presented by the government's motion to dismiss is whether Plaintiffs have identified a valid cause of action that would enable their case to proceed to the merits.  The Court concludes that they have not.

The Presidential Records Act reflects a careful legislative balancing of two competing goals.  See Armstrong v. Bush ("Armstrong I"), 924 F.2d 282, 290 (D.C. Cir. 1991).  On the one hand, Congress wanted to ensure that presidential records are preserved so that the public would have access to them after the President leaves office.  Id.  On the other, Congress "sought assiduously to minimize outside interference with the day-to-day operations of the President and his closest advisors and to ensure executive branch control over presidential records during the President's term in office."  Id.  In striking this balance, Congress chose not to create a private right of action to enforce the Act.  And because the President is not an agency, see Franklin v. Massachusetts, 505 U.S. 788, 801 (1992), his compliance with the PRA cannot be challenged under the Administrative Procedure Act.

To the extent judicial review of the President's decisions under the Presidential Records Act is at all available, plaintiffs must root their claims elsewhere.  Here Plaintiffs invoke the Court's mandamus jurisdiction.  But they have failed to state a valid mandamus claim because the actions they seek to compel—like the issuance of guidelines prohibiting the use of the challenged messaging apps—are too discretionary in nature to satisfy the stringent requirements for mandamus relief.  And because Plaintiffs have failed to state a valid mandamus claim, the counts of their complaint that are premised on violations of the Presidential Records Act must be dismissed.

Plaintiffs' contention that the President has violated the Constitution's Take Care Clause by making policy through executive order meets a similar fate.  Whether claims brought directly

under the Take Care Clause are even justiciable is open to debate. But regardless of whether some form of relief is available, Plaintiffs have not stated a claim to it here. They challenge no particular executive order; they concede that the President may issue executive orders generally; and they offer no authority preventing the President from choosing to address an issue through executive order rather than the administrative process, even if that choice limits the public's access to government records. As a result, the Court must dismiss the Plaintiffs' Take Care Clause claim as well.

**I.    Background**

A.  The Presidential Records Act and the Federal Records Act

The creation, management, and disposal of records by the federal government is controlled by two key statutes: the Presidential Records Act and the Federal Records Act.

The Presidential Records Act ("PRA") specifically governs the maintenance and destruction of "Presidential records." See 44 U.S.C. § 2201 *et seq.*; see also Armstrong I, 924 F.2d at 285–86. It was enacted in 1978 following controversy over the ownership of Richard Nixon's presidential records. See Citizens for Responsibility & Ethics in Washington v. Cheney ("CREW"), 593 F. Supp. 2d 194, 199 (D.D.C. 2009). Congress, in passing the PRA, "sought to establish the public ownership of presidential records and ensure the preservation of presidential records for public access after the termination of a President's term in office." Armstrong I, 924 F.2d at 290.

 "Presidential records" are defined under the PRA as "documentary materials, or any reasonably segregable portion thereof, created or received by" the President or the President's staff "in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44

U.S.C. § 2201(2).  Such records do not include materials "of a purely private or nonpublic character."  Id. § 2201(2)(B)(ii), (3).  Nor do "presidential records" include the "official records of an agency," as defined by the Freedom of Information Act ("FOIA").  Id. § 2201(2)(B)(i).

The PRA directs that the "President shall take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's . . . duties are adequately documented and that such records are preserved and maintained as Presidential records pursuant to" the statute.  Id. § 2203(a).  During the President's term, the President "may dispose of those Presidential records of such President that no longer have administrative, historical, informational, or evidentiary value."  Id. § 2203(c).  Prior to doing so, the President must obtain the views of the Archivist of the United States concerning the records the President wishes to destroy.  Id. § 2203(c)(1).  The Archivist may, and in some situations shall, notify Congress of the intended destruction, and the President must wait at least 60 days after such notification to destroy the records.  Id. § 2203(d), (e).  But the PRA "gives neither the Archivist nor the Congress the authority to veto the President's decision to destroy the records."  Armstrong I, 924 F.2d at 286.

