<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2
       - - - - - - - - - - - - - - - x
 3     CITIZENS FOR RESPONSIBILITY
       AND ETHICS IN WASHINGTON, et al.,
 4                                     CA No:  1:17-cv-01228-CRC
                   Plaintiffs,
 5                                     Washington, D.C.
                                       Wednesday
 6     vs.                             January 17, 2018

 7     DONALD J. TRUMP, et al.,

 8                   Defendants.
       - - - - - - - - - - - - - - - x
 9     _____

10                    TRANSCRIPT OF MOTION HEARING
            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                    UNITED STATES DISTRICT JUDGE
       _____
12     APPEARANCES:
       For the Plaintiffs:        ANNE L. WEISMANN, ESQ.
13                                CONOR SHAW, ESQ.
                                  CITIZENS FOR RESPONSIBILITY AND
14                                ETHICS IN WASHINGTON
                                  455 Massachusetts Avenue, NW
15                                6th Floor
                                  Washington, DC 20001
16                                (202) 408-5565
                                  aweismann@citizensforethics.org
17
                                  ANGELA C. VIGIL, ESQ.
18                                BAKER & MCKENZIE, LLP
                                  1111 Brickell Avenue, Suite 1700
19                                Miami, FL 33131
                                  (305) 789-8904
20                                angela.c.vigil@bakernet.com

21                                MIREILLE R. OLDAK, ESQ.
                                  GEORGE M. CLARKE, III, ESQ.
22                                BAKER & MCKENZIE, LLP
                                  815 Connecticut Avenue NW
23                                Washington, DC 20006
                                  (202) 835-6176
24                                mireille.oldak@bakermckenzie.com
       (Continued on Next Page)
25     Proceedings recorded by mechanical stenography; transcript
       produced by computer-aided transcription
</pre>

1     APPEARANCES (Continued):

2     For the Defendants:          **STEVEN A. MYERS, ESQ.**
                                   **ELIZABETH SHAPIRO, ESQ.**
3                                  UNITED STATES DEPARTMENT OF JUSTICE
                                   Civil Division, Federal Programs
4                                  20 Massachusetts Avenue, NW
                                   Washington, DC 20530
5                                  (202) 305-8648
                                   steven.a.myers@usdoj.gov
6
      Court Reporter:              Lisa A. Moreira, RDR, CRR
7                                  Official Court Reporter
                                   U.S. Courthouse, Room 6718
8                                  333 Constitution Avenue, NW
                                   Washington, DC  20001
9                                  202-354-3187

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Your Honor, we're on the record for Civil Case 17-1228, *Citizens for Responsibility and Ethics in Washington, et al. vs. Donald J. Trump, et al.*

Counsel, if you could please approach the lectern and identify yourselves for the record.

MS. WEISMANN:  Good morning, Your Honor; Anne Weismann on behalf of the plaintiffs.

THE COURT:  Ms. Weismann, how are you?

MS. WEISMANN:  Good.  Thank you.

MR. CLARKE:  George Clarke, also on behalf of the plaintiffs.  And also at counsel table I have Mireille Oldak and Angela Vigil, also with Baker & McKenzie; and Conor Shaw is also with CREW.

THE COURT:  Okay.  Welcome, everyone.

MS. WEISMANN:  Thank you.

MR. MYERS:  Good morning, Your Honor; Steven Myers from the Department of Justice on behalf of the defendants, and I'm joined by my colleague, Elizabeth Shapiro, also from the Department of Justice.

THE COURT:  Okay.  Mr. Myers, Ms. Shapiro, how are you?

MS. SHAPIRO:  Good, thanks.

THE COURT:  Happy New Year.

Okay.  Mr. Myers, it's your motion.  Why don't you

1     start us off.

2               MR. MYERS:  Thank you, Your Honor.

3               Plaintiffs' allegations in this case fall into two

4     basic categories.  First, they allege that White House

5     employees are violating the Presidential Records Act by

6     using messaging applications that automatically delete

7     messages once they've been read.  And second, they allege

8     that the President's use of what they call the Executive

9     Order Process is precluding federal agencies from complying

10    with the Freedom of Information Act, the Federal Records

11    Act, and the Administrative Procedure Act.  Neither of these

12    claims can survive a motion to dismiss.

13              I'll turn first to the PRA claims.  At the outset,

14    these claims fail because the D.C. Circuit has squarely held

15    that the PRA precludes judicial review.  As it said in a

16    case called *Armstrong 1*, "We therefore hold that the PRA

17    precludes judicial review of the President's recordkeeping

18    practices and decisions."

19              THE COURT:  But the PRA doesn't strip the Court of

20    mandamus jurisdiction, does it?

21              MR. MYERS:  Your Honor, we submit that it does.

22    The D.C. Circuit held in *Armstrong* that it precludes

23    judicial review.

24              THE COURT:  But that was an APA case.  The D.C.

25    Circuit held that APA jurisdiction didn't lie, correct?

1            MR. MYERS:  That's fair, Your Honor.  But we've

2     cited a number of cases I believe on Page 20 of our opening

3     brief that stand for the proposition that, when judicial

4     review is precluded, that preclusion extends to mandamus

5     review.

6            THE COURT:  Okay.  I saw those cases, but don't

7     they all include or don't they all involve either a statute

8     like the Anti-Injunction Act, which explicitly strips

9     mandamus jurisdiction, or statutes that create a statutory

10    review scheme?

11           The PRA does neither, correct?

12           MR. MYERS:  The PRA, Your Honor, does not include

13    an express provision of judicial review, but the D.C.

14    Circuit held in the *Armstrong* cases that it includes an

15    implied provision of -- an implied preclusion of judicial

16    review.

17           THE COURT:  But that was substantive judicial

18    review under the APA.  *Armstrong* didn't deal with the

19    Court's mandamus jurisdiction, did it?

20           MR. MYERS:  Not explicitly, Your Honor, but I

21    think it's best read in that way.