The creation, management, and disposal of *agency* records, by contrast, is governed by the Federal Records Act ("FRA").  See 44 U.S.C. §§ 2101 *et seq.*; see also Armstrong I, 924 F.2d at 284–85.  The FRA defines "records" as "all recorded information, regardless of form or characteristics, made or received by a Federal agency . . . and preserved . . . by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government."  44 U.S.C. § 3301(a)(1)(A).

The FRA directs the head of every federal agency to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions,

procedures, and essential transactions of the agency." Id. § 3101. Each agency head must also

"establish and maintain an active, continuing program for the economical and efficient

management of the records of the agency" and must "establish safeguards against the removal or

loss of records." Id. §§ 3102, 3105. Agency records may not be destroyed except as outlined in

the FRA. Id. § 3314.

B. Factual and Procedural Background

The following relevant background is drawn from the allegations set forth in the

complaint, which the Court must accept as true at this stage of the litigation. See Doe v.

Rumsfeld, 683 F.3d 390, 391 (D.C. Cir. 2012). Shortly after President Trump's inauguration, the

press reported that members of his immediate staff were using messaging applications known as

Signal and Confide. Compl. ¶¶ 50, 56. Signal allows users to send text, video, and picture

messages to others and includes a "disappearing messaging function" whereby the user can set a

time limit by which the sent message will be deleted from both the recipient's and sender's

devices. Id. ¶¶ 51–52. Confide is a similar messaging application that automatically deletes text

messages when the recipient "wands" over the message's words to read them. Id. ¶¶ 56, 58.

Following these reports, several members of Congress wrote letters to the White House seeking

information about the use of applications like Signal and Confide. Id. ¶ 63. In response, the

Administration neither confirmed nor denied that the apps had been or were being used, simply

noting that White House policy was to comply with the Presidential Records Act. Mem. P. & A.

Opp'n Defs.' Mot. Dismiss ("CREW Opp'n") at 6–7.

In light of the press reports and the Administration's refusal to squarely deny them,

Citizens for Responsibility and Ethics in Washington and the National Security Archive

(collectively "CREW") filed suit against President Trump and the Executive Office of the

President.  CREW alleged that the use of applications like Confide and Signal prevented White House staff from adequately determining whether a record is a presidential record and that the automatic deletion of messages violated the Presidential Records Act.  Compl. ¶¶ 91–95.  It sought declaratory relief that the use of the applications themselves, as well as the failure to issue guidelines regulating their use, violated the Act.  Id. ¶¶ 98, 102.  Additionally, CREW sought injunctive and mandamus relief requiring the President, his staff, and the Executive Office to comply with their non-discretionary duties under the Act.  Id. ¶ 108.  Finally, CREW sought a declaratory judgment that the Defendants' alleged practice of issuing executive orders to create policy in a manner designed to remove records from the scope of the Federal Records Act and FOIA is contrary to the Take Care Clause of the Constitution.  Id. ¶ 120.  The government subsequently moved to dismiss the case.  The Court held a hearing on the motion on January 17, 2018 and will now grant it.

## II.  Legal Standard

The government has moved for dismissal under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim upon which relief may be granted.  When analyzing a motion to dismiss under either Rule 12(b)(1) or Rule 12(b)(6), "[t]he court assumes the truth of all well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor, but is not required to accept the plaintiff's legal conclusions as correct."  Sissel v. U.S. Dep't of Health & Human Servs., 760 F.3d 1, 4 (D.C. Cir. 2014) (Rule 12(b)(6)); see also Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (Rule 12(b)(1)).

With respect to a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of establishing subject matter jurisdiction.  Harris v. Sebelius, 932 F. Supp. 2d 150, 151 (D.D.C.

2013). The Court may look to materials outside the pleadings when deciding the motion. Jerome Stevens Pharma., 402 F.3d at 1253.

In turn, "[t]o survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Dismissal is ultimately proper if "the 'plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002) (citation omitted). In contrast to a motion under Rule 12(b)(1), when evaluating a motion under Rule 12(b)(6) the Court may consider only the facts in the complaint, any documents attached to or incorporated into the complaint, and matters of which the Court may take judicial notice. See, e.g., EEOC v. St. Francis Xavier Parochial School, 117 F.3d 621, 624 (D.C. Cir. 1997).