22           The Court went on to say that allowing judicial

23    review of the President's compliance with the PRA would

24    substantially upset Congress's carefully crafted balance of

25    presidential control of records, creation management, and

1   disposal during the President's term in office and the logic

2   of that decision, that allowing judicial review over these

3   subjects would interfere with the President's ability to

4   execute his office.  That logic extends equally to mandamus

5   review.  It shouldn't matter whether plaintiffs are

6   characterizing their claim as an APA claim or a mandamus

7   claim or a Take Care Clause claim or whatever kind of claim

8   they're characterizing it as.  The logic of the D.C. Circuit

9   decision is that allowing judicial review over these

10  subjects would interfere with the President's ability to run

11  his own office and manage his own records.

12          THE COURT:  Well, *Armstrong* obviously covers

13  creation decisions, management decisions, destruction

14  decisions, as you've briefed, but let's assume that the PRA

15  did impose some nondiscretionary ministerial duties on the

16  President to, for instance, issue a report every so often.

17  Your position would be that the Court would not have

18  mandamus jurisdiction to enforce such a duty.

19          MR. MYERS:  Your Honor, if the PRA imposed such a

20  requirement, I assume, you know, that would have been

21  litigated in the *Armstrong* decisions, and, you know, I can't

22  speculate as to what the D.C. Circuit would have said in

23  *Armstrong*, but in the world we live in where the PRA says

24  what it says and the D.C. Circuit decided what it did in

25  *Armstrong*, our position, yes, is that the two *Armstrong*

1   decisions preclude judicial review however that claim for

2   relief is characterized.

3          I think it's also important to note, Your Honor,

4   with respect to this question about mandamus, plaintiffs

5   have only asserted a mandamus claim with respect to Claim

6   Three.  They don't seek mandamus under Claims One or Two or

7   under Claim Four.

8          Mandamus has very heightened requirements.

9   Plaintiffs need to show that this is an extraordinary case,

10  and that there's been a failure to comply with a ministerial

11  duty.

12         The only ministerial duty that they suggest that

13  defendants have failed to comply with is discussed on Page

14  36 of their opposition brief.  They say they want an order

15  that would "require defendants to perform their ministerial

16  duty to issue classification guidelines that are consistent

17  with the PRA."

18         Even if you assume that mandamus relief is

19  theoretically available, the public record now reveals that

20  that guidance has been issued, and, indeed, it was issued in

21  February of 2017, long before this lawsuit was filed.

22         THE COURT:  Does the statute create a duty to

23  issue the guidance that they mention?

24         MR. MYERS:  No, Your Honor, it does not, and

25  that's another reason why plaintiffs' claim for mandamus

1    fails.

2            Plaintiffs have cited the *CREW vs. Cheney* decision

3    from your colleague, Judge Kollar-Kotelly, for the

4    proposition that there is a duty to issue such guidance, but

5    that decision suggests only that there is a duty not to

6    issue guidance that conflicts with the PRA.  There is no

7    guideline mandating provision of the PRA.  Plaintiffs have

8    not pointed to one.  We're not aware of one.  *CREW vs.*

9    *Cheney* certainly doesn't identify one.

10           So, again, Your Honor, it's our position at the

11   outset that Claims One through Three, even if they all

12   sought mandamus relief, would be precluded under the logic

13   and under the holdings, I should say, of the *Armstrong*

14   decisions.  Plaintiffs are private litigants who want Your

15   Honor to review the President's general compliance with the

16   PRA, and that's exactly what *Armstrong 1* makes clear is

17   barred by the statutes.

18           THE COURT:  Okay.

19           MR. MYERS:  Plaintiffs have -- I'm sorry, Your

20   Honor.

21           THE COURT:  Why don't you move to Count Four.

22           MR. MYERS:  Sure.  So Count Four is the claim that

23   suggests that the President's use of the executive order

24   process violates the President's constitutional Take Care

25   obligations, and our submission is that this claim is

1    procedurally and substantively flawed.

2          Let me talk about procedure first.  As a matter of

3    basic pleading standards under Rule 8, the plaintiff is

4    obligated to provide a short and plain statement of the

5    claim showing that the pleader is entitled to relief.  In

6    this case, plaintiffs are trying to challenge the

7    President's use of the executive order process writ large

8    without identifying what executive orders they actually want

9    to challenge.  They make clear that they're not challenging

10   the so-called travel ban executive order, but they don't say

11   what they do want to challenge.

12          And so if our motion to dismiss --

13          THE COURT:  It's pretty clear, right?  They allege

14   a pattern of practice of using executive orders for the

15   purpose of undermining FOIA and the Federal Records Act and

16   the APA.  And I'll ask them this, but I take it from their

17   pleadings that they believe that there's a cause of action

18   under the Take Care Clause to vindicate that injury.  Why is

19   that not correct?

20          MR. MYERS:  I think Your Honor is certainly

21   accurately summarizing what they intend to allege, but our

22   position is that --

23          THE COURT:  Well, they've alleged it, and, you

24   know, without getting to whether there are merits to that

25   allegation or not, why doesn't that get them to discovery?

1      MR. MYERS:  It doesn't get them there, Your Honor,

2  because to allege such a pattern and practice they need to

3  identify some executive orders that are examples of that

4  pattern --

5      THE COURT:  They've done that.

6      MR. MYERS:  -- or practice.

7      THE COURT:  At least one.

8      MR. MYERS:  Your Honor, we submit that they

9  haven't.  They've identified one executive order that is

10  now -- any challenge to it would be moot.  That executive

11  order has been withdrawn.  The issue has been up and down.