Finally, when a plaintiff fails to state a valid cause of action, the proper remedy is to dismiss the complaint under Rule 12(b)(6) for failure to state a claim: whether a plaintiff has stated "claims 'upon which relief can be granted' depends in part on whether there is a cause of action that permits [the plaintiff] to invoke the power of the court to redress the violations of law" alleged. Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 188 (D.C. Cir. 2006); see also Bell v. Hood, 327 U.S. 678, 682 (1946) ("[T]he failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction.").

### III. Analysis

CREW's complaint raises four claims. The first three allege violations of the Presidential Records Act and rely on a cause of action under the Court's mandamus jurisdiction: Count I seeks a declaratory judgment that the use of messaging apps like Confide and Signal violates the

Act; Count II seeks a declaratory judgment that the failure to promulgate guidelines concerning these apps violates the Act; and Count III seeks a writ of mandamus or injunctive relief requiring the Defendants to comply with their duties under the Act.  Count IV, in contrast, is brought directly under the Take Care Clause of the Constitution:  CREW seeks a declaratory judgment that the Trump Administration's use of executive orders violates the Clause's mandate to "faithfully execute" the laws.  The Court will first address whether CREW states a claim as to the three Presidential Records Act counts and then turn to the fourth count invoking the Take Care Clause.[1]

A.  Counts I through III

The government first argues that Counts I through III must be dismissed because judicial review is precluded under the Presidential Records Act, as interpreted by the D.C. Circuit's Armstrong decisions.  And even if that were not so, it further argues that CREW still fails to state a valid mandamus claim and thus lacks a cause of action for its first three counts.  The Court will entertain the government's Armstrong argument but ultimately declines to resolve it, finding that dismissal is proper regardless because CREW fails to state a valid mandamus claim.

1.  *The Presidential Records Act and the* Armstrong *decisions*

The government maintains that the Court should dismiss Counts I through III because judicial review of these claims is precluded by the Presidential Records Act, as determined by

---

[1] The government initially disputed whether CREW met the injury-in-fact requirement for standing.  Defs.' Mem. P. & A. Supp. Mot. Dismiss ("Gov. MTD") at 8–11.  It withdrew that challenge, however, in light of declarations that CREW submitted along with its opposition brief attesting to the organization's plans to file future FOIA requests for records generated by the current Administration.  Gov. Reply at 3 n.1.  The Court agrees that CREW has alleged a sufficiently concrete and impending injury—namely, the unavailability of records that would have been responsive to future FOIA requests—to establish standing.

the D.C. Circuit in the <u>Armstrong I</u> decision.  Defs.' Mem. P. & A. Supp. Mot. Dismiss ("Gov.

MTD") at 11–12.  CREW counters that its allegations fall within the narrow swath of claims that

were found to be reviewable in <u>Armstrong II</u>.  CREW Opp'n at 32; <u>see</u> <u>Armstrong v. Executive</u>

<u>Office of the President</u> ("<u>Armstrong II</u>"), 1 F.3d 1274 (D.C. Cir. 1993) (per curiam).

 Although the parties did not brief the issue, it is not immediately apparent that <u>Armstrong</u>

<u>I</u> precludes review of CREW's *mandamus* claim, as opposed to a claim under the Administrative

Procedure Act.  <u>Armstrong I</u> involved a suit brought by a group of plaintiffs under the APA

against then-President Ronald Reagan, then-Vice President George H.W. Bush, the National

Security Council, and the Archivist of the United States, seeking to prevent the deletion of

materials from White House computer systems.  <u>Armstrong I</u>, 924 F.2d at 286.  On appeal, the

D.C. Circuit first held that the President is not an "agency" for purposes of the APA.  <u>Id.</u> at 289.

It then held that the Presidential Records Act "is one of the rare statutes that . . . impliedly

preclude[s] judicial review."  <u>Id.</u> at 290.  Thus, the court concluded, "[t]he APA does not

authorize judicial review of the President's compliance with the PRA because the President is

not an 'agency' . . . and because the PRA precludes judicial review of the President's record

creation and management decisions."  <u>Id.</u> at 297.