12      THE COURT:  But they say that there have been

13  55-some-odd executive orders in the first year of the Trump

14  administration.  I have no idea how that compares to the

15  first year of other administrations, but let's, for the sake

16  of argument, assume that it's double or triple, and that

17  that is alleged evidence of a pattern or practice of the

18  overuse of executive orders, okay?  Why would that not be a

19  violation of the Take -- or at least a plausible violation

20  of the Take Care Clause?

21      MR. MYERS:  Your Honor, I think the answer to that

22  is that executive orders by themselves are perfectly lawful.

23      THE COURT:  Of course.  Of course they are.

24      MR. MYERS:  Every President has issued them, and

25  so to meaningfully litigate this claim, you know, we submit

1    that plaintiffs would have --

2              THE COURT:  Well, let me take it to the extreme.

3    Let's say that discovery revealed or a press report

4    unearthed a memo saying that, you know, "I would like the

5    administration by the President to proceed by executive

6    order whenever possible so as not to trigger our obligations

7    under FOIA and the APA."  Let's assume such a document

8    exists.  Would that constitute or could that be a basis for

9    a claim in federal court as a violation of the Take Care

10   Clause?

11             MR. MYERS:  No, Your Honor, for several reasons.

12             THE COURT:  Okay.

13             MR. MYERS:  You know, putting aside our Procedural

14   Rule 8 points, if they attached such a document -- and,

15   again, there's no evidence that such a document exists.

16             THE COURT:  And I'm not suggesting that there is.

17             MR. MYERS:  Understood, Your Honor, but if the

18   President were to say something like "I would like to

19   proceed by executive order wherever possible," certainly the

20   notion of doing it where possible doesn't suggest a legal

21   violation.

22             THE COURT:  For the purpose of avoiding our FOIA

23   obligations.

24             MR. MYERS:  Well, then I think it's really

25   important to look to what FOIA and these other statutes

1    require.

2              It's black letter law, and we've briefed this,

3    that FOIA does not require agencies to produce documents.

4    The Supreme Court has said that.  The D.C. Circuit has said

5    that.

6              What FOIA requires is an agency to turn over

7    documents on demand, not to create them in the first place.

8    And so FOIA is simply not implicated by a directive not to

9    create documents in the first place.

10              And we've made similar observations as to the APA

11    and the Federal Records Act.  The APA imposes specific

12    requirements when a federal agency issues legislative rules,

13    but if the directive to the agency is don't issue a

14    legislative rule, then by that very fact the APA is not

15    triggered.

16              Similarly, the Federal Records Act requires

17    agencies to document their various actions, but if in this

18    hypothetical universe the federal agencies are being told

19    not to take actions in the first place, there wouldn't be a

20    duty under the Federal Records Act.

21              All of that, you know, doesn't even get to the

22    fact that plaintiffs haven't asserted FOIA claims, they

23    haven't asserted APA claims, and they concede in their

24    opposition brief that this action isn't properly brought

25    under any of those statutes.

1          Finally, with respect to the Take Care Clause

2     itself, the Supreme Court held, you know, something like 150

3     years ago --

4          THE COURT:  Well, that's what I'm getting at.  Is

5     there any precedent since *Mississippi v. Johnson* discussing

6     whether a cause of action can arise under the Take Care

7     Clause based on the Executive's failure to enforce or

8     intentional frustration of or undermining of a federal

9     statute?

10          MR. MYERS:  Your Honor, I am not aware of any

11     case -- and I don't think plaintiffs have cited one -- that

12     upholds an order against the President in his official

13     capacity for failing to comply with Take Care Clause.

14          THE COURT:  Okay.

15          MR. MYERS:  Your Honor, I'm happy to address any

16     other points or answer any other questions, or alternatively

17     to save some time for rebuttal, if you prefer.

18          THE COURT:  Okay.  That's fine.

19          MR. MYERS:  Thank you.

20          THE COURT:  Thank you very much.

21          MR. CLARKE:  Good morning again, Your Honor.

22          THE COURT:  Good morning.

23          MR. CLARKE:  My co-counsel and I have sort of

24     split up this argument where I was planning, at your

25     permission, to cover mandamus and declaratory judgment and

1   Claim Four, and my counsel was going to cover the sort of

2   PRA aspects, if that's acceptable --

3           THE COURT:  That's fine.

4           MR. CLARKE:  -- with respect to mandamus, Your

5   Honor.

6           Obviously there has to be a PRA violation or a

7   Take Care Clause violation in the first instance in order to

8   trigger the grounds for mandamus, but once that's triggered,

9   the D.C. Circuit in *Nixon* said that, you know, quoting

10  directly, "This Court possesses the authority to mandamus

11  the President to perform the ministerial duty involved."

12  And, again, my co-counsel will talk a little bit about what

13  we view the ministerial duties to be, but there's no doubt

14  that the Court has the power under mandamus to do that.

15          Under the mandamus relief we have to allege three

16  different prongs:  that we have a clear right to relief,

17  that the defendant has a clear duty to act, and that there's

18  no other adequate remedy available to us.

19          THE COURT:  Well, tell me, even if I agree with

20  you that mandamus jurisdiction exists notwithstanding

21  *Armstrong*, what ministerial duty does the Presidential

22  Records Act impose on the President that has not been

23  complied with?

24          MR. CLARKE:  Absolutely, Your Honor.  The duty to

25  issue meaningful guidance that actually --

1          THE COURT:  Where is that duty?

2          MR. CLARKE:  There is -- there's a statutory

3     requirement to actually impose a recordkeeping

4     requirement -- this is my co-counsel's point actually, Your

5     Honor, but...

6          So if you look at 44 U.S. Code 2203, "Through the

7     implementation of records management controls and other

8     necessary actions, the President shall take all such steps

9     as may be necessary to assure that the activities,

10    deliberations, decisions, and policies that reflect the

11    performance are adequately documented."  It's right in the

12    statute.