 The government argues that <u>Armstrong I</u> bars CREW's mandamus claims because

"mandamus—like other forms of judicial review—is not available when judicial review is

precluded."  Gov. MTD at 22.  But while <u>Armstrong I</u> could be read to preclude all forms of

judicial review, including mandamus, that case solely involved *APA* claims and thus did not

squarely present the question of whether the PRA precludes *mandamus* claims as well.  And

there are reasons to think that implied preclusion of APA review might not by itself prevent

mandamus review.  For one, the D.C. Circuit has permitted mandamus review even when the

9

relevant statute expressly stripped all other bases of jurisdiction. Ganem v. Heckler, 746 F.2d 844, 850 (D.C. Cir. 1984) (holding that mandamus actions could be brought for certain violations of the Medicare Act because while the Act stripped other bases of jurisdiction it did not specifically strip mandamus jurisdiction).[2]

And judges in this District have held that mandamus is available "even when the statute that creates the duty does not contain a private cause of action." Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp., 219 F. Supp. 2d 20, 42 (D.D.C. 2002) (citing Chamber of Commerce v. Reich, 74 F.3d 1322 (D.C. Cir. 1996)); see also Freedom Watch, Inc. v. Obama, 807 F. Supp. 2d 28, 34 (D.D.C. 2011). Finally, courts should take a cautious approach to foreclosing mandamus review given the backstop nature of mandamus relief—it is only available when "there is no other adequate remedy available to the plaintiffs." Council of and for the Blind of Delaware Cnty. Valley, Inc. v. Regan, 709 F.2d 1521, 1533 (D.C. Cir. 1983). It would be somewhat counterintuitive to conclude that a statute like the PRA (1) impliedly forecloses APA review, (2) thereby creating a need for mandamus review, and yet (3) impliedly forecloses *that* review as well.

Nor do the cases the government cites clearly indicate that Armstrong I forecloses mandamus review. See Gov. MTD at 22. Unlike here, those cases overwhelmingly involve statutes with provisions *expressly* precluding jurisdiction or judicial review, often worded to remove all jurisdiction or judicial review. If anything, these cases emphasize that Congress

---

[2] See also In re Bayou Shores SNF, LLC, 828 F.3d 1297, 1313 & n.24 (11th Cir. 2016) (compiling cases from other circuits reaching the same conclusion); cf. In re al-Nashiri, 791 F.3d 71, 77 (D.C. Cir. 2015) (holding that because the jurisdiction-stripping provision in the Military Commissions Act did not expressly strip mandamus jurisdiction, the court had jurisdiction to consider a mandamus claim under the All Writs Act).

knows how to withdraw mandamus if it wishes, either by explicitly stripping all jurisdiction or judicial review, see, e.g., I.R.C. § 7421(a); 28 U.S.C. § 1447(d), or by stripping mandamus authority specifically, see, e.g., 8 U.S.C. § 1252(a)(2)(B); 38 U.S.C. § 511(a). "The fact that Congress knows how to withdraw a particular remedy and has not expressly done so is some indication of a congressional intent to preserve that remedy." Ganem, 746 F.2d at 852. In sum, it is not as clearly established as the government suggests that Armstrong I prevents mandamus review in addition to review under the APA.

But even if Armstrong I did preclude mandamus actions, CREW argues that its first three claims fall within a category of claims that are subject to judicial review under the D.C. Circuit's decision in Armstrong II. Following subsequent proceedings on remand, the Armstrong case returned to the D.C. Circuit two years later, this time with the plaintiffs arguing that the Executive Office of the President was violating the Presidential Records Act by issuing guidelines that improperly instructed federal agencies to treat agency records as presidential records and thereby shield them from immediate release under FOIA. See Armstrong II, 1 F.3d at 1290. Unlike in Armstrong I, the D.C. Circuit this time found that the plaintiffs' claims were reviewable. The court held that although "the PRA impliedly precludes judicial review of the President's decisions concerning the creation, management, and disposal of presidential records during his term of office," courts "may review guidelines outlining what is, and what is not, a 'presidential record'" because to hold otherwise would "be tantamount to allowing the PRA to functionally render the FOIA a nullity." Id. at 1293–94.