13         THE COURT:  Okay.

14         MR. CLARKE:  So that's a ministerial duty.  It's

15    not subject to discretion.  It's the implementation of

16    records management control.

17         THE COURT:  Does it say how often the guidance has

18    to be issued?  What form the guidance must take?  What the

19    guidance must include?

20         It has to -- don't there have to be contours to a

21    duty to be subject to a mandamus order?

22         MR. CLARKE:  I don't think there have to be those

23    precise of contours.  The question is is the guidance that

24    they've issued effective?  Is that guidance effective at

25    preventing people from using these message-deleting apps

1    which destroy the history of this presidency?  And that's a

2    factual question that can be determined without undue

3    interference into the Executive -- any aspect of what the

4    Executive is doing from a discretionary perspective.

5              I think it's also important to note that the

6    mandamus -- applying mandamus in this case -- yes, the

7    President's a defendant.  The EOP is also a defendant,

8    right?  Nothing about what the Court would do here in

9    issuing mandamus is going to be telling Donald J. Trump to

10   do anything, right?  He is not going to personally rewrite

11   these records policies.  He's not going to personally

12   instruct people what to do, right?  Practically.  His chief

13   of staff is.  That's what previously happened in the Clinton

14   administration.  Podesta, John Podesta, issued this

15   guidance.

16             What we have so far is coming from his White House

17   counsel.  Both of those individuals would be the individuals

18   that would functionally be subject to mandamus just like

19   some of the other nonpresidential cases.

20             THE COURT:  Your complaint goes beyond seeking

21   mandamus to issue general guidance under the act.

22             MR. CLARKE:  It does, Your Honor.

23             THE COURT:  You're seeking a declaration that the

24   use of these particular apps is contrary to the statute.

25             MR. CLARKE:  We are, Your Honor.

1          THE COURT:  And how would that not be contrary to

2     the D.C. Circuit's holding in *Armstrong* that basically, you

3     know, because of the unique statutory scheme and the

4     balancing of the interests of the Congress and the

5     President, there's no judicial review, generally, of

6     management and creation and destruction decisions?

7          MR. CLARKE:  Well, I think, Your Honor, we

8     disagree that that's the sum total ruling of the two

9     *Armstrong* cases.

10          THE COURT:  There's an exception.  I understand.

11          MR. CLARKE:  Right.  Well, that --

12          THE COURT:  The base ruling is at least as to

13     decisions regarding creation and maintenance and

14     destruction, but there's no judicial review, correct?

15          MR. CLARKE:  It is, Your Honor, but I think --

16     just reading from the second case, "Contrary to the district

17     court, we conclude that the PRA allows limited review to

18     assure that guidelines defining presidential records do not

19     improperly sweep in nonpresidential records.  Accordingly,

20     we remand it to the district court."

21          That's a pretty bright guidelines determining

22     presidential records.  Agreed, we're not dealing with the

23     categorization between presidential and nonpresidential, but

24     we are talking about is it a presidential record at all,

25     right?  Is it kept?  Is it maintained?  You have to have it

1    in the first instance before you can get to any

2    determination, and that's what these apps do.  They prevent

3    that determination from even being made.

4          Just if I can cover the declaratory -- while I'm

5    standing here -- cover the declaratory judgment and our

6    Point Four.

7          With respect to declaratory judgment, the cause of

8    action there is the same as the cause of action in *Nixon*.

9    Once mandamus is triggered, declaratory judgment is a tool

10   that the Court can use.

11         In addition to that, under *Chamber of Commerce vs.*

12   *Reich*, an independent claim of a President's violation of

13   the Constitution is reviewable as -- you know, this is the

14   Judicial Branch --

15         THE COURT:  What provision of the Constitution was

16   that issue in the *Reich* case?  And was it -- more to the

17   point, was it the Take Care Clause?

18         MR. CLARKE:  It was not the Take Care Clause, Your

19   Honor.  It was not the Take Care Clause, Your Honor.

20         THE COURT:  So my same question as to Mr. Myers:

21   Is there any precedent for the -- assuming that you're not

22   proceeding under one of the enumerated statutes that you're

23   saying is being frustrated, you're seeking -- you're

24   pursuing a cause of action under the Take Care Clause.  Is

25   there any precedent since 1866 as to whether that's a viable

1      cause of action?

2              MR. CLARKE:  On the Take Care Clause, no, Your

3      Honor.

4              THE COURT:  Okay.

5              MR. CLARKE:  Let me address *Mississippi* real

6      quickly.  *Mississippi* was a case involving post-

7      reconstruction in the South.  The acts there were acts that

8      were absolutely not ministerial.  They were discretion -- it

9      was opposing -- appointing generals in the South to run

10     reconstruction, okay?

11             And if you look at the case, when they talk about

12     the intrusion that that would be on the Executive, they're

13     talking about the intrusion with respect to those specific

14     acts.  Such duties -- that's the language that the Court

15     uses, and those such duties are clearly those discretionary

16     duties of determining who these generals are and what their

17     positions are.

18             I would also say that in *Nixon*, the D.C. Circuit

19     clearly said that that case functionally was decided on

20     political question grounds, so that case does not stand for

21     the premise my colleague has cited it for.

22             I would also say that if you look at Judge Bates's

23     opinion in *Miers* that talks about the -- or talks about the

24     Declaratory Judgment Act, Judge Bates says clearly that, you

25     know, where the Constitution is the source of the right

1    allegedly violated, no other source of a right or

2    independent cause of action need be identified.