The parties dispute the precise contours of the exception created by Armstrong II. CREW argues that Armstrong II establishes a clear dichotomy: record creation, management, and disposal decisions are not reviewable, but record classification decisions are. CREW Opp'n

at 30–31; see also CREW, 593 F. Supp. 2d at 214 (district court adopting CREW's approach). And in its view, permitting the use of the challenged messaging apps constitutes a reviewable classification decision. CREW Opp'n at 31. The government contests this understanding of Armstrong II, contending that it only allows for the review of classification *guidelines*, which are not implicated here. Gov. MTD at 15. Alternatively, it argues that even if CREW's reading of Armstrong II is correct, judicial review is still precluded because CREW is challenging creation, management, and disposal decisions, not classification decisions. Id. at 18. Ultimately, the Court need not resolve these competing interpretations because, to the extent judicial review is available here at all, CREW must still state a valid mandamus claim. And as the Court will now explain, it has not done so.

### 2. Whether CREW has stated a valid mandamus claim

As noted, the first three counts of CREW's complaint allege violations of the Presidential Records Act. To reach the merits on these claims, CREW must assert a valid cause of action. See, e.g., Gunpowder Riverkeeper v. FERC, 807 F.3d 267, 273 (D.C. Cir. 2015). The Presidential Records Act does not itself provide one. See Judicial Watch, Inc. v. NARA, 845 F. Supp. 2d 288, 299 n.5 (D.D.C. 2012); CREW, 593 F. Supp. 2d at 218. Nor can the Declaratory Judgment Act standing alone supply a cause of action: it "is not an independent source of federal jurisdiction" and thus "the availability of [declaratory] relief presupposes the existence of a judicially remediable right." Schilling v. Rogers, 363 U.S. 666, 677 (1960).

CREW therefore relies on its mandamus cause of action to sustain the first three counts of its complaint.[3] CREW Opp'n at 41. Federal courts have jurisdiction over suits "in the nature

---

[3] A valid mandamus claim can sustain declaratory relief. Nat'l Treasury Emps. Union v. Nixon, 492 F.2d 587, 616 (D.C. Cir. 1974).

of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Mandamus relief is "drastic" and "available only in 'extraordinary situations.'" In re Cheney, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc). Furthermore, even if a plaintiff makes out the required elements for mandamus, "whether mandamus relief should issue is discretionary." Id.

In order to obtain mandamus relief, a plaintiff must show that the defendant owes her a "clear and compelling" duty. Id. (citation omitted). The duty must be "so plainly prescribed as to be free from doubt and equivalent to a positive command." Wilber v. U.S. ex rel. Kadrie, 281 U.S. 206, 218 (1930); see also U.S. ex rel. McLennan v. Wilbur, 283 U.S. 414, 420 (1931) ("The law must not only authorize the demanded action, but require it; the duty must be clear and indisputable."). In other words, "mandamus is inappropriate except where a public official has violated a 'ministerial' duty." Consol. Edison Co. of N.Y., Inc. v. Ashcroft, 286 F.3d 600, 606 (D.C. Cir. 2002). "A ministerial duty is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty." Swan v. Clinton, 100 F.3d 973, 977 (D.C. Cir. 1996). "[I]f there is no clear and compelling duty under the statute as interpreted, the [Court] must dismiss the action." In re Cheney, 406 F.3d at 729.

CREW contends that it has identified a clear and compelling duty here: the duty to issue (effective) record classification guidelines. See, e.g., CREW Opp'n at 35–36 ("The writ of mandamus sought by Plaintiffs would simply require Defendants to perform their ministerial duty to issue classification guidelines that are consistent with the PRA."); id. at 37 ("The classification obligations the PRA creates are ministerial."). The Court disagrees.