3            I would also just then follow with the Take Care

4    Clause points.

5            We have alleged multiple executive orders:  draft

6    black site executive order, travel ban executive order,

7    draft immigration public charge executive order.  These are

8    all part of the pattern and practice of preventing

9    congressional -- Congress's statutes, the APA, the FRA, the

10   FOIA, from finding the records and having the records.

11           And my colleague would have us file FOIA cases.

12   We have filed FOIA cases.  Those FOIA cases -- what's the

13   agency defense?  "We don't have it."  Of course that's the

14   agency's defense.  And, you know what, that's a good defense

15   because they don't have it.  And it's part of a pattern and

16   practice of preventing the agencies from having it.

17           THE COURT:  Okay.  Wouldn't a holding by a

18   district court, no less, that an Executive's frustration of

19   or undermining of other statutes represents an independent

20   cause of action under the Take Care Clause?  Wouldn't that

21   be an extraordinarily broad thing to hold?

22           I mean, aren't there all sorts of scenarios under

23   which a plaintiff could come in and say a president is

24   undermining this statute by not including funding for it in

25   its budget, or by appointing an agency head that is

1    inimicable to the mission of the agency and the statutes

2    that they are charged with enforcing, or not providing, you

3    know, enforcement resources?  That's frustrating this

4    particular statute; therefore, it's a violation of the Take

5    Care Clause.

6              How is that any different than what you've alleged

7    here?

8              MR. CLARKE:  It's very different, Your Honor, and

9    it wouldn't be broad if it was properly crafted.

10             This is why.  It can't be a discretionary action.

11   Clearly, if the President has discretion to take those

12   actions, this whole Take Care Clause thing is out.

13             Two, they would have to have standing to bring

14   that case, and I know it's a separate aspect.

15             THE COURT:  Isn't records management and

16   destruction completely discretionary under the statute;

17   right?

18             MR. CLARKE:  Your Honor, there are agencies that

19   are delegated by Congress with legislative-like duties.

20   They're delegated -- DHS, for one example.  We cite their

21   delegation order.  Okay?  They're delegated with the

22   authority to do that.  The President is preventing them from

23   implementing the policy -- this is our allegation.  The

24   President is preventing them from implementing that.  That's

25   not discretionary, right?

1     If these rules get implemented, they have to

2     implement them.  It's a legislative grant, and they have to

3     actually maintain those records so that they're FOIAable.

4     They have to have noticing comments so the people can

5     comment.

6          THE COURT:  I'm sorry.  I misspoke.  I'm confusing

7     Count Four with Counts One through Three.

8          Isn't the decision, the President's decision,

9     whether to proceed by executive order a discretionary one?

10         MR. CLARKE:  The President's decision as executive

11    order is, but what we allege is that it isn't -- and the

12    executive orders themselves may be completely lawful.  The

13    question is not whether they're lawful.  May be completely

14    lawful.  Lawful, sorry.  The question, though, is is it

15    frustrating congressional purpose with respect to FOIA and

16    APA and FRA?  And we allege that it is intentionally

17    frustrating that.  We want discovery to see if it is.

18         It could be that we're wrong.  It could be that

19    the President's just decided to do that, and he doesn't have

20    the people in the various agencies that he wants to

21    implement so that they've decided to do it.  It has nothing

22    to do with what we've alleged.  That could happen.

23         But we want discovery into that because there's

24    been allegations, including allegation -- I mean, we cite in

25    our complaint Steven Bannon saying his goal is to prevent a

1   paper trail.  There is public reporting on this.

2            So I think, going back to your question, though,

3   Your Honor, it can't be -- as far as breadth, it won't be

4   broad because it can't be discretionary.  The plaintiff

5   would have to have standing, which I know is a different

6   element, but it's still an element that restricts.  You

7   couldn't have another avenue to review it.

8            Obviously if you had another way to review it,

9   through the APA or whatever, you would have an ability to do

10  that, and it has to be an instance where the President is

11  directly contradicting what Congress told him to do in a

12  ministerial way.  So I think it's very -- it's very narrow,

13  Your Honor.

14           THE COURT:  Okay.  I want to move this along.

15           Ms. Weismann.

16           MR. CLARKE:  Thank you, Your Honor.

17           THE COURT:  You're welcome.

18           MS. WEISMANN:  Thank you, Your Honor.  I really --

19           THE COURT:  I had to dust off my fed jur Hornbook

20  for this one.  CREW always keeps us hopping.

21           MS. WEISMANN:  Well, we try, Your Honor.  We do

22  try from year to year.  In these times we're quite busy,

23  frankly.

24           What I'd like to do, Your Honor, is really drill

25  down on the Presidential Records Act cases because the

1      government sort of starts and ends from the premise that

2      under *Armstrong* there is no judicial review, period.  And I

3      think it's very telling that today counsel relied

4      exclusively on *Armstrong 1*, and I understand why, because

5      the language of the Court in the *Armstrong* court was very

6      broad.

7                As you know, that was a case where the plaintiffs

8      were challenging the proposed destruction of a subset of

9      presidential records, and the Court said there's no judicial

10     review because otherwise it would upset the political

11     compromise that the PRA represents between the President's

12     right to control the creation, management, and disposal of

13     his records, and the right of the public, on the other hand,

14     to eventually own and access those records after he leaves

15     office.

16               So there's no question if the Court had stopped

17     there it would be a much harder question, I think, for this

18     Court, the judicial review.  It would be harder for us

19     because, as I said, the Court used language, and it's

20     language that the defendants have used here, to characterize

21     our claims as somehow seeking the review of the President's

22     general compliance with the PRA.

23               But there was a subsequent case that significantly

24     narrowed the scope of that, and I'm talking about *Armstrong*

25     *2.*

1          *Armstrong 1* went back on remand, and the issue --

2     one of the issues on remand before the district court was

3     whether or not guidelines that the National Security Council

4     and EOP had to manage electronic records were contrary to

5     the PRA, and the district court, looking at the broad

6     language of *Armstrong 1*, said there was no judicial review.