The Court will start, as it ought, with the relevant text of the Presidential Records Act. Two provisions matter here. First, the statute directs that "[t]hrough the implementation of

13

records controls and other necessary actions, the President shall take all such steps as may be necessary to assure that . . . [presidential] records are preserved and maintained" in accordance with the statute. 44 U.S.C. § 2203(a). Second, the statute provides that "[d]ocumentary materials produced or received by the President" or his staff "shall, to the extent practicable, be categorized as Presidential records or personal records upon their creation or receipt." Id. § 2203(b). CREW argues that these two provisions create a clear and compelling duty on the part of the President to issue effective classification guidelines.

Unfortunately for CREW, neither of these two provisions obligates the President to perform any duty with the requisite level of specificity that mandamus requires. For one, neither provision references classification guidelines in particular, let alone commands their creation. Subsection (a) refers to the "implementation of records controls," id. § 2203(a), but nothing in the statute says those "controls" must include classification guidelines. Similarly, while subsection (b) might direct that records *be* classified, it says nothing about *who* must classify these records or *how* she must go about doing so. In all, the statute does not require that any particular classification guidance be created, let alone that the President must create it.

By contrast, when courts have found that a statute creates a clear and compelling duty, the statute has ordinarily described the precise action the officer must undertake. See, e.g., N. States Power Co. v. U.S. Dep't of Energy, 128 F.3d 754, 758 (D.C. Cir. 1997) (holding that statute providing that the Department "'shall begin' disposing'" of nuclear waste by January 31, 1998 created a "duty to act [that] could hardly be more clear"); 13th Reg'l Corp. v. U.S. Dep't of Interior, 654 F.2d 758, 760–61 (D.C. Cir. 1980) (holding that statute that "directed" the Secretary of Interior "to make a study of all Federal programs primarily designed to benefit Native people" created a ministerial duty (citation omitted)). The PRA's silence as to any specific requirement

is deafening for purposes of mandamus review: without a clear command to undertake any particular action, CREW has an uphill battle to show that a clear and compelling duty exists.

The battle is made all the more difficult by the discretion accorded the President in determining how to carry out his obligations under the Presidential Records Act. The statute simply directs the President to take such actions "as may be necessary" to preserve records, a phrase necessarily carrying a substantial degree of discretion to determine *what* steps are necessary. Indeed, even the President's duty to preserve records allows for some degree of discretion: The Act permits the President to destroy Presidential records "that no longer have administrative, historical, informational, or evidentiary value" but it defines none of these terms. 44 U.S.C. § 2203(c).[4] Thus, the President must determine what it means for a record to no longer have "value" and whether any particular, individual record has any remaining "value." In light of the overall discretion accorded the President to manage presidential records—including which records to maintain or destroy—and the statute's silence as to any specific duty to create classification guidelines, CREW has failed to show the statute creates a ministerial duty to issue classification guidance.

Judge Kollar-Kotelly's decision in <u>CREW v. Cheney</u> is not to the contrary. The court there held that the Vice President (and, consequently, the President) has no discretion "to *change* the definition of Vice-Presidential [or Presidential] records provided by Congress." 593 F. Supp. 2d at 220. As the court explained, "[b]ecause the PRA provides a definition for Vice-Presidential records," the Vice President had no "discretion to apply whatever definition of Vice-

---

[4] The statute does require the President to undertake certain specific notifications prior to the destruction of records. <u>See</u> 44 U.S.C. § 2203(c). CREW does not raise an argument that the President has failed to comply with any ministerial duties as regards these procedures.

Presidential records he decided suited him when undertaking his preservation obligations." Id. at 220–21.  Put another way, the Vice President and President lack discretion to issue classification guidelines that conflict with the statute.  But the mere fact that they cannot issue guidelines at odds with the statute does not mean they must issue those guidelines in the first instance. Limitations on an officer's discretion *when* undertaking a particular action do not automatically impose a limitation on the officer's discretion *to* undertake that action.  And, again, the PRA creates no obligation to issue guidelines to begin with.  That—along with the more expansive discretion generally accorded the President to make decisions regarding how to adequately preserve records—yields the conclusion that the statute does not clearly command the actions CREW seeks to compel.