7     And it went up to the D.C. Circuit, *Armstrong 2*, and the

8     Court said, "You're wrong.  There is judicial review."  And

9     there's two things about that decision.

10          You know, the Court, on the one hand, drew a line

11     of demarcation between the creation, management, control,

12     and disposal records issues and guidelines.  And so the

13     question after *Armstrong 2* has been, you know, what are the

14     parameters of this judicial review.  The D.C. Circuit --

15          THE COURT:  So your complaint alleges that the use

16     of these apps --

17          MS. WEISMANN:  Yes.  Our complaint -- I'm sorry.

18          THE COURT:  -- requires or that the use of these

19     apps leads to the destruction or the disposal of records

20     prior to the ability to make a classification decision; and,

21     therefore, these are classification decisions and not

22     disposal decisions.

23          MS. WEISMANN:  They're not disposal decisions

24     within the --

25          THE COURT:  But what if the President had issued a

1     memo saying, you know, "From here forward I don't want to

2     create a paper trail; therefore, you know, all records are

3     to be destroyed within three days"?  Would that be

4     reviewable?

5              MS. WEISMANN:  I believe it would, Your Honor.

6              THE COURT:  Why isn't that a disposal decision?

7              MS. WEISMANN:  Well, first of all --

8              THE COURT:  You may disagree with it.

9              MS. WEISMANN:  Yes, I understand.  If the

10    President said we are going to effectuate that using a

11    communications process like --

12             THE COURT:  But you're saying that it's tacit,

13    that it's a tacit decision to destroy records, right?

14             MS. WEISMANN:  No, it's not even a decision to

15    destroy --

16             THE COURT:  Let's make it explicit.  Let's say he

17    says, "We're going to destroy all existing records."  Is

18    that --

19             MS. WEISMANN:  Well, that might be a harder

20    question, but I have to disagree respectfully with Your

21    Honor that I do not believe this is, in fact, a tacit

22    decision, and that's the whole point of these applications.

23    They don't prevent -- they prevent any consideration

24    whatsoever.  Messages are destroyed without regard to

25    content.  One of them, in fact, as you touch the words on

1  the screen, they appear, and then as you move on, they

2  disappear, and, in fact, the maker of that product touts the

3  fact that they're incapable of being preserved.  They're

4  incapable of being preserved.

5          And I think -- so what we're talk -- we are not

6  talking about a decision that is made to either -- to create

7  a specific presidential record, which is how the *Armstrong 2*

8  court defined "creation."  We're not talking about the day-

9  to-day management of presidential records because they don't

10  even come into existence as presidential records.  And when

11  the Court in *Armstrong 2* talked about disposing, it

12  referenced specifically the statutory scheme in the

13  Presidential Records Act which starts from the premise that

14  a presidential record exists and says, "If a President wants

15  to get rid of that record, here are the hoops that he or she

16  has to go through."  And we're not talking about that

17  either.  We don't start from the existence of a presidential

18  record.  It never comes into existence in the first place.

19          And so there is absolutely no assessment that is

20  made either by the sender or the recipient of whether it's a

21  presidential record or a personal record or something else

22  all together, and that's what we think is the core of the

23  two *Armstrong* decisions read together.  What they precluded

24  judicial review over is essentially the day-to-day

25  management by the President of, as the Court said, creation,

1    management, and disposal decisions.  And we very much take

2    issue with the government's position that this is a disposal

3    issue.

4            But it's not a question of playing with records,

5    Your Honor, because the PRA defines "disposal," and it was

6    that definition that the *Armstrong* court turned to.

7            So because the use of these disappearing apps

8    falls into none of those buckets, there is no judicial

9    preclusion, as *Armstrong 2* recognized, and I'd like to -- as

10   I mentioned, there's been no decision since 1993 from the

11   D.C. Circuit, but there have been several district court

12   cases, and I think one in particular is directly on point

13   and offers the most cogent analysis of *Armstrong*, and that's

14   the *CREW v. Cheney* case.  And as you know, in that case what

15   CREW was challenging was the destruction -- was the vice

16   president's apparent treatment of his records as personal,

17   not vice presidential.

18           Vice presidential records under the PRA are

19   treated exactly like presidential records, and the

20   government there --

21           THE COURT:  That case, like *Armstrong 2*, dealt

22   with review of guidance that distinguished presidential

23   versus --

24           MS. WEISMANN:  Yes, but I think --

25           THE COURT:  -- nonpresidential records.

1          MS. WEISMANN:  That's correct, but critically --

2          THE COURT:  Why aren't those two cases best read

3     as defining the exception to be judicial review of guidance

4     issued by the president?

5          MS. WEISMANN:  Because to get to that, the Court

6     engaged in an analysis that I think extends beyond the

7     specific holding there.

8          In that case the government argued, as it's

9     arguing here, that there's only judicial review under

10    *Armstrong 2* where the plaintiff is bringing a lawsuit under

11    the FOIA or the Federal Records Act and where they're

12    claiming that federal records will be treated as

13    presidential, and the *Cheney* court looked at that and said

14    basically it makes no sense.

15         If you go back to the underlying purpose of the

16    statute, which sets up a whole scheme for dealing with vice

17    presidential records, and if the vice president can evade

18    that scheme all together by simply saying, "No, these are

19    personal," then that would allow the destruction of records

20    that the statute clearly envisioned would be preserved.

21         And so the Court both looked at the purpose of the

22    statute, but also the Court went back to what is the core of

23    *Armstrong 2.*  And as the Court found in the *Cheney* case and

24    also in the *American Historical Association* case, which is

25    another case we cite in our brief, the core of *Armstrong 2*

1    is this finding that there's no review over the creation,

2    management, and disposal decisions.