To sum up, CREW points to no duty that is sufficiently clear and compelling to meet the stringent requirements for mandamus relief.  While the Presidential Records Act may obligate the President to take steps to preserve records, it nowhere dictates *which* steps to take.  And while CREW may question the effectiveness of any guidance the President has issued regarding the preservation of his records, the Act nowhere clearly and definitively directs him to issue particular guidelines.  Because CREW has not identified a ministerial duty, it has failed to state a valid mandamus claim.  The Court must therefore dismiss Counts I through III of the Complaint.

B. Count IV

This leaves the fourth count of CREW's complaint.  Unlike the preceding three counts, Count IV does not invoke the Presidential Records Act.  Instead, CREW seeks a declaration that President Trump has violated his obligation under the Take Care Clause to ensure that "the Laws be faithfully executed," U.S. CONST. art. II, § 3, cl. 5, by following a practice of making policy through executive order rather than administrative rulemaking (or adjudication).  This is so,

CREW says, because centralizing policymaking in the White House avoids the creation of agency records under the Federal Records Act and thereby shields records from disclosure under other statutes like the APA and FOIA. Compl. ¶¶ 110–19. CREW does not root this count in any statutory cause of action; it proceeds directly under the Constitution's Take Care Clause itself. See CREW Opp'n at 41. Thus, CREW raises a difficult question: Can a plaintiff obtain declaratory relief against the President directly under the Take Care Clause?

The government offers what at first blush appears to be an easy answer: the Supreme Court made clear over 150 years ago in Mississippi v. Johnson, 71 U.S. 475 (1866), that federal courts cannot review the President's obligation to take care to "faithfully execute" the laws. Gov. MTD at 29; Gov. Reply at 12, 22. Johnson involved a suit seeking to enjoin then-President Andrew Johnson from enforcing the post–Civil War Reconstruction Acts. 71 U.S. at 498. The Supreme Court declined to do so. Id. at 499. It first distinguished two prior cases where it had granted writs of mandamus, explaining that these cases involved "a mere ministerial duty" where "[t]here was no room for the exercise of judgment." Id. The Court then explained that

> [v]ery different is the duty of the President in the exercise of the power to see that the laws are faithfully executed, and among these laws the acts named in the bill. By the first of these acts he is required to assign generals to command in the several military districts, and to detail sufficient military forces to enable such officers to discharge their duties under the law. By the supplementary act, other duties are imposed on the several commanding generals, and these duties must necessarily be performed under the supervision of the President as commander-in-chief. The duty thus imposed on the President is in no just sense ministerial. It is purely executive and political.

Id. In deference to the "executive and political" nature of the President's duty, the Johnson Court adhered to "the general principles which forbid judicial interference with the exercise of Executive discretion." Id.

The government here seizes on <u>Johnson</u>'s description of the President's duty under the Take Care Clause, interpreting it as holding the Clause to be entirely non-justiciable.  <u>See</u> Gov. MTD at 29; Gov. Reply at 12, 22.  But the picture is cloudier than the government—or CREW for that matter—makes it out to be.

For one, <u>Johnson</u> and subsequent cases discuss limitations on the ability of federal courts to issue an *injunction* against the President, but CREW seeks only *declaratory* relief.  It is not as clearly settled that a court cannot issue a declaratory judgment against the President.  On the one hand, the D.C. Circuit has recognized that "similar considerations regarding a court's power to issue [injunctive] relief against the President himself apply to [a] request for declaratory judgment."  <u>Swan</u>, 100 F.3d at 976 n.1; <u>see also</u> <u>Franklin</u>, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment) (arguing that federal courts cannot issue a declaratory judgment against the President).