3         And so I respectfully submit that that remains the

4    core intent of what the D.C. Circuit meant in *Armstrong 2*

5    read together with *Armstrong 1*, and because we submit we are

6    not bringing any of those, the applications that we are

7    challenging cannot qualify as a creation, management, or

8    disposal decision as defined in the statute; that just as

9    there was judicial review in *Cheney*, just as there was

10   judicial review in the *American Historical Association* case,

11   here, too, there is judicial review.

12        And just consider if this Court were to find no

13   judicial review here, then I think the President and the

14   White House would be granted a license to ignore essentially

15   all PRA obligations, and, you know, speaking -- if you

16   confine it to say --

17        THE COURT:  Isn't that a matter for Congress?  I

18   mean, isn't that the balance that the statute struck, that

19   we're going to presume that the President will comply but --

20   and future presidents will comply?

21        MS. WEISMANN:  It's not a matter for Congress

22   here, Your Honor, because the Congress went further in

23   enacting the PRA.  I mean, it set out a whole statutory

24   scheme.

25        So this isn't a question where Congress hasn't

1    acted or filled in the blanks, and it's more appropriate for

2    Congress to do that than this Court.

3              We have a statute that imposes a variety of

4    requirements, many of which we submit -- and we've talked

5    about in our briefs in here -- are nondiscretionary, and so

6    it's not, I think, a question of there's a need to go back

7    to Congress.  I think this Court has everything it needs

8    within the four corners of the Presidential Records Act, and

9    I think any other ruling here will allow the White House,

10   here and in the future, to completely undermine the whole

11   purpose of the Presidential Records Act, which was to create

12   the fullest possible historical record.

13             I did want to also raise one more point on --

14             THE COURT:  There were several sets of

15   correspondence cited in the briefing.

16             MS. WEISMANN:  Yes.  Let me address --

17             THE COURT:  Since the briefing, has there been any

18   indication from the Administration as to whether these apps

19   were in use, still are in use?

20             MS. WEISMANN:  We have not seen anything

21   whatsoever.  I mean, I think it's very interesting -- very

22   remarkable that the government has not joined issue on our

23   claims on the merits.

24             As far as our PRA claims, their sole argument is

25   that this Court lacks judicial review, and today counsel

1    pointed to a February 22nd memo that he said is the guidance

2    because one of our PRA claims is that the government has

3    failed to put in place effective guidance even with

4    knowledge that these applications are being used, and I

5    think the answer to the government's claim is on the face of

6    that guidance itself.

7         And curiously, they didn't put it into the record.

8    They didn't put it in their opening brief.  But in their

9    reply they quote from it, and here's the thing.  That

10   guidance contains the following when it's talking about

11   electronic communications.  It says that if you use them

12   without the approval of the office of the White House

13   counsel, you must preserve them by sending them to your EOP

14   email account via a screen shot or other means.

15        Well, the whole problem with these messaging apps

16   is that you can't do that.  So this can't possibly be

17   effective guidance that addresses --

18        THE COURT:  Well, wouldn't the use of the app,

19   then, violate the guidance?

20        MS. WEISMANN:  I don't think --

21        THE COURT:  If you can't comply with the guidance

22   by using the app, then --

23        MS. WEISMANN:  I think what that means, Your

24   Honor, is that the guidance doesn't go far enough and is not

25   effective, and that's what we've alleged.  Because the core

1    of our guidance claim is that the White House knowingly has

2    allowed the continued use of these messaging apps, and the

3    only guidance they put out was on February 22nd, that

4    they've identified even tangentially.

5         That use has continued past there.  We know from a

6    letter, a congressional letter, that there have been

7    congressional inquiries since then.

8         So Congress and the Oversight Committee have

9    raised concerns about this practice and other practices,

10   like violation of the President's Tweets, and the fact that

11   it appears that White House officials are using multiple

12   private email accounts.  And so these practices continue,

13   and concerns have continued to be raised as recently as

14   October from congressional letters that are at least in the

15   public record, and still the White House can identify only

16   guidance from February 22nd.

17             THE COURT:  Okay.  Thank you very much.

18             MS. WEISMANN:  Thank you, Your Honor.

19             THE COURT:  Mr. Myers, you get the last word.

20             MR. MYERS:  Thank you, Your Honor.

21             Let me start by addressing *Armstrong 2*, which I

22   didn't really get a chance to address when I was up here the

23   first time.  There are a couple of really key things to

24   understand about *Armstrong 2*.

25             First of all, that case did not involve PRA

1    claims.  Following remand from the D.C. Circuit in *Armstrong*

2    *1*, the plaintiffs amended their complaint to abandon their

3    PRA claims.  They asserted claims under FOIA and the Federal

4    Records Act.  And they then challenged guidelines that had

5    the effect, according to the plaintiffs, of treating

6    materials that were properly considered agency records and

7    should have been subject to FOIA as though they were instead

8    subject to the PRA and, therefore, not immediately subject

9    to FOIA.

10           And so what the D.C. Circuit said in *Armstrong 2*

11   is that the Court could review these guidelines for the

12   limited purpose of ensuring that they do not encompass

13   within their operational definition of "presidential

14   records" materials properly subject to FOIA.

15           So there are two key points there.  First is that

16   the animating principle, the limiting purpose identified by

17   the D.C. Circuit, is to ensure that the guidelines are not

18   sweeping in agency records that should be subject to FOIA.

19   It's not about ensuring the Presidential Records Act

20   materials are treated properly.  It's about ensuring that

21   agency records are treated properly.

22           And second, as the D.C. Circuit said in *Armstrong*

23   *2*, it was permitting review of guidelines, not general

24   practices, and many of plaintiffs' claims in this case deal

25   with alleged document management and deletion practices, not

1    guidelines.

2            To the extent that plaintiffs do intend to

3    challenge guidelines, I think Your Honor has it exactly

4    right, that this guideline that we've pointed to is

5    sufficient notwithstanding their allegation because if you

6    can't comply with the guidelines by using those particular

7    apps that plaintiffs have alleged are being used, the upshot

8    would be you obviously can't use those apps because you

9    can't forward it, you know, as the guidelines contemplate.