On the other hand, the D.C. Circuit *has* issued a declaratory judgment directly against the President.  In <u>National Treasury Employees Union v. Nixon</u>, 492 F.2d 587 (D.C. Cir. 1974), a federal employees union brought suit against then-President Richard Nixon (and only him) seeking to force the President to effectuate a pay raise passed by Congress.  <u>Id.</u> at 616.  After concluding that it could issue a writ of mandamus directing the President to implement the pay raise, the court instead elected to enter a declaratory judgment stating that the President had a constitutional duty to do so.  <u>Id.</u> at 615.[5]  In light of this D.C. Circuit decision, it is not fully

---

[5] The Supreme Court's decision in <u>Clinton v. City of New York</u>, 524 U.S. 417 (1998) may be another such case.  The President was a defendant in that case and a declaration that the Line Item Veto Act was unconstitutional ultimately issued.  <u>Id.</u> at 448–49.  The Court was also careful to note that the plaintiffs in that case "sought a declaratory judgment that the Line Item Veto is unconstitutional and that the particular [line item veto issued] was invalid" but that

established that <u>Johnson</u> forecloses the issuance of a declaratory judgment order against the President for a Take Care Clause violation.[6]

It is also unclear whether <u>Johnson</u> forecloses any and all possible Take Care Clause claims, particularly against executive branch officials other than the President.[7] While <u>Johnson</u> can be fairly read to suggest that a Take Care Clause claim is outright non-justiciable, the government cites no case adopting that understanding of <u>Johnson</u> and the Court is aware of none. In fact, the Supreme Court suggested that the Clause's justiciability is an open question by *sua sponte* directing the litigants in <u>United States v. Texas</u> to address whether the Obama Administration's Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") policy violated the Take Care Clause. See <u>United States v. Texas</u>, 136 S. Ct. 906 (2016). That question was left unresolved when the lower court's decision was affirmed by an equally divided Court. See 136 S. Ct. 2271 (2016).[8]

And finally, it may be the case that <u>Johnson</u> is best understood as a political question case, rather than one about the Take Care Clause in particular. The D.C. Circuit has hinted at

───────────────

"neither set of plaintiffs sought injunctive relief against the President," suggesting that the Court found important the distinction between declaratory and injunctive relief. <u>Id.</u> at 425 n.9.

[6] The government cites the D.C. Circuit's statement in <u>Newdow v. Roberts</u>, 603 F.3d 1002, 1013 (D.C. Cir. 2010), that courts "have never submitted the President to declaratory relief." But, as discussed, the D.C. Circuit *has itself* submitted the President to declaratory relief. See <u>Nat'l Treasury Emps. Union</u>, 492 F.2d at 616. The decision in <u>Newdow</u> never cites or discusses <u>National Treasury Employees Union</u>.

[7] Notably, CREW also seeks declaratory relief as to the Executive Office of the President. The government does not discuss whether any limitations on issuing relief as to the President in particular apply to declaratory relief against that defendant.

[8] The decision below in that case also declined to address the parties' Take Care Clause arguments. <u>Texas v. United States</u>, 809 F.3d 134, 146 n.3 (5th Cir. 2015).

such an understanding, stating that the Supreme Court ultimately dismissed the case "on the ground that it presented a political question." Nat'l Treasury Emps. Union, 492 F.2d at 348 (citing Georgia v. Stanton, 73 U.S. (6 Wall.) 50 (1867) and Mississippi v. Stanton, 154 U.S. 554 (1893)). All of this is to say that while Johnson may prevent a court from issuing an injunction to the President concerning a discretionary duty, that case does not so clearly foreclose the declaratory judgment claim at issue here.

At this juncture, however, the Court need not resolve the larger extant questions regarding the existence or scope of Take Care Clause claims. Even assuming some universe of viable Take Care Clause claims exists, CREW's claim here does not fall within it. CREW does not challenge any of the President's executive orders themselves, nor does it argue that they exceed the President's authority to issue. CREW Opp'n at 18. Nor does CREW offer any reason why an administration could not, in good faith, elect to act through executive order rather than administrative action, even if that decision has incidental effects on the preservation of government records and the public's access to them. And the Court is aware of no authority preventing the President from electing to "faithfully execute" the laws by executive order rather than administrative process (assuming, of course, that the particular executive order at issue does not exceed the President's authority). Put another way, CREW does not dispute that the President has the discretion to make policy by executive order. The Supreme Court has advised that "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for [the courts'] review." Dalton v. Specter, 511 U.S. 462, 476 (1994). The Court will not ignore that counsel here.

* * *

For the foregoing reasons, the Court will grant the government's motion to dismiss. A separate Order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:   March 20, 2018