10           And so for the same reason we would submit that

11   Judge Kollar-Kotelly's decision in *CREW vs. Cheney* both

12   misapplies *Armstrong 2*, but in any case is distinguishable.

13   It misapplies *Armstrong 2* because it deals with materials

14   that actually were alleged to be presidential or, in that

15   case, vice presidential records and not agency records.

16           There's no way to square the holding of *CREW vs.*

17   *Cheney*.  There could be review of guidelines dealing with

18   the potential deletion or categorization as personal of vice

19   presidential records with the statement even in *Armstrong 2*

20   itself that decisions that involve materials that are truly

21   presidential records are immune from judicial review.

22   That's *Armstrong 2* at Page 1293.

23           Again, *CREW vs. Cheney* also dealt with review of

24   guidelines, and by and large this case does not.

25           There is one other point I would make about *CREW*

1   *vs. Cheney*, just to circle back to a discussion you and I

2   were having about mandamus review.

3          Your Honor was asking whether the *Armstrong* cases,

4   you know, should be read to preclude mandamus review as

5   well.  Certainly the government disagrees with a lot of the

6   holding of *CREW vs. Cheney*, but note how that decision is

7   structured.  It considers at the outset whether the

8   *Armstrong* decisions preclude judicial review, and then it

9   gets to the mandamus question.  It doesn't say at the

10  outset, "Well, there are mandamus claims here, so therefore

11  I don't need to worry about *Armstrong*."  It treats it as a

12  two-step inquiry.

13         And we would submit that similarly here Your Honor

14  needs to look at the *Armstrong* decisions and evaluate

15  whether they do, in fact, preclude all judicial review

16  before getting to the question of whether mandamus relief

17  could possibly be appropriate.

18         With respect to Claim Four, a couple of --

19         THE COURT:  Before you leave, with respect to

20  mandamus relief --

21         MR. MYERS:  Yes, Your Honor.

22         THE COURT:  -- Mr. Clarke cited a section of the

23  provision of the statute which imposes a reporting duty, a

24  duty to issue guidance, and it's that section that they've

25  identified as the nondiscretionary ministerial duty that

1     could be the basis for mandamus relief.  Why is that not

2     correct in the government's view?

3                MR. MYERS:  For two reasons, Your Honor.  First,

4     the section to which plaintiffs have pointed says something

5     to the effect of the President should issue records

6     management controls and such other steps as may be

7     necessary.

8                The notion of "such steps as may be necessary"

9     really exudes the notion of discretion and deference to the

10    President.  It doesn't say, you know, "The President shall

11    issue such and such guidance in such and such form on such

12    and such date, and here are the 12 points that it needs to

13    cover."  It just says, you know, "controls and such steps as

14    may be necessary."  So that's Point One.

15               And, again, Point Two is that this guidance

16    already exists.  Other than nitpicking around the edges of

17    what this guidance says, the guidance is already there.

18               If I could move, Your Honor, just briefly to Point

19    Four.  I think plaintiffs' counsel said something really

20    quite extraordinary while addressing the Court, which is

21    that plaintiffs' point may not even be that these executive

22    orders are unlawful.  And so plaintiffs are asking Your

23    Honor to hold, I think, that executive orders that the

24    President is legally permitted to enter somehow violate his

25    duties under the Take Care Clause of the Constitution, and

1   as Your Honor noted, that would be a really extraordinary

2   holding.  It would leave -- it would leave the President

3   without any sort of manageable standard for when he is or is

4   not entitled to enter executive orders if the orders are

5   simultaneous -- you know, can be simultaneously lawful and

6   somehow violate his obligations under the Take Care Clause.

7        Finally, with respect to whether claims under the

8   Take Care Clause are justiciable as a general matter,

9   plaintiffs have pointed to the D.C. Circuit's decision in

10  the *Chamber of Commerce vs. Reich* case.  I don't believe

11  that case involved allegations under the Take Care Clause.

12  I don't believe it was brought against the President of the

13  United States.  Those are two really key distinctions from

14  this case.

15       And finally I point Your Honor to the Supreme

16  Court's decision in *Dalton vs. Spencer*.  One of the key

17  holdings of that case is that the President's failure to

18  comply with a federal statute isn't a violation of the

19  Constitution.  There's a difference between a statutory

20  claim and a constitutional claim.

21       Of course, here plaintiffs aren't even alleging

22  that the President has violated any statutes or that any

23  statutes preclude his actions.  I think that concession is

24  both in their opposition brief and was made in court today.

25  But in any event, a statutory violation doesn't amount to a

1    violation of the Take Care Clause.

2              THE COURT:  Okay.

3              MR. MYERS:  So for those reasons, we would ask you

4    to grant our motion to dismiss.

5              THE COURT:  All right.  Thank you very much.  Very

6    interesting.

7              The Court will take the government's motion under

8    advisement, and we'll issue something in due course, okay?

9              MR. MYERS:  Thank you, Your Honor.

10             THE COURT:  We're adjourned.

11                  (Whereupon the hearing was

12                  concluded at 10:56 a.m.)

13

14           **CERTIFICATE OF OFFICIAL COURT REPORTER**

15

16             I, LISA A. MOREIRA, RDR, CRR, do hereby

17   certify that the above and foregoing constitutes a true and

18   accurate transcript of my stenographic notes and is a full,

19   true and complete transcript of the proceedings to the best

20   of my ability.

21     Dated this 27th day of July, 2018.

22

23                          /s/Lisa A. Moreira, RDR, CRR
                            Official Court Reporter
24                          United States Courthouse
                            Room 6718
25                          333 Constitution Avenue, NW
                            Washington, DC 20001